**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WANDERING DAGO INC.,**

                      **Plaintiff,**

   vs.                                                  1:13-cv-1053
                                                        (MAD/RFT)

**NEW YORK STATE OFFICE OF GENERAL**
**SERVICES; ROANN M. DESTITO; JOSEPH J.**
**RABITO; WILLIAM F. BRUSO, JR.; AARON**
**WALTERS; NEW YORK RACING**
**ASSOCIATION, INC.; CHRISTOPHER K. KAY;**
**STEPHEN TRAVERS; JOHN DOES 1-5; and**
**THE STATE OF NEW YORK,**

                      **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**BOIES, SCHILLER & FLEXNER, LLP**     **GEORGE F. CARPINELLO, ESQ.**
30 South Pearl Street
Albany, New York 12207
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**          **LAURA A. SPRAGUE, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants New York State
Office of General Services, RoAnn M.
Destito, Joseph J. Rabito, William F. Bruso,
Jr., Aaron Walters, and the State of New
York

**GREENBERG TRAURIG LLP**           **HENRY M. GREENBERG, ESQ.**
54 State Street, 6th Floor                     **CYNTHIA E. NEIDL, ESQ.**
Albany, New York 12207                      **STEPHEN M. BUHR, ESQ.**
Attorneys for Defendants New York
Racing Association, Inc., Christopher K.
Kay, and Stephen Travers

**Mae A. D'Agostino, U.S. District Judge:**
        **MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On August 27, 2013, Plaintiff commenced this civil rights action seeking injunctive and declaratory relief and damages arising from the denial by Defendants New York State Office of General Services ("OGS"), RoAnn M. Destito, Joseph J. Rabito, William F. Bruso, Jr., and Aaron Walters of Plaintiff's application to participate as a food vendor in the 2013 Empire State Plaza Summer Outdoor Lunch Program, and the subsequent termination of Plaintiff's status as a vendor at the Saratoga Race Course by Defendants New York State Racing Association ("NYRA"), Christopher K. Kay, and Stephen Travers. *See* Dkt. No. 1. Plaintiff alleges that Defendants took these actions under pressure from, or at the direction of, various New York State officials. *See id.*

Also on August 27, 2013, Plaintiff filed a motion for a preliminary injunction. *See* Dkt. No. 4. On August 28, 2013, the Court issued an Order to Show Cause, directing Defendants to show cause why an order should not be entered preliminarily enjoining Defendants "from taking any action to prevent Plaintiff from participating as a vendor in the Empire State Plaza Outdoor Summer Lunch Program or to prevent Plaintiff from serving as a vendor at the Saratoga Race Course pending final resolution of this action[.]" *See* Dkt. No. 6. On September 19, 2013, after granting the parties several extensions of time, the Court held a hearing on Plaintiff's motion for preliminary injunctive relief. *See* Dkt. No. 37.

Currently before the Court is Plaintiff's motion for preliminary injunctive relief.

## II. BACKGROUND

Plaintiff Wandering Dago Inc. is a New York corporation formed in January 2012 by Andrea Loguidice and Brandon Snooks. Through Wandering Dago Inc., Ms. Loguidice and Mr. Snooks operate a food truck using the "Wandering Dago" brand from which they serve a variety

of foods cooked and prepared on-site in the truck's mobile kitchen. Ms. Loguidice and Mr. Snooks are Italian-Americans and claim that they chose the "Wandering Dago" name as a playful reference to their Italian heritage.

**A.    Empire State Plaza**

In early 2013, Plaintiff became interested in participating in the Empire State Plaza ("ESP") Summer Outdoor Lunch Program. This program is run by OGS and allows food vendors to operate at the Empire State Plaza "on weekdays from late May until early October." *See* Dkt. No. 4-1 at 8.[1] To this end, Plaintiff was in periodic contact by phone and email with multiple individuals at OGS, including Aaron Walters, Madeline Rizzo, and Jason Rumpf, starting in February 2013. *See id.*

On May 3, 2013, Defendant Walters sent Plaintiff an application for the ESP Summer Outdoor Lunch Program. *See id.* The application states that, "[u]nless prior arrangements have been made with OGS, all vendors are expected to complete the entire season." On or about May 6, 2013, Plaintiff spoke with Defendant Walters by telephone to inquire whether its seven-week commitment at the Saratoga Race Course would prevent it from participating in the program. *See* Dkt. No. 35-1 at ¶ 2. Defendant Walters informed Plaintiff that he would speak with his supervisors to determine whether Plaintiff could participate. *See id.* On May 8, 2013, Plaintiff spoke with Jason Rumpf to follow up and was informed that Defendant Walters was working on getting an answer. *See id.* at ¶ 3. According to Ms. Loguidice, on May 10, 2013, she received a voicemail from Defendant Walters indicating that he had "'discussed this with [his] director' and

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

that OGS would approve Wandering Dago's application despite the expected seven-week absence." *See id.* at ¶ 4. Further, Ms. Loguidice claims that, on or about May 13, 2013, Defendant Walters contacted her and advised that Plaintiff would have until Friday, May 17, 2013, to submit its application. *See id.* at ¶ 5.

On May 17, 2013, at approximately 12:16 p.m., Ms. Loguidice faxed the application for Plaintiff to Defendant OGS. *See id.* at ¶ 6. Ms. Loguidice claims that her fax did not include the cover page to the application or the two-page Appendix A to the application packet, entitled Rules for the Empire State Plaza Vendor Participation, because these pages are purely informational and do not request any information from the applicant. *See id.* The fax did include the complete Appendix B to the application packet, entitled 2013 Empire State Plaza Summer Outdoor Lunch Program Application, and all of the requested additional documentation. *See id.*[2]

On May 20, 2013, Ms. Loguidice sent Defendant Walters an email inquiring whether Plaintiff's application had been approved. *See id.* at ¶ 8. Defendant Walters replied that Plaintiff's application had been denied, stating that Defendant OGS "'will be unable to accommodate your application for space in this year's program.'" *See id.* Upon receipt of the email, Ms. Loguidice called Defendant Walters to ask for an explanation of the denial. *See id.* at ¶ 9. Defendant Walters allegedly informed her that Plaintiff's application was the only food vendor application for the 2013 ESP Summer Outdoor Lunch Program that was denied by Defendant OGS, but stated that he could not tell her the reason for the denial and directed her to speak with Defendant OGS's legal department. *See id.*

Thereafter, Ms. Loguidice called Defendant OGS's legal department and spoke to

---

[2] On October 1, 2013, Plaintiff submitted a letter clarifying that "the first page of the actual application was apparently not transmitted with the faxed application." *See* Dkt. No. 41 at 1.

4

Defendant Bruso. *See id.* at ¶ 10. Ms. Loguidice claims that Defendant Bruso gave three reasons for the application's denial: (1) it was late; (2) it was incomplete; and (3) Wandering Dago's business name had been deemed offensive. *See id.* at ¶ 11. Ms. Loguidice claims that, during the telephone call, Defendant Bruso never mentioned Plaintiff's expected absence during the Saratoga Race Track season as a reason for denial of the application. *See id.* at ¶ 12. During the May 20, 2013 call with Defendant Bruso, Ms. Loguidice asked him to provide a formal letter stating the reasons for the application's denial. *See id.* at ¶ 14. Defendant Bruso allegedly refused to provide a written explanation without a formal request under New York's Freedom of Information Law ("FOIL"). *See id.*

On May 29, 2013, Ms. Loguidice sent Defendant Bruso a letter requesting a written explanation for the application's denial, as well as a request for a citation to the public rule that gives Defendant OGS the authority to deny the application on the basis of Plaintiff's name. *See id.* at ¶ 15. On June 25, 2013, Ms. Loguidice submitted a FOIL request asking for various documents related to Plaintiff's Empire State Plaza Food Vendor application. *See id.* at ¶ 16. The following day, Ms. Loguidice received a confirmation from Heather R. Groll, the Director of Defendant OGS's Public Information Office, that the FOIL request had been received and that a determination on the request would be made within twenty (20) business days. *See id.* On July 1, 2013, Ms. Loguidice received a letter from Defendant Bruso stating that "'I conveyed to you by telephone on May 20, 2013, OGS' several reasons for its denial of your firm's application.'" *See id.* at ¶ 17. Further, the letter stated that the denial was made pursuant to the terms of the Food Vendor Application packet, as well as Parts 300 and 301 of Title 9 of the New York Codes, Rules and Regulations. *See id.*

On July 22, 2013, Ms. Groll was quoted in an article on the website "All Over Albany"

5

saying "'[a]mong other reasons, it was determined that [Wandering Dago's] application was not appropriate because the name of the business was found to be an offensive ethnic slur by any standard.'" *See id.* at ¶ 18. On July 25, 2013, Ms. Loguidice received a letter from Ms. Groll indicating that, "'[d]ue to the extensive research involved in compiling and reviewing records responsive to your request, the determination deadline will be extended by 20 business days' to August 22, 2013." *See id.* at ¶ 19. That same day, Ms. Loguidice sent Ms. Groll a letter requesting that, in light of the deadline extension, the FOIL request be amended to include "'[a]ny and all notes, memorandums, documented conversations, electronic mailings, recorded telephone conversations, telephone records and all other communications by and between employees of the New York State government regarding the denial of the Wandering Dago Food Truck Empire State Plaza Food Vendor application.'" *See id.* at ¶ 20. The deadline for responding to Ms. Loguidice's FOIL request was later extended an additional twenty (20) business days to September 20, 2013. *See id.* at ¶ 21.

**B.   Saratoga Race Course**

On January 28, 2013, Plaintiff began talks with Drew Revella of Centerplate to discuss the possibility of Plaintiff being a vendor for the 2013 track season. After negotiations, Plaintiff eventually reached an agreement with Centerplate to participate as a vendor at the Saratoga Race Course during the seven-week track season, in exchange for twenty-five percent of its gross food and beverage sales and a five percent donation to a racing-related charity. Plaintiff was listed in promotional materials produced by Defendant NYRA and Centerplate as a vendor for the 2013 race track season. On or about July 18, 2013, Centerplate issued a press release listing Wandering Dago as "'one of the country's top barbecue fusion trucks.'" Ms. Loguidice claims that

6

Plaintiff was offered and turned down numerous business opportunities, including both private catering events and public festivals, because they conflicted with its commitment at the Saratoga Race Course. *See* Dkt. No. 35-1 at ¶¶ 29, 31-33.

In preparation for the volume of business expected during its seven-week engagement at the Saratoga Race Course, Plaintiff purchased a substantial amount of new cooking equipment, including a six-foot barbeque smoker, a stainless steel prep table, and a deep fryer. Plaintiff also hired five employees to work during the track season and obtained the necessary workers compensation insurance. On July 16, 2013, Plaintiff brought its truck, smoker and supplies to the Saratoga Race Course to begin setting up in advance of the start of the track season on July 19, 2013. Ms. Loguidice and Mr. Snooks spent three days delivering and setting up Plaintiff's equipment in preparation for opening day. Due to an unexpected problem with propane delivery, however, Ms. Loguidice and Mr. Snooks were unable to cook and Plaintiff was not open for business on opening day.

At or about 10:00 p.m. on the evening of July 19, 2013, Mr. Snooks received a telephone call from Defendant Travers, NYRA's Vice President of Hospitality, Guest Services and Group Sales, instructing her to remove their truck and equipment from the Saratoga Race Course immediately. *See* Dkt. No. 35-2 at ¶ 15. Defendant Travers allegedly stated that this decision had been made because a state official complained about Plaintiff's name. *See id.* Mr. Snooks alleges that he pleaded with Defendant Travers to be allowed to stay, offering to cover up Plaintiff's name everywhere it appeared on the truck and equipment. *See id.* at ¶ 16. Mr. Snooks claims that Defendant Travers refused the offer and stated that his "'hands are tied,' because NYRA had been contacted by a high ranking state official." *See id.* at ¶ 17. After Mr. Snooks asked whether there were any other options that would allow Plaintiff to remain at the track, Defendant Travers

7

insisted that the truck must be removed, but suggested that Plaintiff could operate out of a tent under another business name. *See id.* at ¶ 18. Defendant Travers allegedly indicated that this would involve more than simply putting up a sign with a different name; rather, Plaintiff would have to be licensed to do business under the new name and that all of its permits and paperwork would have to be in order under the new name. *See id.* at ¶¶ 19-20. Plaintiff claims that these requirements made it functionally impossible for it to operate out of a tent. *See id.* at ¶ 21.

On the morning of July 20, 2013, Mr. Snooks called Defendant Travers to request something in writing describing the reason Plaintiff was being expelled from the track. *See id.* at ¶ 22. As they were preparing to leave the track with their equipment, Mr. Snooks and Ms. Loguidice were met by Defendant Travers and Drew Revella. *See id.* at ¶ 24. Mr. Revella presented them with a letter stating the purported reason for termination: "'[W]e have reached out to you with concern for your business name "Wandering Dago".  We have received numerous complaints about the Dago part being offensive and think it is in our fans [sic] best interest to remove your truck from the track.'" *See id.* The letter also indicated that they would not be charged for the food and propane ordered through Centerplate. *See id.* at ¶ 25. Further, Defendant Travers informed Mr. Snooks that Defendant NYRA would reimburse them $900, which Mr. Snooks claims would cover approximately fifty percent of the cost of the new smoker they had purchased to handle the volume of business they anticipated at the Saratoga Race Course. *See id.*

**C.     Plaintiff's motion for preliminary injunctive relief**

In its motion, Plaintiff argues that its commercial speech has been censored solely on the basis of its exercise of its First Amendment rights, "which is a *per se* irreparable injury." *See* Dkt.

8

No. 4-1 at 14 (citations omitted).  Further, Plaintiff argues that Defendants' actions constitute clear violations of the First Amendment and Equal Protection Clause of the Fourteenth Amendment, as well as Article I, sections 8 and 11 of the New York State Constitution.  *See id.*  As such, Plaintiff argues that it is "very likely to succeed on the merits."  *See id.*

As for its Equal Protection cause of action, Plaintiff argues that it was the only applicant for the Empire State Plaza Summer Outdoor Lunch Program whose application was denied by Defendant OGS.  *See id.* at 23.  Further, Plaintiff claims that, "[o]ut of the numerous vendors with whom Centerplate contracted to sell food and beverages at Saratoga Race Course, NYRA singled out Wandering Dago to be expelled from the grounds."  *See id.*

### III. DISCUSSION

**A.   Standard of review**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted).  "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court."  *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'"  *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 (D. Conn. 2005) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).  "'When, as here, the moving party seeks a preliminary injunction that will affect

government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation omitted); *see also Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation omitted).

Moreover, in certain circumstances, an even higher standard applies. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo' – *i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).[3] "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotations omitted).

The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Consonant with this view, the Second Circuit has held that a district court may consider hearsay evidence when deciding whether to grant preliminary injunctive relief. *See Mullins v. City of*

---

[3] As the Second Circuit has noted, "'[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics,' . . . and that in a close case an injunction can be framed in mandatory or prohibitory terms[.]" *Jolly*, 76 F.3d at 473-74 (internal quotations and citation omitted).

10

*New York*, 626 F.3d 47, 52 (2d Cir. 2010). Therefore, the strict standards for affidavits under the Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are not expressly applicable to affidavits in support of preliminary injunctions. *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted). Nevertheless, courts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction. *See* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that while the court "may consider hearsay evidence in a preliminary injunction hearing . . . , a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

  In the Second Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Maryland Cas. Co. v. Realty Advisory Bd. of Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 (2d Cir. 1989)). "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Id.*

  Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its

11

discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

**B.     Irreparable injury**

Plaintiff argues that "Wandering Dago's commercial speech has been censored solely on the basis of its exercise of its First Amendment rights, which is a *per se* irreparable injury." Dkt. No. 4-1 at 14 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003); *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996)).  The State Defendants assert that the alleged injury in this case is distinguishable from situations in which injunctive relief is requested to prevent a continuing deprivation of rights.  *See* Dkt. No. 27 at 7.  The State Defendants claim that the act about which Plaintiff complains occurred more than three months prior to the date on which Plaintiff filed its complaint, and the program in which Plaintiff sought to participate ended in the beginning of October.  *See id.*  The NYRA Defendants argue that since the 2013 track season is now over, and racing will not resume at the Saratoga Race Course until July 2014, the preliminary injunction aspect of Plaintiff's case is now moot.  *See* Dkt. No. 30 at 14 (citing *Knaust v. City of Kingston*, 157 F.3d 86, 88 (2d Cir. 1998)).

"Perhaps the single most important prerequisite for the issuance of a preliminary inunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 34 (2d Cir. 1991) (quotation and other citations omitted).  "Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the

12

issuance of an injunction will be considered." *Rodriguez*, 175 F.3d at 234 (quotation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quotation omitted).

The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (citation omitted). Despite this language, the Second Circuit has recognized that it has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (citation omitted). "On the one hand, we have said that since violations of First Amendment rights are presumed to be irreparable, the allegation of a First Amendment violation satisfies the irreparable injury requirement." *Id.* (citing *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000)). "On the other hand, we have suggested that, even when a complaint alleges First Amendment injuries, irreparable harm must still be shown — rather than simply presumed — by establishing an actual chilling effect." *Id.* (citing *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)).

In *Elrod*, the plaintiffs, employees of the Cook County, Illinois Sheriff's Office, alleged that they were fired or threatened with dismissal for refusing to change their political affiliations, and that this violated their constitutional rights secured by the First and Fourteenth Amendments. *See id.* at 351. The Supreme Court affirmed the Seventh Circuit's decision that injunctive relief was appropriate, in that First Amendment interests were either threatened or being impaired at the

13

time relief was sought. *See id.* at 373. The Court noted that, absent injunctive relief, the plaintiffs would be required to change their political affiliation or face termination. *See id.* In so doing, the Court affirmed the Seventh Circuit's finding that the plaintiffs had shown sufficient irreparable injury to fulfill the threshold requirement of a preliminary injunction.

Contrasted with *Elrod* is a case in which the Second Circuit refused to grant a preliminary injunction. *See Savage v. Gorski*, 850 F.2d 64 (2d Cir. 1988). In *Savage*, the plaintiffs, employees of Erie County, New York, brought suit against Gorski, the newly-elected County Executive, alleging that they were discharged from employment because of their political affiliations in violation of the First Amendment. However, the *Savage* plaintiffs did not allege, nor did the court find, that they were being coerced into another political party; they claimed only that they were associated with an administration with whose philosophy and beliefs the County Executive disagreed. *Id.* at 67. The district court granted the *Savage* plaintiffs' motion for preliminary injunction, finding, *inter alia*, that the employees' political affiliation "was a 'substantial' or 'motivating' factor for their discharge." *Id.* The Second Circuit, in reversing the district court, stated that

> [t]he precise question thus becomes whether appellees' discharge pending the outcome of their case before the district court would have a chilling effect on appellees' First Amendment rights sufficient to constitute irreparable harm. Since the source of the "chill" is the permanent loss of appellees' jobs, retaining those positions pending resolution of the case will do nothing to abate that effect.

*Savage*, 850 F.2d at 67-68. The court went on to reiterate what it had stated in another case wherein it denied a preliminary injunction on similar grounds:

> "[W]e fail to understand how a chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech . . . stems not from the interim discharge but from the threat of

14

> permanent discharge, which is not vitiated by an interim injunction.
>
> Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief."

*Id.* at 68 (quoting *American Postal Workers Union v. United States Postal Service*, 766 F.2d 715, 722 (2d Cir. 1985), *cert. denied*, 475 U.S. 1046, 106 S. Ct. 1262, 89 L. Ed. 2d 572 (1986)).

The Court finds the Second Circuit's decisions in *Savage* and *American Postal Workers Union* to be persuasive. As courts in the Second Circuit have noted, "while the mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm, *KM Enterprises, Inc. v. McDonald*, No. 11 Civ. 5098, 2012 WL 540955, at *3 (E.D.N.Y. Feb. 16, 2012) . . . , where the constitutional deprivation is convincingly shown *and that violation carries noncompensable damages*, a finding of irreparable harm is warranted. *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010)." *Smith v. Fredrico*, No. 12-cv-4408, 2013 WL 122954, *6 (E.D.N.Y. Jan. 8, 2013) (emphasis in original). "'In other words, the Plaintiff must still convincingly show that a violation carries noncompensable damages in addition to monetary damages.'" *Smith*, 2013 WL 122954, at *6 (quotation omitted); *see also Savage*, 850 F.2d at 67. In *Savage*, in denying the motion for a preliminary injunction, the Second Circuit relied on, among other things, the fact that because "reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury [wa]s plainly reparable." *Savage*, 850 F.2d at 68; *see also Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction").

"In short, it appears that the cases in which courts have found irreparable injury by virtue of a constitutional deprivation alone have done so, with certain exceptions, where the protected

15

right has been personal and the violation non-compensable. Accordingly, 'when "personal" constitutional rights are violated and the harm that accompanies the violation is remediable or compensable, the damage is not irreparable.'" *Smith*, 2013 WL 122954, at *7 (citations omitted); *see also Flower Cab Co. v. Petitte*, 685 F.2d 192, 194-95 (7th Cir. 1982) (finding that any damage resulting from a possible due process violation would be compensable through money damages); *Hohe*, 868 F.2d at 73 (holding that, although a violation of First Amendment rights was alleged, the potential damage did not include a chilling effect on First Amendment freedoms and would be fully compensable through restitution or money damages); *ACS Enter., Inc. v. Comcast Cablevision of Philadelphia, L.P.*, 857 F. Supp. 1105, 1110 (E.D. Pa. 1994) (finding that a taking in violation of the Fifth Amendment would not constitute *per se* irreparable harm where monetary damages and injunction would fully remedy the harm).

In the present matter, Plaintiff has been refused permission to be a vendor at both venues, at least in part, because of its name. Plaintiff has not been forced to change its name; it has simply been denied access to the Empire State Plaza Summer Lunch Program and the Saratoga Race Course. Since the source of the "chill" in the present matter is the permanent denial of permission to serve as a vendor at both venues, enjoining Defendants from denying Plaintiff's application on the basis of the offensive nature of its name pending resolution of this case will do nothing to abate that effect. *See Savage*, 850 F.2d at 67-68 (holding that, since "reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury [wa]s plainly reparable").

Moreover, the Court finds that Plaintiff has failed to show irreparable injury in that a preliminary injunction will not abate the alleged "chill," since the Empire State Plaza Summer Outdoor Lunch Program and the Saratoga Race Track season have since ended for the year. *See*

16

*Meadows v. State Univ. of N.Y. at Oswego*, 832 F. Supp. 537, 542 (N.D.N.Y. 1993) (citations omitted).

In *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201 (D. Utah 2004), the plaintiffs alleged that the city defendants violated their First Amendment rights when they prohibited Plaintiff from engaging in expressive activity in a plaza. *See id.* at 1221-22. Finding that the plaintiffs failed to establish irreparable injury, the court first noted that the plaintiffs' "delay belies any irreparable harm to their rights." *Id.* at 1221. Thereafter, the court found that the plaintiffs "have ample alternative sites in the immediate vicinity on which to express their First Amendment rights. The City sidewalks run perpendicular to each end of the Plaza, and thus the issue of whether Plaintiffs can demonstrate on the Plaza is largely academic because the precise location of their protests will not impact their ability to communicate their messages." *Id.* at 1221-22; *see also Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986) (holding that "[t]he First Amendment does not guarantee an optimal setting for speech at all times and places") (citation omitted).

In *Thayer v. City of Worcester*, ___ F. Supp. 2d ___, 2013 WL 5780445 (D. Mass. Oct. 24, 2013), the plaintiffs sought a preliminary injunction against city ordinances restricting aggressive panhandling and prohibiting individuals from standing on traffic medians or islands, except for "lawful" purposes. *Thayer*, 2013 WL 5780445, at *1-*2. The plaintiffs alleged that the ordinances violated their First Amendment rights. After discussing the merits of the challenge, the court found that the plaintiffs would not suffer irreparable harm. *See id.* at *12. The court noted that "[t]hose that would solicit for funds will not suffer lost opportunity as Plaintiffs suggest. Their opportunities are simply proscribed as to time, place, and manner." *Id.*; *see also 308 Highway 35, Inc. v. Borough of Eatontown*, 90 Fed. Appx. 633, 635-36 (3d Cir.

17

2004) (holding that the plaintiff failed to establish that it would suffer irreparable injury as required to support a motion for preliminary injunction in corporation's section 1983 action against the defendant which alleged that the defendant's land use ordinance, to the extent that it prohibited live entertainment generally and entertainment in the form of nude and semi-nude dancers, violated the First Amendment, where it was unclear whether there were alternative avenues available for the operation of a sexually oriented business).

In the present matter, in both their papers in support of the motion and at the hearing, it was made clear that Plaintiff has continued to operate under the name Wandering Dago and continues to service various locations throughout the Capital District. *See* Dkt. No. 38. Moreover, as part of its supplemental declaration in support of its motion for preliminary injunctive relief, Plaintiff submitted a permit issued by Albany County that entitled it to "operate a mobile food service establishment" under the name "Wandering Dago" at "various locations in Albany County[.]" *See* Dkt. No. 41-2 at 9. Plaintiff has clearly availed itself of these additional opportunities, and thereby continued to convey their message, whatever it may be. *See Thayer*, 2013 WL 5780445, at *12; *see also Utah Gospel Mission*, 316 F. Supp. 2d at 1221-22.

Finally, particularly relevant to the State Defendants is the fact that Plaintiff waited over three (3) months to file this action and seek injunctive relief. In the complaint, Plaintiff alleges that its application was denied on May 20, 2013 by Defendant OGS, but the complaint was not filed until August 27, 2013. At the hearing on the preliminary injunction, Plaintiff's counsel, Mr. Carpinello, explained that the delay in filing was partly because Ms. Loguidice and Mr. Snooks are of limited means and they spoke with several different attorneys before speaking to Mr. Carpinello who agreed to take their case. *See* Dkt. No. 38 at 13-15. In Ms. Loguidice's affidavit, she explains that she first attempted to secure legal representation on July 23, 2013. *See* Dkt. No.

35-1 at ¶ 31.[4]  Plaintiff's three-month delay in filing this action and seeking injunctive relief weighs heavily against a finding of irreparable harm.  *See Life Technologies Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325, 2011 WL 1419612, *8 (S.D.N.Y. Apr. 11, 2011) (citing cases); *Utah Gospel Mission*, 316 F. Supp. 2d at 1221; *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (noting that "courts typically decline to grant preliminary injunctions in the fact of unexplained delays of more than two months"); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (noting that the Second Circuit has "found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction") (citation omitted).  Although courts have excused delays of longer duration, in those cases the parties were typically engaged in discussions in an attempt to settle the matter without the need of litigation, and then promptly filed suit upon the unsuccessful resolution of the settlement discussions.  *See Life Technologies Corp.*, 2011 WL 1419612, at *7-*8 (discussing cases in which the delay was caused by the parties' attempts at reaching a settlement without the need for litigation).

Based on the foregoing, the Court denies Plaintiff's motion for preliminary injunctive relief.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

---

[4] The Court notes that, on May 29, 2013, Ms. Loguidice sent Defendant Bruso a letter in which she stated the following: "Please be advised that Wandering Dago, Inc. has retained The Law Offices of Andrea D. Loguidice, P.C. in connection with the denial of their Food Vendor application for the Empire State Plaza 2013 Summer Outdoor Lunch Program." *See* Dkt. No. 29 at 26.

**ORDERS** that Plaintiff's motion for a preliminary injunction is **DENIED**;[5] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 8, 2013
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[5] Although the Court normally disposes of pending motions by the order in which they are received, in light of the nature of this action and Plaintiff's expressed concerns, the Court will immediately begin review of the pending motions to dismiss and any subsequently filed motions.