**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WANDERING DAGO INC.,**

                                    **Plaintiff,**

        **vs.**                                            **1:13-cv-1053**
                                                           **(MAD/RFT)**
**NEW YORK STATE OFFICE OF GENERAL**
**SERVICES; ROANN M. DESTITO; JOSEPH J.**
**RABITO; WILLIAM F. BRUSO, JR.; AARON**
**WALTERS; NEW YORK RACING**
**ASSOCIATION, INC.; CHRISTOPHER K. KAY;**
**STEPHEN TRAVERS; JOHN DOES 1-5; and**
**THE STATE OF NEW YORK,**

                                    **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**BOIES, SCHILLER & FLEXNER, LLP**        **GEORGE F. CARPINELLO, ESQ.**
30 South Pearl Street
Albany, New York 12207
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                **LAURA A. SPRAGUE, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants New York State
Office of General Services, RoAnn M.
Destito, Joseph J. Rabito, William F. Bruso,
Jr., Aaron Walters, and the State of New
York

**GREENBERG TRAURIG LLP**                 **HENRY M. GREENBERG, ESQ.**
54 State Street, 6th Floor                **CYNTHIA E. NEIDL, ESQ.**
Albany, New York 12207                    **STEPHEN M. BUHR, ESQ.**
Attorneys for Defendants New York
Racing Association, Inc., Christopher K.
Kay, and Stephen Travers

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

What's in a name?  To Andrea Loguidice and Brandon Snooks, the owners of Wandering Dago Inc. who wish to operate their food truck at the Empire State Plaza and the Saratoga Race Course, everything is in the name.  On August 27, 2013, Plaintiff commenced this civil rights action seeking injunctive and declaratory relief and damages arising from the denial by Defendants New York State Office of General Services ("OGS"), RoAnn M. Destito, Joseph J. Rabito, William F. Bruso, Jr., and Aaron Walters of Plaintiff's application to participate as a food vendor in the 2013 Empire State Plaza Summer Outdoor Lunch Program, and the subsequent termination of Plaintiff's status as a vendor at the Saratoga Race Course by Defendants New York State Racing Association ("NYRA"), Christopher K. Kay, and Stephen Travers.  *See* Dkt. No. 1.  Plaintiff alleges that Defendants took these actions under pressure from, or at the direction of, various New York State officials.  *See id.*

The issue in this case asks the Court to determine whether Defendants NYRA and OGS have the right to deny a food truck bearing the name "Wandering Dago" the ability to park its food truck with a logo depicting a pig and the words "Wandering Dago" on its property for the purpose of selling food because of the name's perceived offensive nature.



It takes neither complicated legal argument, nor complex

legal research to determine that the word "dago" is highly offensive to many. It simply takes common sense. For certain, the term "dago" is not a playful or accepted word for most Italians. To the contrary, it is hurtful and indeed painful to many. It conjures memories of a time not long ago when Italian Americans were the subject of widespread discrimination.

The issue in this case involves the parking of a truck on property owned and operated by the State of New York. There is no question in the Court's mind that, had this case involved the parking of the truck on purely public property, such as a street, a sidewalk, or a public park, the analysis would be rather simple because the right to free speech in such areas is so fundamental to the very foundation of this nation that the government's right to silence it is subject to the most rigorous of standards. In such traditional public fora, we must accept language that offends our sensibilities, chills our common core, and shocks our conscience. With rare exception, the right to free speech in such traditional public fora, whether commercial or private, is considered a birth right in the United States – a birth right that has been forged by our Constitution and by the lives and deaths of all men and women who have fought to protect this freedom.

As will be discussed, although restrictions on speech in traditional public fora are subjected to the most rigorous standards, such restrictions in the other types of fora identified by the Supreme Court are generally subjected to a less exacting form of review. As such, identifying the relevant fora at issue and each fora's classification are central to the disposition of this case. Thereafter, the Court must determine whether the rules and policies enforced by the various Defendants against Plaintiff can withstand the applicable level of scrutiny.

## II. BACKGROUND

Plaintiff Wandering Dago Inc. ("Plaintiff" or "Wandering Dago") is a New York Corporation. *See* Dkt. No. 1 at ¶ 5. Wandering Dago is operated by Andrea Loguidice and Brandon Snooks, with Ms. Loguidice serving as the corporation's president. *See id.* Through Wandering Dago Inc., Ms. Loguidice and Mr. Snooks operate a food truck using the "Wandering Dago" brand from which they serve a variety of foods cooked and prepared on-site in the truck's mobile kitchen. *See id.* Ms. Loguidice and Mr. Snooks work as the business's co-chefs, with Mr. Snooks also serving as the driver. *See id.* Ms. Loguidice and Mr. Snooks have invested a significant amount of money in the truck and equipment, and Wandering Dago is currently their only source of income. *See id.*

Defendant New York State Office of General Services ("OGS") is an administrative agency of the State of New York. *See id.* at ¶ 6. Defendant OGS is responsible for managing the Empire State Plaza Summer Outdoor Lunch Program. *See id.* Defendant RoAnn M. Desito is the Commissioner of OGS. *See id.* at ¶ 7. Defendant Joseph J. Rabito is the Deputy Commissioner of OGS. *See id.* at ¶ 8. Defendant William F. Bruso, Jr. is an Associate Attorney working for OGS and Defendant Aaron Walters is employed as a Special Events Coordinator for OGS. *See id.* at ¶¶ 9-10.[1]

Defendant New York Racing Association, Inc. ("NYRA") is a New York State non-profit corporation, which holds the exclusive right to operate the Saratoga Race Course. *See id.* at ¶ 11. Defendant Christopher K. Kay is NYRA's Chief Executive Officer and President and

---

[1] These Defendants will be referred to collectively as the "OGS Defendants."

Defendant Stephen Travers it is Vice President of Hospitality, Guest Services & Group Sales. *See id.* at ¶¶ 12-13.[2]

### A.     Empire State Plaza Outdoor Summer Lunch Program

In early 2013, Plaintiff became interested in participating in the 2013 Empire State Plaza Summer Outdoor Lunch Program. *See* Dkt. No. 1 at ¶ 20. This program is run by Defendant OGS and allows food vendors to operate at the Empire State Plaza during specified hours on weekdays from late May until early October. *See id.* Starting in February 2013, Plaintiff was in periodic contact by phone and email with multiple individuals at OGS, including Defendant Walters, Madeline Rizzo, and Jason Rumpf. *See id.* at ¶ 21. Plaintiff inquired on multiple occasions about participating as a summer vendor at the Empire State Plaza and requested an application for the program at least as early as April 11, 2013. *See id.*

On May 3, 2013, Defendant Walters sent Plaintiff the application for the Empire State Plaza Summer Outdoor Lunch Program. *See id.* at ¶ 22. The application deadline was May 10, 2013. *See id.*; *see also* Dkt. No. 1-1. The application states that, "[u]nless prior arrangements have been made with OGS, all vendors are expected to complete the entire season." *See* Dkt. No. 1-1 at 2. On or about May 6, 2013, Plaintiff spoke with Defendant Walters by phone to inquire whether Plaintiff's seven-week commitment at the Saratoga Race Course would prevent it from participating in the program. *See* Dkt. No. 1 at ¶ 23. Defendant Walters told Plaintiff that he would speak with his supervisors to determine whether Plaintiff could participate. *See id.* On or about May 8, 2013, Plaintiff spoke with Jason Rumpf to follow up and was informed that Defendant Walters was working on getting an answer. *See id.* at ¶ 24. Mr. Rumpf told Plaintiff

---

[2] These Defendants will be referred to collectively as the "NYRA Defendants."

that Defendant OGS would be flexible on the deadline for the application because of the delay from their management. *See id.*

On May 10, 2013, at approximately 3:00 p.m., Plaintiff received a voicemail from Defendant Walters indicating that Defendant OGS would approve Plaintiff's application despite the expected seven-week absence. *See id.* at ¶ 25. On or about May 13, 2013, Defendant Walters contacted Plaintiff by phone and advised that Plaintiff would have until Friday, May 17, 2013, to submit its application and apologized for the delay caused by OGS. *See id.* at ¶ 26. On May 17, 2013, at approximately 12:16 p.m., Plaintiff faxed its application to Defendant OGS. *See id.* at ¶ 27. Plaintiff selected the option to participate in the program on Wednesdays and Fridays only and provided credit card authorization for the $1,000 fee required to participate in the program. *See id.*

On May 20, 2013, Plaintiff sent Defendant Walters an email inquiring whether its application had been officially approved. *See id.* at ¶ 28. Shortly thereafter, Plaintiff received an email reply from Defendant Walters denying the application, stating that Defendant OGS "will be unable to accommodate your application for space in this year's program." *See id.*; *see also* Dkt. No. 1-2. Upon receipt, Plaintiff immediately called Defendant Walters to ask for an explanation of the denial. *See* Dkt. No. 1 at ¶ 30. Defendant Walters informed Plaintiff that its application was the only food vendor application for the 2013 Empire State Plaza Summer Lunch Program that was denied by Defendant OGS. *See id.* Defendant Walters also indicated that he could not tell Plaintiff the reason for the denial and directed it to contact OGS's legal department. *See id.*

Thereafter, Plaintiff immediately contacted Defendant OGS's legal department and spoke to Defendant Bruso. *See id.* at ¶ 31. Defendant Bruso gave three reasons for the application's

denial: (1) the application was late; (2) the application was incomplete; and (3) the name Wandering Dago had been deemed offensive. *See id.* at ¶ 32. Plaintiff claims that the first two stated reasons were pretextual. *See id.* at ¶ 33. Plaintiff asked Defendant Bruso to provide a formal letter stating the reasons for the application's denial. *See id.* at ¶ 34. Defendant Bruso refused without a formal request pursuant to New York's Freedom of Information Law ("FOIL"). *See id.*

On May 29, 2013, Plaintiff sent a letter to Defendant Bruso requesting a written explanation for the application's denial, including a citation to the public rule that gives Defendant OGS the authority to deny the application on the basis of Plaintiff's name. *See id.* at ¶ 36. On June 25, 2013, Plaintiff submitted a FOIL request asking for all documents related to Plaintiff's Empire State Plaza Food Vendor application. *See id.* at ¶ 37. The following day, Plaintiff received a confirmation from Heather R. Groll, the Director of OGS's Public Information Office, that the FOIL request had been received and that a determination on the request would be made within twenty (20) business days. *See id.*

On July 1, 2013, Plaintiff received a letter from Defendant Bruso stating, "'I conveyed to you by telephone on May 20, 2013, OGS' several reasons for its denial of your firm's application.'" *See id.* at ¶ 38. The letter stated that the denial was made pursuant to the terms of the Food Vendor Application packet, as well as Parts 300 and 301 of Title 9 of the New York Codes, Rules and Regulations. *See id.*; *see also* Dkt. No. 1-3. At the time the complaint was filed in the present matter, Plaintiff claims that it had not received any further response to its FOIL request. *See id.* at ¶ 39.

Plaintiff claims that the Empire State Plaza is the single most desirable and profitable lunchtime location for mobile food vendors in the Capital District because of the high foot traffic

and large number of people working in close proximity. *See id.* at ¶ 41. Since being denied access to the 2013 Empire State Plaza Summer Outdoor Lunch Program, Wandering Dago has operated during lunchtime at various locations in the Capital District, but none have the volume of foot traffic and potential customers present at the Empire State Plaza. *See id.* at ¶ 42. Plaintiff claims that these locations have less visibility to the public, which leads to fewer private catering jobs and other business opportunities. *See id.*

**B.**     **Saratoga Race Course**

On January 28, 2013, Plaintiff began talks with Drew Revella of Centerplate, a hospitality company that manages food vendors at the Saratoga Race Course. *See* Dkt. No. 1 at ¶ 43. Plaintiff alleges that, upon information and belief, Centerplate's standard commission for vendors at the Saratoga Race Course is thirty-five percent of gross sales. *See id.* at ¶ 44. After extensive negotiations, Plaintiff eventually reached an agreement with Centerplate to participate as a vendor at the Saratoga Race Course during the seven-week 2013 season. *See id.* at ¶ 45. Plaintiff agreed to pay Centerplate twenty-five percent of its gross food and beverage sales and to donate an additional five percent to the Thoroughbred Retirement Foundation, a non-profit charity. *See id.*

Plaintiff was listed in promotional material produced by Defendant NYRA and Centerplate as a vendor for the 2013 season. *See id.* at ¶ 46. On or about July 18, 2013, Centerplate issued a press release listing Plaintiff as "'one of the country's top barbecue fusion trucks.'" *See id.* Defendant NYRA listed Plaintiff as one of its vendors both on its website and in its Saratoga Insider Fan Guide. *See id.* Plaintiff claims that it was offered and turned down numerous business opportunities, including both private catering events and public festivals,

because they conflicted with Plaintiff's commitment at the Saratoga Race Course. *See id.* at ¶ 47.

In preparation for the volume of business anticipated during its seven-week engagement at the Saratoga Race Course, Plaintiff purchased a substantial amount of new cooking equipment, including a six-foot barbeque smoker, a stainless steel prep table, and a deep fryer. *See id.* at ¶ 48. Plaintiff also hired five employees to work during the track season and obtained the necessary workers compensation insurance. *See id.*

On July 16, 2013, three days before opening day, Plaintiff brought its truck, smoker, and supplies to the Saratoga Race Course to begin setting up. *See id.* at ¶ 49. Plaintiff spent three days delivering and setting up its equipment in preparation for opening day. *See id.* Plaintiff arranged for a third party to deliver and install a 100-gallon propane tank for Wandering Dago's smoker, but for unknown reasons, the third party was not permitted to install the tank. *See id.* at ¶ 50. Plaintiff immediately contacted Drew Revella, and he arranged for a different party to deliver propane for the smoker. *See id.* The propane was not installed until the evening of July 18, 2013. *See id.*

As a result of the unexpected problem with the propane delivery, Plaintiff was unable to smoke its meat for the necessary fourteen hours and, therefore, was not open for business on opening day. *See id.* at ¶ 51. After resolving the propane problem, Plaintiff began smoking meat and was fully prepared to begin serving food on the morning of July 20, 2013. *See id.* Plaintiff claims that Drew Revella apologized for the delay and represented in a text message that he would "'get [Plaintiff] another opportunity for the missed day.'" *See id.* at ¶ 52.

At or about 10:00 p.m. on the evening of July 19, 2013, Mr. Snooks and Ms. Loguidice received a call from Defendant Travers instructing them to remove Wandering Dago's truck and

equipment from the Saratoga Race Course immediately. *See id.* at ¶ 53. Defendant Travers

alleged that this decision had been made because a state official complained about Plaintiff's

name. *See id.* at ¶ 54. Plaintiff pleaded with Defendant Travers to be allowed to stay, offering to

cover up its business name everywhere it appeared on its truck and equipment. *See id.* at ¶ 55.

Defendant Travers refused this offer and stated that his "'hand are tied,'" because Defendant

NYRA had been contacted by a high ranking state official. *See id.* at ¶ 56. Defendant Travers

told Plaintiff that the truck would be towed if it was not removed before 10:00 a.m. the following

morning. *See id.* Plaintiff alleges that, "[u]pon information and belief, Travers was acting under

the direction of Defendant Christopher K. Kay, other unknown NYRA officials, and officials of

the State of New York." *See id.* at ¶ 57.

In order to quickly remove the equipment that had been set up over a three-day period,

Plaintiff was forced to rent a moving trailer, thereby incurring additional expense. *See id.* at ¶

58. On the morning of July 20, 2013, as Plaintiff was preparing to leave the Saratoga Race

Course, Plaintiff was met by Defendant Travers and Drew Revella. *See id.* at ¶ 59. Mr. Revella

presented Plaintiff with a letter stating the purported reason for termination: "[W]e have reached

out to you with concern for your business name 'Wandering Dago'. We have received numerous

complaints about the Dago part being offensive and think it is in our fans [sic] best interest to

remove your truck from the track." *See id.*; *see also* Dkt. No. 1-4.

Plaintiff claims that, after being expelled from the Saratoga Race Course, it attempted to

book as many public and private events as possible to fill its schedule, but most events, including

events that Plaintiff had previously turned down because of its commitment at the race track,

were no longer available. *See* Dkt. No. 1 at ¶ 61. Plaintiff alleges that it has also attempted to

fill its lunchtime schedule, but due to the limited number of locations in the Capital District,

Plaintiff typically works no more than three lunchtime shifts per week. *See id.* Moreover, Plaintiff claims that the business that it does during weekday lunch times and occasional booked events "does not come anywhere close to the amount of business it would have done serving the Saratoga Race Course crowd six days a week for the duration of the seven-week track season." *See id.*

**C.    Plaintiff's claims and Defendants' arguments in favor of dismissal**

On August 27, 2013, Plaintiff commenced this action for damages, an injunction and declaratory relief relating to the denial of its application to participate as a food vendor in the 2013 Empire State Plaza Summer Outdoor Lunch Program and the subsequent termination of its status as a vendor at the Saratoga Race Course. *See* Dkt. No. 1 at ¶ 1. Plaintiff contends that Defendants' actions were in violation of the First Amendment of the United States Constitution and the Free Speech Clause of the New York State Constitution (Article I, § 8), as well as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Equal Protection Clause of the New York State Constitution (Article I, § 11). *See id.* at ¶ 2. Additionally, Plaintiff claims that its expulsion from the Saratoga Race Course constituted a tortious interference with Plaintiff's contract with Centerplate, Inc. ("Centerplate"), the hospitality company in charge of overseeing vendors at the Saratoga Race Course or, in the alternative, a tortious interference with Plaintiff's business relationship with Centerplate. *See id.* at ¶ 3.

In the OGS Defendants' motion to dismiss, they first argue that Plaintiff has failed to state a claim for a First Amendment violation. *See* Dkt. No. 28-1 at 12-18.[3] The OGS Defendants claim that, since they were acting in their proprietary capacity and because the Empire State Plaza is a non-public forum, or at best a limited public forum, restrictions on speech are examined only for reasonableness. *See id.* at 11-14. Further, the OGS Defendants argue that restrictions on ethnic or racial slurs in a non-public forum are deemed "viewpoint neutral," which are permissible. *See id.* at 16. Finally, the OGS Defendants assert that "a ruling that the State may not deny an application to a vendor who is, by its name and menu items, derogating various ethnic or national origins . . . would be contrary to public policy and the State's obligation to prevent the establishment of a hostile work environment." *See id.* at 17. Such a ruling, according to the OGS Defendants, would subject the State's workers to such a hostile work environment. *See id.* at 17-18.

Next, the OGS Defendants argue that "Plaintiff's Equal Protection claim sounds in selective enforcement, and rests entirely on the premise that its application was denied solely to inhibit the [P]laintiff's First Amendment rights. As the [P]laintiff has failed to demonstrate any impropriety in the State's regulation of offensive speech on the Empire State Plaza during peak working hours and visitation hours, however, plaintiff's Equal Protection claim must also fail." *See id.* at 18. Thereafter, the OGS Defendants argue that Plaintiff has failed to state a cause of action against them for its removal from the Saratoga Race Course. *See id.* at 19. They assert that the allegation that Defendant "Travers 'alleged that his decision had been made because a state official complained about Plaintiff's name'" is insufficient to state a plausible cause of

---

[3] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

action. *See id.* Next, the OGS Defendants claim that Defendants New York State and OGS are immune from suit pursuant to the Eleventh Amendment. *See id.* at 20-21. Finally, the OGS Defendants argue that, since they are entitled to dismissal of all federal claims, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. *See id.* at 21-22.

The NYRA Defendants argue that Plaintiff should be treated as a public employee or government contractor for purposes of its First Amendment claim. *See* Dkt. No. 36-2 at 17-18. Since a government contractor's speech is only protected if spoken on matters of public concern, the NYRA Defendants contend that the claim must be dismissed. *See id.* at 18-21. Further, the NYRA Defendants argue that the Saratoga Race Course is a nonpublic forum and that Plaintiff's removal therefrom was reasonable and viewpoint neutral. *See id.* at 21-29. Moreover, they claim that Defendant NYRA was acting in a proprietary capacity when it prohibited Plaintiff's use of an ethnic and racial slur on its property, which was reasonably related to maintaining the Saratoga Race Course for the purposes to which it was dedicated. *See id.* at 28.

As to the Equal Protection claim, the NYRA Defendants contend that it must fail because the claim is derivative of Plaintiff's First Amendment claim. *See id.* at 30. Second, they argue that Plaintiff failed to allege that it was treated differently from others who were similarly situated. *See id.*

Next, the NYRA Defendants argue that, since the state constitutional claims are subject to the same analysis as the federal constitutional claim, they must be dismissed as well. *See id.* at 31. Finally, the NYRA Defendants assert that Plaintiff's tortious interference claims must be dismissed because Plaintiff premised the claim on the theory that the NYRA Defendants' rendered performance of the contract impossible and because Plaintiff cannot establish that the

NYRA Defendants acted for a wrongful purpose or used dishonest, unfair, or improper means. *See id.* at 32-33.

## III. DISCUSSION

### A.      Motion to dismiss standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

**B.     42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**C.     First Amendment jurisprudence**

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). It is "common ground" that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981). A violation occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *See Frisby v. Schultz*, 487 U.S. 474, 479 (1988).

The Supreme Court has set forth a three-step, forum-based test for determining whether a state actor violated a plaintiff's First Amendment right to free speech. *See Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797 (1985). Pursuant to this test, the court must determine "(1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard." *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005) (citing *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)).[4]

---

[4] In support of its motion for a preliminary injunction, Plaintiff cited to, among others, *Bad Frog Brewery, Inc. v. N.Y.S. Liquor Auth.*, 134 F.3d 87 (2d Cir. 1998), in support of their argument that Plaintiff has engaged in commercial speech and that this case should be analyzed pursuant to the test for commercial speech established in *Central Hudson Gas & Electric Corp. v. Public Service Comm.*, 447 U.S. 557 (1980). *See* Dkt. No. 4-1 at 15. Although Plaintiff's position on this point appears to have changed, the Court feels compelled to explain why it has decided to treat this case as a public forum case as opposed to a commercial speech case.

(continued...)

### *1. Protected speech*

The First Amendment's protection of free speech, made applicable to the states through the Fourteenth Amendment, extends to a broad range of speech and expressive conduct. *See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). Speech on public issues and political matters lies at the heart of protected speech. *See Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. Syracuse*, 670 F.3d 127 (2d Cir. 2012).

Defendants argue that Plaintiff has not engaged in speech protected by the First Amendment. The Court disagrees. Plaintiff's corporate name, *i.e.* Wandering Dago, is a form of expressive speech protected under the First Amendment. *See Kalman v. Cortes*, 723 F. Supp. 2d

---

[4](...continued)

At issue in *Bad Frog Brewery* was the New York State Liquor Authority's decision to preclude the plaintiff from selling its beer in the State because, in its view, the labels were vulgar and profane. *See Bad Frog Brewery*, 134 F.3d at 98. Applying *Central Hudson*, the Second Circuit determined that the State had substantial interest in regulating the speech, but that it did not show "that its denial of Bad Frog's application directly and materially advance[d] . . . its state interests" and that the prohibition was more extensive than necessary to advance the State's interests. *Id.* at 100–01. Although *Bad Frog Brewery* involved a somewhat similar set of facts to the present matter, the Court finds that key distinctions exist which make the test set forth in *Central Hudson* particularly inappropriate.

*Bad Frog Brewery* involved the State denying the plaintiff a license for permission to sell its beer anywhere in the State, not simply on property owned by the State. Here, however, Plaintiff asserts that the Defendants violated the First Amendment when they prohibited Plaintiff from conducting its business on property owned by the State, during events sponsored by the State. As the Supreme Court has repeatedly held, "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 598 (2008) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961)). Although this case is somewhat unique, the Court finds that it is most appropriately analyzed pursuant to the forum analysis as set forth below and not as a commercial speech case as Plaintiff's initially argued.

766, 798-99 (E.D. Pa. 2010) (finding that a corporation's name is expressive speech protected under the First Amendment).

### 2. *Forum analysis and application of the applicable standard*

The appropriate level of judicial scrutiny depends on the nature of the forum subject to the regulation. "'Traditional public fora'" are places such as "streets and parks which 'have immemorially been held in trust for the use of the public, and . . . have [generally] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)). "Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, *e.g.* converting a public park to an office building." *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004). "Content-based restrictions on speech in traditional public fora are subject to strict scrutiny." *Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (citations omitted). "The government may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Id.* (quotation omitted); *see also Make the Road By Walking, Inc.*, 378 F.3d at 142 (citations omitted).

The second category, the designated public forum, "'refers to government property which, although not a traditional public forum, has been "intentionally opened up for that purpose."'" *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 507 (S.D.N.Y. 2013) (quotations and other citation

omitted); *see also  Perry Educ. Ass'n*, 460 U.S. at 46.  "'Because the government, as property owner, has opened up a designated public forum to the same breadth of expressive speech as found in traditional public forums, the same standards apply: Any content-based restrictions on speech must survive strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest, and content-neutral time, place, and manner restrictions are permissible only if they are narrowly tailored and leave open other avenues for expression.'" *Hershey*, 938 F. Supp. 2d at 507 (quotation and other citations omitted); *see also Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 526-27 (2d Cir. 2009) (citation omitted).  Although the government may decide to close a designated public forum, "so long as a forum remains public, government regulation of speech within it 'is subject to the same limitations as that governing a traditional public forum.'"  *Make the Road by Walking, Inc.*, 378 F.3d at 143 (quotation omitted).

The third category, the limited public forum, is often analyzed as a subset of the designated public forum and as a nonpublic forum opened up for specific purposes.  *See  Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir. 2010) ("[T]he law of [the Second Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects" (internal quotation marks and citations omitted)); *see also N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 & n.2 (2d Cir. 1998) (quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)).  A limited public forum is created "'where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'"  *Make the Road By Walking, Inc.*, 378 F.3d at 143 (quotations omitted).  "Common examples of limited public fora include 'state university meeting facilities opened for student

groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations.'" *Hershey*, 938 F. Supp. 2d at 507 (quotations omitted).

"In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Hotel Emps.*, 311 F.3d at 545 (citations omitted). "'Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" *Id.* at 545-46 (quotation omitted). If the expressive activity does not fall within the limited category for which the forum has been opened, however, restrictions on speech need only be reasonable and viewpoint neutral. *See id.* at 546 (citations omitted).

The final category, the nonpublic forum, consists of property that "the government has not opened for expressive activity by members of the public." *Hotel Emps.*, 311 F.3d at 546 (citation omitted). Examples of nonpublic fora include airport terminals, government-owned professional sports stadiums, military bases and restricted access military stores, and jailhouse grounds. *See id.* (collecting cases). Restrictions on speech in such fora must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 800; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality").

The public forum doctrine raises particular challenges in a case such as this, where the plaintiff seeks to classify as a "traditional public forum" a public place that does not easily meet the historic definition of such a forum. In view of such challenges, the Second Circuit does not view the "tripartite approach as a straightjacket, but instead as a useful means of analyzing the

parties' competing interests, informed by such factors as the location, use, and purpose of the property in question." *Hotel Emps.*, 311 F.3d at 546 (citation omitted). "Indeed, while it has been observed that traditional public fora are not expressly designed to accommodate all forms of speech, . . . common to those types of properties deemed to be traditional public fora is that 'the open access and viewpoint neutrality commanded by the [public forum] doctrine is compatible with the intended purpose of the property.'" *Id.* (internal citation and other quotation omitted).

"In distinguishing between a public and non-public forum, we examine the forum's physical characteristics and the context of the property's use, including its location and purpose." *Hotel Emps.*, 311 F.3d at 547 (citing *United States v. Kokinda*, 497 U.S. 720, 727-29, 110 S. Ct. 3115 (1990); *United States v. Grace*, 461 U.S. 171, 179-80, 103 S. Ct. 1702 (1983)). "'The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.'" *Id.* (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 160 (3d Cir. 1982)). "Also relevant is the government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations." *Id.* (citations omitted); *see also Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (holding that the government's intent can be inferred from "policy and past practice, as well as the nature of the property and its compatibility with expressive activity"); *N.J. Sports*, 691 F.2d at 160-61 ("Public forum status is not appropriate for a locale where the full exercise of First Amendment rights would be inconsistent with the special interests of a government in overseeing the use of its property" (internal quotation marks omitted)). "Finally, we consider whether the property in question 'is part of a class of property which by history or tradition has been open and used for expressive

activity.'" *Hotel Emps.*, 311 F.3d at 547 (citing *Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir. 1999); *Greer v. Spock*, 424 U.S. 828, 838, 96 S. Ct. 1211 (1976); *Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 943 (9th Cir. 2001), *cert. denied*, 535 U.S. 905, 122 S. Ct. 1204, 152 L. Ed. 2d 142 (2002)).

### a. The OGS Defendants' motion to dismiss

The OGS Defendants argue that the outdoor space at the Empire State Plaza is a nonpublic forum for purposes of First Amendment analysis. *See* Dkt. No. 28-1 at 13. They state that "[t]he forum is public in the traditional sense, in that the public is permitted to freely visit at certain times, but this is not the characteristic upon which classification as a 'public forum' is based in the First Amendment context." *See id.* Rather, the OGS Defendants contend that the dispositive question is whether the government owner has "'abandoned any claim that it has special interests' in regulating the speech permitted in the forum." *See id.* (quoting *Flower v. United States*, 407 U.S. 197, 198 (1972)). Plaintiff, however, argues that the Empire State Plaza "is the quintessential traditional public forum." *See* Dkt. No. 40 at 6. Alternatively, Plaintiff argues that "[e]ven if this Court were to decide that the Empire State Plaza is not a quintessential public forum because of its physical characteristics, it will be shown to be a designated public forum by virtue of the fact that (1) the State has treated it as such, allowing all forms of speech; and (2) the OGS Defendants adopted no clearly articulated guidelines delineating the types of speech allowed on the Plaza." *See id.*

The Second Circuit's decision in *Hotel Employees*, finding that the Lincoln Center Plaza was not a traditional public forum, serves as an instructive counterpoint to the instant case. In *Hotel Employees*, the Second Circuit found that Lincoln Center Plaza was not a traditional public

forum on the basis that it had not been dedicated as a city park and that its location and purpose were not similar to the types of properties that have historically been defined as traditional public fora.  *See Hotel Emps.*, 311 F.3d at 550.  The court reasoned that Lincoln Center Plaza's location and purpose were to serve as the centerpiece for and extension of the Lincoln Center performing arts complex and was therefore distinguishable from the "typical recreational park or town square."  *Id.*  The Second Circuit concluded that "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses, or in which the government's ability to restrict speech has historically been circumscribed."  *Id.* at 551.  Ultimately, the Second Circuit held that Lincoln Center Plaza "has not historically been open to all types of expression, and while it may share some of the same physical characteristics as sidewalks or parks, its primary function and purpose, together with its historical use, distinguish the Plaza from those types of properties that have heretofore been deemed traditional public fora."  *Id.* at 551 n.12.

Like the Plaza at issue in *Hotel Employees*, the Empire State Plaza has not been designated as a park by the State of New York.  *See* 9 N.Y.C.R.R. § 384.10 (listing all state owned parks, parkways, recreation facilities and historic sites in the Saratoga-Capital District Region).  Although the Second Circuit did not rule on whether such a designation would automatically render such an area a traditional public forum, it found that certain differences from the Lincoln Center Plaza and a traditional park were relevant to its inquiry in finding that the parcel at issue was physically distinct from those that have been determined to be traditional public fora.

The Empire State Plaza is a seventy (70) acre complex of governmental buildings in downtown Albany.  It houses 11,000 New York State employees in a complex of ten buildings.

*See* N.Y.S. Office of Gen. Servs., http://www.ogs.ny.gov/ESP/ (last visited January 9, 2013).

"The Plaza offers a world-class modern art collection, New York State's Museum, Library and Archives, a distinctive performing arts center, convention center and more." *Id.* Similar to the Lincoln Center Plaza, the Empire State Plaza connects with walkways leading to surrounding streets and it does not form part of Albany's transportation grid in the way that traditional streets and sidewalks do. *See Hotel Emps.*, 311 F.3d at 550. Further, the ability of pedestrians to cross the Empire State Plaza as a short-cut between surrounding streets is merely an incidental feature of its principal function as the entrance for the buildings that surround the complex. *See id.* The buildings are set around a row of three reflecting pools. On the west side are the four Agency towers. On the east side is the performing arts center (the "Egg") and the Erastus Corning Tower, which has an observation deck on the forty-second floor. On the south end of the Plaza is the Cultural Education center, containing the New York State Museum, Library and Archives. The New York State Capital is on the north end of the Plaza. Finally, the Plaza houses numerous memorials of various types, including memorials dedicated to World War II, the Korean War, the Vietnam War, as well as memorials to women veterans, police, firefighters, and crime victims.

Although many of the physical attributes of the Empire State Plaza are similar to those possessed by traditional public fora, whether the Empire State Plaza is a traditional public forum is not the dispositive inquiry in this case. In defining the relevant forum, the Supreme Court has "focused on the access sought by the speaker." *Cornelius*, 473 U.S. at 801. In its complaint, Plaintiff alleges that the Empire State Plaza Summer Outdoor Lunch Program is a program run by Defendant OGS which allows food vendors to operate at the Empire State Plaza on weekdays from late May until early October. *See* Dkt. No. 1 at ¶ 20. Further, the complaint alleges that

Plaintiff's application to be a vendor at the 2013 Empire State Plaza Summer Outdoor Lunch Program was wrongfully denied in violation of the First Amendment. *See id.* at ¶¶ 29-42, 62-69. According to the rules appended to the application, each vendor "will be assigned a specific location" and vending hours run from 9:00 a.m. to 2:00 p.m. *See* Dkt. No. 1-1 at 3. Accordingly, based on Plaintiff's allegations in the complaint, the Court finds that the relevant forum is not the Empire State Plaza *in toto* as the parties have assumed. Rather, the relevant forum is the more limited Empire State Plaza Summer Lunch Program, which happens to take place within the grounds that comprise the Empire State Plaza.[5] *See Calvary Chapel Church, Inc. v. Broward County, Fla.*, 299 F. Supp. 2d 1295, 1301 (S.D. Fla. 2003) (finding that the "Holiday Fantasy of Lights," an annual event hosted by the county that ran from just before Thanksgiving day to the middle of January, was the relevant forum, not the Tradewind Park in which the event takes place).

The case law makes clear that even when a piece of government property may not be a public forum, channels for public communication – or alternative fora – may well exist within the greater piece of government property. *See Air Line Pilots Ass'n, Int'l v. Department of Aviation*, 45 F.3d 1144, 1151-52 (7th Cir. 1995). For example, in *Cornelius*, the Supreme Court was asked to "decide whether the Federal Government violates the First Amendment when it excludes legal defense and political advocacy organizations from participation in the Combined Federal Campaign (CFC or Campaign), a charity drive aimed at federal employees." *Cornelius*,

---

[5] The Court notes that the OGS Defendants have accepted Plaintiff's proposition that the relevant forum is the Empire State Plaza. *See, e.g.,* Dkt. No. 28-1 at 13-14 (noting that the forum in this case is the "outdoor space at the Empire State Plaza . . ."). The Court, however, is not bound by a defendant's characterization of the relevant forum at issue. *See Cornelius*, 473 U.S. at 801-02 (refusing to define the relevant forum as the federal workplace, but the more limited Combined Federal Campaign to which the petitioner sought access).

473 U.S. at 790. The CFC is an annual charitable fund-raising drive conducted in the federal workplace during working hours largely through the voluntary efforts of federal employees. *See id.* In attempting to define the relevant forum, the petitioner argued that a "First Amendment forum necessarily consists of tangible government property" and that "[b]ecause the only 'property' involved here is the federal workplace, . . . the workplace constitutes the relevant forum." *Id.* at 800-01. In contrast, the respondents argued that forum should be defined in terms of the access sought by the speaker. *See id.* at 801. "Under their view, the particular channel of communication constitutes the forum for First Amendment purposes." *Id.*

Agreeing with the respondents, the Supreme Court held that the relevant forum was the CFC, not the entirety of the federal workplace where the CFC takes place. *See id.* Specifically, the Court found that

> [a]lthough petitioner is correct that as an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. *See, e.g., Greer v. Spock,* [424 U.S. 828 (1976)]. In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property. For example, *Perry Education Assn. v. Perry Local Educators' Assn.,* . . . examined the access sought by the speaker and defined the forum as a school's internal mail system and the teachers' mailboxes, notwithstanding that an "internal mail system" lacks a physical situs. Similarly, in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 300, 94 S. Ct. 2714, 2715, 41 L. Ed. 2d 770 (1974), where petitioners sought to compel the city to permit political advertising on city-owned buses, the Court treated the advertising spaces on the buses as the forum. Here, as in *Perry Education Assn.,* respondents seek access to a particular means of communication. Consistent with the approach taken in prior cases, we find that the CFC, rather than the federal workplace, is the forum. This conclusion does not mean, however, that the Court will ignore the special nature and function

> of the federal workplace in evaluating the limits that may be
> imposed on an organization's right to participate in the CFC.

*Cornelius*, 473 U.S. at 801-02 (citation omitted).

The Supreme Court's holding in *Cornelius* makes clear that Plaintiff is attempting to

define the relevant forum too broadly. If the license at issue was to sell food at the Empire State

Plaza at any time, throughout the entire year, as opposed to a program of a more limited nature,

the Court may reach a different result. However, Plaintiff applied for a license to be a vendor

during the 2013 Empire State Plaza Summer Outdoor Lunch Program. *See* Dkt. No. 1-1 at 2.

The program ran for twenty weeks and vending hours were limited from 9:00 a.m. to 2:00 p.m.

*See id.* at 3. Businesses wishing to participate in the program were required to pay between

$1,000.00 and $1,500.00. *See id.* Finally, the application contained the condition that "[a]ll

vendors are expected to conduct themselves with courtesy and in an orderly manner.

Arguments, harassment, sexual harassment, name-calling, profane language, or fighting are

grounds for revocation of the vendor permit." *See id.* at 4. These facts clearly establish that the

relevant forum is the Empire State Plaza Summer Lunch Program. *See Air Line Pilots Ass'n,*

*Int'l*, 45 F.3d at 1151-52 (holding that where the speaker seeks access to diorama display cases in

an airport, the public forum inquiry focuses on the display cases rather than the airport as a

whole); *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Comm'n*, 797 F.2d 552,

555-56 (8th Cir. 1986) (holding that where the speaker seeks access to advertising space in a

sports arena, the public forum inquiry focuses on the advertising space rather than entire arena),

*cert. denied*, 479 U.S. 986, 107 S. Ct. 576, 93 L. Ed. 2d 579 (1986); *Lebron v. National R.R.*

*Passenger Corp.*, 69 F.3d 650, 655-56 (2d Cir. 1995); *Freedom from Religion Foundation, Inc.*

*v. City of Warren, Mich.*, 873 F. Supp. 2d 850, 860 (E.D. Mich. 2012) (finding that the City's

holiday display housed within a government complex was the relevant forum, not the entire government complex).

Having determined that the relevant forum is the Empire State Plaza Summer Lunch Program, the Court must now determine the type of forum. As noted, although the OGS Defendants did not specifically tailor their arguments to the Empire State Plaza Summer Outdoor Lunch Program, they argue that the Empire State Plaza, as a whole, is a nonpublic forum. *See* Dkt. No. 28-1 at 13. The OGS Defendants claim that the "dispositive question is whether the government owner has 'abandoned any claim that it has special interests' in regulating the speech permitted in the forum.'" *See id.* (quoting *Flower v. United States*, 407 U.S. 197, 198 (1972)). They cite to several provisions of the Public Buildings Law, Executive Law and regulations promulgated by the Commissioner of OGS as evidence that Defendant OGS has not abandoned its right to regulate expressive activity at the Empire State Plaza. *See id.* at 14-15 (citing N.Y. Pub. Buildings Law § 2; N.Y. Exec. Law § 202; 9 N.Y.C.R.R. §§ 300-1.1, 300-3.2, 301.5, 301.6, 301.7). Alternatively, the OGS Defendants argue that the Empire State Plaza is a limited public forum and, therefore, the "reasonableness" test applicable to nonpublic fora is applicable. *See id.* at 15 n.9 (citation omitted).

Plaintiff disputes the OGS Defendants' classification of the Empire State Plaza and argues that it is "the quintessential traditional public forum." *See* Dkt. No. 40 at 6.[6]

---

[6] In its memorandum of law in support of its motion for a preliminary injunction, Plaintiff argued that this is a commercial speech case controlled by *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). *See* Dkt. No. 4-1 at 15-16. In its reply in further support of its motion for a preliminary injunction and in its response to the OGS Defendants' motion to dismiss, Plaintiff now argues that the Empire State Plaza is a traditional public forum. Although there is a commercial aspect to this case, the Court believes that Defendants have correctly treated this claim as involving speech on government property thereby involving the forum analysis discussed above.

Alternatively, Plaintiff claims that even if the Court finds that the Empire State Plaza is not a traditional public forum, "it will be shown to be a designated public forum by virtue of the fact that (1) the State has treated it as such, allowing all forms of speech; and (2) the OGS Defendants adopted no clearly articulated guidelines delineating the types of speech allowed on the Plaza." *See id.* (citation omitted). Plaintiff argues that, "[i]f the Empire State Plaza is a public forum, either as a matter of law or of fact, then the State Defendants must meet the test established in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564 (1980)." *See* Dkt. No. 40 at 6. Thereafter, Plaintiff asserts that even if the Empire State Plaza is not a public forum, the OGS Defendants' denial of Plaintiff's application was nevertheless a violation of the First Amendment for two reasons. *See id.* "First, the application's denial was not pursuant to any clearly articulated policy, but was the result of unbridled discretion. Pl. Reply Br. in Supp. of Prelim. Inj. 19-22. Second, the application's denial was viewpoint discrimination. Pl. Reply Br. in Supp. of Prelim. Inj. 23-25." *See id.*

The Second Circuit has instructed that a variety of factors are to be examined in conducting forum analysis, including "the forum's physical characteristics and the context of the property's use, including its location and purpose." *Hotel Emps.*, 311 F.3d at 547. Another relevant factor is "the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations." *Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 342 (2d Cir. 2010) (citing *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991)). The Second Circuit has held that the "'primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.'" *Id.* (quotation omitted). Finally, a court should consider whether the

property in question "is part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Emps.*, 311 F.3d at 547 (citation omitted).

It is clear that the forum analysis that the Court must undertake is a fact intensive analysis. *See Zalaski*, 613 F.3d at 343 (noting its concerns about the forum analysis conducted by the district court, "[e]specially in light of the sparse record before [the court] on appeal . . ."). Given the nature of this inquiry and the lack of a developed factual record, the Court finds that it is premature to classify the forum at this time. This finding is particularly appropriate considering the fact that the parties have tailored their arguments to the belief that the relevant forum is the Empire State Plaza rather than the 2013 Empire State Plaza Outdoor Summer Lunch Program. In the absence of a forum classification, the Court is unable to determine whether the policy at issue is constitutional. *See N.A.A.C.P. v. City of Philadelphia*, No. 11-cv-6533, 2013 WL 2182704, *4 (E.D. Pa. May 20, 2013) (denying motion to dismiss the complaint because a more developed record was necessary to classify the forum at issue).[7]

---

[7] Even if this Court were to conclude that the Empire State Plaza Summer Lunch Program is a nonpublic or limited public forum, the inquiry would not end there. Merely because a venue has been categorized as a nonpublic forum "does not mean that the government can restrict speech in whatever way it likes." *Int'l Soc'y for Krishna Consciousness, Inc ("ISKCON ")*, 505 U.S. 672, 687 (1992). Indeed, the standard of review for a nonpublic forum is that the government's regulation on expressive activity must be "reasonable in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. Thus, as the Supreme Court stated in *ISKCON*, the determination that a venue is a non-public forum only begins the inquiry. *See ISKCON*, 505 U.S. at 687.

Although the OGS Defendants have cited to several regulations that they claim are applicable to vendors at the Empire State Plaza, the Court is skeptical that they are applicable to the matter at issue. For example, the OGS Defendants cite to 9 N.Y.C.R.R. § 301.7(i)-(m), which provides the grounds upon which an application to use State property may be denied. *See* Dkt. No. 28-1 at 15. Pursuant to 9 N.Y.C.R.R. § 301.1, however, "[t]he use of State facilities within the Empire State Plaza at Albany under a license issued by the commissioner acting in a proprietary capacity through the OGS Convention Center is not governed by this Subpart." 9 N.Y.C.R.R. § 301.1(c). As such, it is unclear if this regulation upon which the OGS Defendants

(continued...)

Based on the foregoing, the Court denies the OGS Defendants' motion to dismiss insofar as it seeks dismissal of Plaintiff's First Amendment claim.

### c. The NYRA Defendants' motion to dismiss

#### i. The relevant forum

Plaintiff argues that the NYRA Defendants incorrectly describe the relevant forum as the Saratoga Race Course in its entirety. *See* Dkt. No. 44 at 12. Rather, Plaintiff claims that its truck, "and thus its protected speech, was located on the exterior grounds of the Saratoga Race Course in a park-like setting." *See id.* In their reply memorandum of law, the NYRA Defendants take issue with Plaintiff's statement. *See* Dkt. No. 45 at 11 n.3. Specifically, the NYRA Defendants argue as follows:

> Profoundly misleading is the statement in Plaintiff's brief (which is not alleged in the Complaint) that the truck was located on "exterior grounds" of the Race Course, implying that the truck may have been accessible to members of the "visiting public" that did not pay admission to the Race Course. . . . As NYRA averred in connection with Plaintiff's motion for a preliminary injunction – and Plaintiff did not dispute in any of its supporting affidavits – Plaintiff's truck was located on the Race Course grounds in an area accessible only to admission-paying patrons. . . . Plaintiff's misleading suggestion represents a desperate attempt to liken the present case to *Paulsen v. County of Nassau*, 925 F.2d 65 (2d Cir. 1991). There, the Second Circuit held that grounds <u>outside</u> of the Nassau Coliseum constituted a designated public forum, in a case

_____

(...continued)
rely is applicable to the current situation.

Further, Plaintiff seems to argue that an unwritten policy is never permissible because of the arbitrary way in which it may be applied. The Second Circuit, however, has held that "[t]he fact hat a policy is not committed to writing does not of itself constitute a First Amendment violation." *Lebron v. National R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir. 1995) (citation omitted). It is unclear at this point whether such an unwritten policy does exist and whether it has been applied in any other situation.

involving a challenge brought by an evangelical Christian group whose members were arrested on the sidewalk for leafleting during a heavy metal concert. *See id.* at 66-71. Here, however, the Plaintiff's truck was located <u>inside</u> the perimeter of the Race Course's grounds and accessible to persons who pay admission to enter. Further, the present case does not involve a restriction on speech that was religious (as in *Paulsen*) or political in nature.

*See* Dkt. No. 45 at 11 n.3. Finally, the NYRA Defendants argue that Plaintiff incorrectly asserts that even if the Race Course's physical characteristics make it a nonpublic forum, it became a public forum because Defendant NYRA did not have a "'clearly articulated' policy limiting the kind of speech that can be spoken there." *See id.* at 11. The NYRA Defendants claim that Plaintiff's argument lacks any support in First Amendment jurisprudence. *See id.*

The NYRA Defendants are correct that the complaint does not allege that the food truck was located on the "exterior grounds" of the Race Course in a "park-like setting." *See generally* Dkt. No. 1. Rather, the complaint repeatedly states, in general terms, that Plaintiff's truck was located at the "Saratoga Race Course." *See id.* at ¶¶ 45, 48 & 53. Although the complaint does not specifically allege where on the grounds of the Saratoga Race Course its food truck was to be located, the allegations are nevertheless sufficient to withstand the motion to dismiss. However, since it is unclear where Plaintiff's food truck was to be located or the access Plaintiff was to be granted through its agreement with Centerplate, the Court is unable to determine at this time whether the applicable forum is the entire property or a more circumscribed forum located within the confines of the larger property. *See Cornelius*, 473 U.S. at 801 (holding that "forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. Whether speakers seek general access to public property, the forum encompasses that property. . . . In cases in which limited

access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property") (internal citation omitted).

### ii. Classification of the forum

The NYRA Defendants argue that the Saratoga Race Course is a nonpublic forum. *See* Dkt. No. 36-2 at 23. The NYRA Defendants claim that "'[e]xamples of non-public fora include airport terminals, military bases and restricted access military stores, jailhouse grounds, and the Meadowlands Sports Complex.'" *See id.* (quoting *Hotel Emps.*, 311 F.3d at 546) (emphasis omitted). They assert that "[a] mountain of case law makes clear that sports-related facilities on government property, including racetracks and other gambling venues, constitute nonpublic fora." *See id.* at 24-25. Plaintiff, however, argues that "the exterior grounds consist of paved, tree-lined paths surrounding grassy areas in which the visiting public lays out picnic blankets and lawn chairs." *See* Dkt. No. 44 at 13. Plaintiff claims that the "exterior grounds of the Saratoga Race Course," which is a "park-like setting," is a public forum. *See id.* at 12-13. Alternatively, Plaintiff argues that, "[i]n any event, even if the Race Course is not found to be, by virtue of its physical characteristics, a public forum, it can become one by virtue of NYRA's policies (or lack of policies) as to access for various kinds of speech." *See id.* at 13. Since the Saratoga Race Course lacks any regularly enforced policies restricting speech on its property, Plaintiff claims that it has created a designated public forum. *See id.* at 13-14 (citations omitted).

Upon review of the complaint and its attachments, it is clear that the Court is unable to classify the applicable forum at this point. The complaint does not provide specific detail regarding where its food truck was to be placed at the Saratoga Race Course. Although the

34

NYRA Defendants argue that the truck was to be located on the Race Course grounds in an area accessible only to admission-paying patrons, the Court is not permitted to consider such allegations in deciding a motion to dismiss. The complaint simply alleges that Plaintiff had "reached an agreement with Centerplate to participate as a vendor at Saratoga Race Course during the seven-week track season." *See* Dkt. No. 1 at ¶ 45. Although the NYRA Defendants are likely correct in their assertion, the Court is obligated to draw all reasonable inferences in Plaintiff's favor. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98 (citation omitted).

Moreover, in determining the classification of an applicable forum, the Court is required to consider the types of speech that have been permitted or excluded at the location in the past, and whether there has been a consistent practice of limiting such types of speech. *See New York Magazine v. Metropolitan Trans. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (citation omitted); *Paulsen v. County of Nassau*, 925 F.2d 65, 70 (2d Cir. 1991) ("Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity"). Such facts assist the Court in determining whether the space has been opened by the State primarily in its capacity as a commercial actor or whether it intended to allow more diverse expressive activity. *See id.*; *see also Paulsen*, 925 F.2d at 70 (finding a designated public forum where the government "failed to demonstrate a consistent practice of limiting noncommercial, expressive activity"); *Lebron v. Washington Metropolitan Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) ("There is no . . . question that WMATA has converted its subway stations into public fora by accepting . . . political advertising").

The NYRA Defendants cite to several cases in which courts have found sports and gambling venues to be nonpublic fora. *See Int'l Soc'y for Krishna Consciousness, Inc. v. N.J.*

*Sports & Exposition Auth.*, 691 F.2d 155 (3d Cir. 1982) (hereinafter "*N.J. Sports*").  Specifically, in *Int'l Soc'y for Krishna Consciousness, Inc.*, the Third Circuit affirmed the decision of the district court finding that the Meadowland Sports Center is a non public forum because it is a "commercial venture by the state . . . designed to bring economic benefits to northern New Jersey" and was not intended to serve "as a place for the exchange of views." *Id.* at 161.  The district court's determination regarding the status of the forum at issue, however, was rendered after the court conducted a full trial on the merits and all factual disputes had been resolved.  *See Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 532 F. Supp. 1088 (D. N.J. 1981).  Similarly, in *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Com'n*, 797 F.2d 552 (8th Cir. 1986), the district court determined that the advertising space within the Metrodome is a nonpublic forum and, therefore, granted the defendants' motion for summary judgment.  *See id.* at 556-57.  Unlike those cases cited by the NYRA Defendants, the present case is before the Court as a motion to dismiss, without having had the benefit of discovery.  Although courts are often able to determine the classification of a forum without the need for discovery, the factual uncertainties outlined above distinguish the current case from those cited by the NYRA Defendants.  A review of the relevant case law makes clear that disposal of public forum cases via a 12(b)(6) motion is the exception, not the rule.  *See Albrect v. Metropolitan Pier and Exposition Auth.*, 338 F. Supp. 2d 914, 923-24 (N.D. Ill. 2004) (citing cases).[8]

---

[8] *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1285 (10th Cir. 1999) (disposing of case at trial); *Sefick v. Gardner*, 164 F.3d 370, 371 (7th Cir. 1998) (disposing of case at trial); *ISKCON v. N.J. Sports and Exposition Auth.*, 691 F.2d 155, 158 (3rd Cir. 1982) (disposing of case at trial); *Sefick v. United States*, No. 98-C5031, 1999 WL 778588, *1 (N.D. Ill. May 6, 1999) (disposing of case at trial); *Chicago Acorn v. MPEA*, 150 F.3d 695 (7th Cir. 1998) (granting injunction after evidentiary hearing); *Families Achieving Independence and Respect v. Neb. Dep't*
(continued...)

Construing the complaint in the light most favorable to Plaintiff, this Court cannot determine at this time that the Saratoga Race Course, in its entirety, is a nonpublic forum. Accordingly, the NYRA Defendants' motion to dismiss Plaintiff's First Amendment claim is denied.

**D.     Equal protection claim**

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).  A plaintiff may proceed under the Equal Protection Clause as either a "class of one," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (citations omitted), or under the theory of "selective enforcement," *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citation omitted).  In the present matter, Plaintiff has alleged a selective enforcement claim against Defendants.

---

[8](...continued)
*of Social Svs.*, 111 F.3d 1408, 1414 (8th Cir. 1997) (denying permanent injunction after conducting full hearing); *Henderson v. Lujan*, 964 F.2d 1179, 1181 (D.C. Cir. 1992) (granting permanent injunction after conducting hearing on the merits); *ISKON v. Lee*, 505 U.S. 672, 676-77 (1992) (granting the plaintiff's motion for summary judgment); *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 796 (1985) (reversing grant of summary judgment); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 41-42 (1983) (affirming the district court's decision granting the defendants' motion for summary judgment); *Hotel Employees & Rest. Employees Union v. City of New York*, 311 F.3d 534, 543 (2d Cir. 2002) (affirming the district court's decision granting the defendants' motion for summary judgment); *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 14 (1st Cir. 2002) (affirming the district court's decision granting the defendants' motion for summary judgment); *Iskcon Miami v. Metro. Dade County*, 147 F.3d 1282, 1285 (11th Cir. 1998) (affirming the district court's decision granting the defendants' motion for summary judgment); *Hampton Int'l Comm., Inc. v. Las Vegas Convention and Visitors Auth.*, 913 F. Supp. 1402, 1405 (D. Nev. 1996) (granting the defendant's motion for summary judgment).

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel*, 232 F.3d at 103 (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). Nevertheless, it is well settled that a plaintiff must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quotation omitted). "[T]o succeed on a 'selective enforcement claim,' a plaintiff must show: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (quotation omitted); *see also Cine SK8*, 507 F.3d at 790 (quotation omitted); *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) (holding that "[a] selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated"). In particular, a "plaintiff must present evidence comparing [him]self to individuals that are 'similarly situated in all material respects.'" *Sebold*, 2007 WL 2782527, at *26 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

### 1. The OGS Defendants

The OGS Defendants argue that Plaintiff's Equal Protection claim sounds in selective enforcement and rests entirely on the premise that its application was denied solely to inhibit Plaintiff's First Amendment rights. *See* Dkt. No. 28-1 at 18. Therefore, the OGS Defendants claim that since Plaintiff "has failed to demonstrate any impropriety in the State's regulation of

offensive speech on the Empire State Plaza during peak working and visitation hours, . . . [P]laintiff's Equal Protection claim must also fail." *See id.* "As the [P]laintiff had no right to utilize State property except in the manner approved by the State, it was entirely proper for the State defendants to deny its application based on the offensiveness of its name and certain menu items." *See id.* (citation omitted).

In the present matter, the Court finds that Plaintiff has plausibly alleged a selective enforcement claim. Plaintiff alleges that Defendant Walters informed it that its application was the only food vendor application for the 2013 Empire State Plaza Summer Outdoor Lunch Program that was denied by Defendant OGS, thereby plausibly alleging that it was treated differently from other similarly situated individuals/vendors. *See* Dkt. No. 1 at ¶ 30. Further, Plaintiff quotes a July 22, 2013 article in which Heather Groll states that, "'[a]mong other reasons, it was determined that their application was not appropriate because the name of the business was found to be an offensive ethnic slur by any standard.'" *See id.* at ¶ 40. Plaintiff also states that Defendant Bruso claimed that the application had been denied because the name had been deemed offensive. *See id.* at ¶ 32. Although Defendant Bruso allegedly provided Plaintiff with two additional reasons for the application's denial, Plaintiff claims that these two additional reasons were pretextual. *See id.* at ¶¶ 32-33. These allegations are sufficient to state a plausible selective enforcement Equal Protection claim. *See Pflaum v. Town of Stuyvesant*, 937 F. Supp. 2d 289, 304-05 (N.D.N.Y. 2013) (denying the defendants' motion to dismiss and finding that the plaintiff plausibly alleged that he was selectively treated in retaliation for the exercise of his constitutional rights).

Based on the foregoing, the Court denies the OGS Defendants' motion to dismiss Plaintiff's Equal Protection claim.

### 2. The NYRA Defendants

The NYRA Defendants assert that "because Plaintiff's First Amendment claim is meritless, it cannot establish its derivative equal protection claim." *See* Dkt. No. 36-2 at 30 (citation omitted). "Second, under either a class-of-one or selective enforcement theory, Plaintiff must establish that it was treated differently from others who were similarly situated. . . . But this Plaintiff cannot do; it does not and cannot allege 'there exists a group of similarly-situated individuals.'" *See id.* (quoting *Payne v. Huntington Union Free Sch. Dist.*, 219 F. Supp. 2d 273, 278 (E.D.N.Y. 2008)).[9]

In the present matter, the NYRA Defendants are correct that Plaintiff has failed to allege that it was treated differently from other similarly situated individuals. *See Cine SK8*, 507 F.3d at 790. The only allegations relating to other vendors at the Saratoga Race Course are as follows: (1) "On January 28, 2013, Plaintiff began talks with Drew Revella of Centerplate, a hospitality company that manages food vendors at Saratoga Race Course;" (2) "Centerplate's standard commission for vendors at Saratoga Race Course is 35% of gross sales;" and (3) that Defendant "NYRA listed Plaintiff as one of its vendors both on its website and in its Saratoga Insider Fan Guide." *See* Dkt. No. 1 at ¶¶ 43-44, 46. Plaintiff does not specifically allege how it was similarly situated to any other vendors at the Race Course or that it was treated differently from these vendors. As such, Plaintiff has failed to allege facts supporting the first element of its selective enforcement claim.

---

[9] Although the NYRA Defendants have argued why a "class-of-one" claim must fail, in its response, Plaintiff treats its Equal Protection claim as a selective enforcement only. *See* Dkt. No. 44 at 18. As such, the Court has treated this claim as a selective enforcement Equal Protection violation.

In its response, Plaintiff argues that "Wandering Dago was similarly situated to all of the other food vendors at Saratoga Race Course. Wandering Dago was treated differently from the rest of the food vendors when it alone was expelled from Saratoga Race Course on the basis of its speech." *See* Dkt. No. 44 at 18. Although such allegations may have been sufficient to state a plausible selective enforcement claim, Plaintiff may not amend its complaint by its response to the pending motion. *See Lam v. American Exp. Co.*, 265 F. Supp. 2d 225, 234 n.1 (S.D.N.Y. 2003) ("A plaintiff cannot effectively amend his complaint by means of allegations and materials contained in papers generated in response to a motion to dismiss") (citing Fed. R. Civ. P. 12(b); *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000)); *see also Correction Officers Benev. Ass'n v. Kralik*, No. 04 Civ. 2199, 2009 WL 856395, *4 n.1 (S.D.N.Y. Mar. 26, 2009) (citation omitted).

Based on the foregoing, the Court grants the NYRA Defendants' motion to dismiss as to Plaintiff's Equal Protection selective enforcement claim. Plaintiff, however, shall be afforded an opportunity to amend this claim.

**E.    Plaintiff's New York State Constitution claims**

Defendants argue that the Court should dismiss Plaintiff's free speech and equal protection claims brought under the New York State Constitution because the claims are coextensive with that of the U.S. Constitution. *See* Dkt. No. 36-2 at 31 (citing cases). As such, Defendants argue that "Plaintiff's state constitutional claims should be dismissed for the same reasons that its federal constitutional claims should be dismissed." *See id.* (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 754-55 (2d Cir. 2003)) (other citation omitted).

"'The New York State Constitution's guarantees of equal protection and due process are virtually coextensive with those of the United States Constitution.'" *Guan N. v. N.Y.C. Dept. of Educ.*, No. 11-cv-4299, 2013 WL 67604, *20 (S.D.N.Y. Jan. 07, 2013) (citing *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1317 (2d Cir. 1991)) (other citation omitted). Further, "freedom of speech claims are subject to the same analysis under the federal and New York State Constitutions." *Menes v. City Univ. of N.Y. Hunter College*, 578 F. Supp. 2d 598, 617 n.16 (S.D.N.Y. 2008) (citations omitted).

With the exception of Plaintiff's Equal Protection claim against the NYRA Defendants, the Court has denied the motions to dismiss Plaintiff's federal constitutional claims. As such, the Court dismisses without prejudice Plaintiff's New York State Equal Protection claim against the NYRA Defendants. *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 754-55 (2d Cir. 2003) (citation omitted). The Court, however, denies the motions to the extent that they seek dismissal of the remaining New York State Constitutional claims.

## F.     Eleventh Amendment immunity

The OGS Defendants argue that Plaintiff's claims against Defendants New York and OGS are barred by the Eleventh Amendment. *See* Dkt. No. 28-1 at 19-21. Further, the OGS Defendants assert that Plaintiff's claims seeking damages against Defendants DeStito, Rabito, Bruso and Walters in their official capacities are similarly barred by the Eleventh Amendment. *See id.* at 21 n.11. Plaintiff acknowledges that, "[a]lthough there is a substantial body of academic literature contesting the Supreme Court's Eleventh Amendment jurisprudence, . . . Plaintiff recognizes that under current binding Supreme Court precedent a § 1983 action cannot be maintained against a state or its agencies." *See* Dkt. No. 40 at 10-11 (internal and other

citations omitted). As such, Plaintiff asserts that its "claims against the State of New York and the New York State Office of General Services are brought only to preserve the issue in the event of future legal changes." *See id.* at 11.

The Eleventh Amendment provides a state with sovereign immunity from suit. *See Virginia Office for Protection and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (citation omitted). "[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Id.* at 1638 (citation omitted). Generally, New York and its agencies enjoy sovereign immunity from suit in federal court under the Eleventh Amendment. *See Woods v. Rondout Valley Central Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (holding that the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities) (citation omitted).

In 1908, the Supreme Court decided *Ex parte Young*, 209 U.S. 123 (1908), which established an exception to the Eleventh Amendment sovereign immunity protection afforded to the states. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Com'n. of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S. Ct. 2028, 138 L. Ed.2d 438 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)).

"Under *Ex parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of the law." *In re Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 372-73 (2d Cir. 2005) (quoting *Ex parte*

*Young*, 209 U.S. at 157).  "So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act."  *In re Dairy Mart*, 411 F.3d at 373.  Deciding whether or not a state official has violated federal law, however, "affects both the initial immunity inquiry as well as the ultimate decision on the merits."  17A James Wm. Moore *et al.*, *Moore's Federal Practice* § 123.40[3][a] (3d ed. 2004); *see also In re Dairy Mart*, 411 F.3d at 374.  At this stage, the court's job is not to decide the merits of the claim, but "only determine whether [the plaintiff's] assertion that the [defendant's acts] resulted in a violation of federal law is . . . substantial and not frivolous[.]"  *In re Dairy Mart*, 411 F.3d at 373.

In the present matter, the Court finds that Plaintiff's claims against Defendants New York State and OGS are precluded by the Eleventh Amendment.  Moreover, to the extent that Plaintiff seeks damages against Defendants DeStito, Rabito, Bruso and Walters in their official capacities, such claims are similarly barred by the Eleventh Amendment.  To the extent that Plaintiff has also brought claims against Defendants DeStito, Rabito, Bruso and Walters in their official capacities seeking prospective injunctive relief, however, those claims are not subject to dismissal at this time.

Based on the foregoing, the Court grants in part and denies in part this portion of the OGS Defendants' motion to dismiss.


### G.    Tortious interference with contract

The NYRA Defendants contend that the Court should dismiss Plaintiff's tortious interference with contract claim because Centerplate did not breach the contract.  *See* Dkt. No. 36-2 at 32.  Rather, according to the NYRA Defendants, Plaintiff simply alleges that performance was rendered impossible when they expelled it from the Saratoga Race Course,

which is insufficient under New York law.  *See id.* (citation omitted).  Second, the NYRA Defendants argue Defendant NYRA "'holds the exclusive right to operate Saratoga Race Course' (Compl. ¶ 11), and thus had a 'superior right' to exclude Plaintiff from its property."  *See id.*  The OGS Defendants argue that the complaint fails to set forth a plausible claim against them.  *See* Dkt. No. 28-1 at 19.

To state a claim in New York for tortious interference with contract, a plaintiff must allege the following elements: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (internal quotations omitted).  "[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."  *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 621 (1996) (citing *Israel v. Wood Poison Co.*, 1 N.Y.2d 116, 119 (1956)).  "It is clear, however, that a tortious interference with contract claim may not be premised on a theory that the defendant committed an act that rendered performance of a contract impossible."  *Marzullo v. Beekman Campanile, Inc.*, No. 10 Civ. 364, 2011 WL 3251507, *3 (S.D.N.Y. July 22, 2011) (citing *Twelve Inches Around Corp. v. Cisco Sys., Inc.*, No. 08 Civ. 6896(WHP), 2009 WL 928077, at *6 (S.D.N.Y. Mar. 12, 2009); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 481 (S.D.N.Y. 1997)).

In the present matter, Plaintiff alleges that Defendant NYRA "holds the exclusive right to operate the Saratoga Race Course."  *See* Dkt. No. 1 at ¶ 11.  Further, the complaint states that

45

"Plaintiff had a contract with Centerplate under which Plaintiff would participate as a vendor during the 2013 track season at Saratoga Race Course in exchange for payment to Centerplate of 25% of Plaintiff's gross food sales." *See id.* at ¶ 97. Thereafter, Plaintiff alleges that by expelling Plaintiff from the Race Course, "the OGS Defendants and the NYRA Defendants intentionally induced Centerplate to breach the contract or otherwise render performance under the contract impossible." *See id.* at ¶ 100.

The NYRA Defendants correctly contend that a complaint which simply alleges that the defendant engaged in conduct that rendered performance of the contract impossible is insufficient under New York law. *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477 (S.D.N.Y. 1997) is instructive on this point:

> MR Plus concedes that there was no breach of the contract but rather maintains that Fonar's conduct rendered performance of the contract impossible and that this is enough to constitute a tortious interference with contractual relations.
>
> There is indeed some authority on which MR Plus may rely in support of this proposition. Some courts have stated that in order to make out a claim for tortious interference with contract, a party either needs to show that there was a breach of the contract by the third party or that the defendant's interference made the contract impossible to perform. . . .
>
> However, this proposition runs contrary to the rulings of the New York Court of Appeals and the Second Circuit. The Court of Appeals, for example, has held that "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of contract by the other party." *Jack L. Inselman & Co. v. FNB Financial Co.*, 41 N.Y.2d 1078 (N.Y. 1977). . . .
>
> The Second Circuit has concurred in this view, holding that "[u]nder traditional principles of New York law, a party may not recover for tortious inducement of a breach of contract without proving that the contract has been breached." *Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) (citing *Inselman*).

> The court adheres to the rulings of New York's highest state court
> as well as those of the Second Circuit and holds that in order to
> establish a claim under the tort of interference with contractual
> relations, a third party must breach the contract after being induced
> to do so by the defendant.

*Fonar Corp.*, 957 F. Supp. at 480-81 (internal citations omitted); *see also Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) ("'In order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish . . . the actual breach of the contract . . .'") (quoting *Jim Ball Chrysler LLC v. Marong Chrysler–Plymouth, Inc.*, 19 A.D.3d 1094 (4th Dept. 2005)); *Anderson v. Aset Corp.*, 416 F.3d 170, 171 (2d Cir. 2005) (affirming dismissal of suit because, *inter alia*, the plaintiff "failed to plead the breach required by New York law") (citing *NBT Bancorp, Inc.*, 87 N.Y.2d at 620–21).

In the present matter, however, the complaint not only alleges that the Defendants' conduct rendered performance under the contract impossible, it also alleges, alternatively, that "the OGS Defendants and the NYRA Defendants intentionally induced Centerplate to breach the contract[.]" *See* Dkt. No. 1 at ¶ 100. Additionally, the complaint alleges that "[o]n the morning of July 20, 2013, as Plaintiff was preparing to leave Saratoga Race Course, Plaintiff was met by Defendant Travers and Drew Revella. Revella presented Plaintiff with a letter stating the purported reason for termination: '[W]e have reached out to you with concern for your business name "Wandering Dago." We have received numerous complaints about the Dago part being offensive and think it is in our fans [sic] best interest to remove your truck from the track.'" *See id.* at ¶ 59. This letter, which Plaintiff attached to the complaint, was signed by Drew Revella (an employee of Centerplate), written on Centerplate letterhead, and implies that Centerplate made the decision to terminate its contract with Plaintiff. *See* Dkt. No. 1-4 at 2. Based on the foregoing, the Court finds that Plaintiff has sufficiently alleged that the NYRA Defendants

intentionally caused Centerplate to breach its contract with Plaintiff rather than simply rendering its performance impossible.

As to the OGS Defendants, the Court similarly finds that Plaintiff has sufficiently alleged tortious interference with their contract with Centerplate. Specifically, Plaintiff alleges that Defendant Travers refused to permit Plaintiff to stay on the property even if it covered up its name, and indicated that "his 'hands are tied,' because NYRA had been contacted by a high ranking state official." *See* Dkt. No. 1 at ¶¶ 55-56. Through discovery, Plaintiff will have an opportunity to possibly determine who may have induced the alleged breach of contract.

Based on the foregoing, the Court denies Defendants' motion to dismiss Plaintiff's tortious interference with contract claim.


## H.      Tortious interference with prospective economic advantage[10]

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (citation omitted). "The defendant's interference must be direct: the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Kolchinsky v. Moody's Corp.*, No. 10 Civ. 6840(PAC), 2012 WL 639162, *6

---

[10] Tortious interference with business relations and tortious interference with prospective economic advantage are different titles for the same cause of action. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

(S.D.N.Y. Feb. 28, 2012) (quoting *B & M Linen, Corp. v. Kannegeisser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010)). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).

In the present matter, the NYRA Defendants argue that "Plaintiff does not and cannot allege the third element of its claim. As demonstrated above, NYRA's conduct was constitutional and in furtherance of its legitimate proprietary interests as the operator of the Race Course." *See* Dkt. No. 36-2 at 33. As discussed above, however, Plaintiff has plausibly alleged that both the NYRA Defendants and the OGS Defendants engaged in unconstitutional conduct.

Based on the foregoing, the Court denies Defendants' motions to dismiss as to Plaintiff's tortious interference with prospective economic advantage claim.

## I.    Qualified Immunity

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit"). "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that [their] alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As qualified immunity is an affirmative defense, the burden falls on

the defendants. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)). Since determining whether a defendant is entitled to qualified immunity is generally a fact intensive inquiry, the Second Circuit has made clear that it disfavors granting qualified immunity at the motion to dismiss stage. *See McKenna v. Wreight*, 386 F.3d 432, 435 (2d Cir. 2004) (noting that generally "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted") (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). The qualified immunity determination consists of two steps, which a court may consider in either order. *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted). The first step requires the court to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted). "As the qualified immunity defense evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In a footnote in their memorandum of law in support of the motion to dismiss, the OGS Defendants argue that "the particular facts alleged here establish, as a matter of law, that the individual State defendants are entitled to qualified immunity as a reasonable official in the individual defendants' position could believe that denying a permit to plaintiff at the Empire State Plaza complex did not violate federally protected rights." *See* Dkt. No. 28-1 at 19 n.11 (citation omitted). Further, the OGS Defendants contend that "[a]n objectively reasonable

official could readily believe that it was appropriate, pursuant to federal law, to prohibit the plaintiff from offending State employees on the basis of their national origin or ethnicity at their workplace under the particular circumstances here." *See id.* (citations omitted). The OGS Defendants do, however, dedicate almost two pages of the body of their reply memorandum of law in support of this argument. *See* Dkt. No. 42 at 10-11.

Federal courts routinely decline to consider "issues raised only in a footnote and in a perfunctory manner." *Insurance Co. of the State of Pennsylvania v. Johnson*, No. 2:06-CV-195, 2011 WL 1211595, *13 (D. Vt. Feb. 7, 2011) (citations omitted); *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 878, n.13 (2d Cir. 2008); *Calvert v. Wilson*, 288 F.3d 823, 836 (6th Cir. 2002) ("[I]t is generally held that an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority"); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived"); *Wilson v. N.Y.C. Police Dept.*, No. 09 Civ. 2632, 2011 WL 1215031, *12 (S.D.N.Y. Feb. 4, 2011) (declining to consider argument raised in a footnote); *Geron v. Robinson & Cole LLP*, 476 B.R. 732, 744 n.3 (Bankr. S.D.N.Y. 2012) (citations omitted). In the present matter, this Court declines to consider the OGS Defendants' arguments raised in a footnote in their memorandum of law. The OGS Defendants' arguments make no effort to identify the facts as set forth in the complaint which they believe entitle them to qualified immunity at this early juncture.

In light of the OGS Defendants' conclusory arguments on this point and due to the fact-intensive inquiry required in determining whether a defendant is entitled to qualified immunity, the Court denies the OGS Defendants' motion on this ground. Although the OGS Defendants

may eventually establish that they are entitled to qualified immunity, they have failed to convince the Court that it is appropriate at this time.

## IV. CONCLUSION

This case involves an admittedly important question regarding freedom of speech. There will always be individuals and businesses in society that will attempt to push the envelope when it comes to free speech. While many may question just how offensive the use of the "D" word is on the truck in question, others should and will question whether Defendants' conduct would be permissible under the First Amendment if the name of the food truck at issue was any of the following: Wandering "N," in reference to African Americans; Wandering "K," in reference to Jewish Americans; Wandering "S," in reference to Hispanic Americans; or Wandering "C," in reference to Chinese Americans. The Court has no doubt that if the truck at issue had been named any one of the above, the outcry from people in all walks of life, regardless of their own ethnicity, would have been so significant that the owners may have willingly changed the name *posthaste* without the need of Government intervention. This is not the case here.

After carefully considering the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the OGS Defendants' motion to dismiss is **GRANTED in part and DENIED in part;** and the Court further

**ORDERS** that the NYRA Defendants' motion to dismiss is **GRANTED in part and DENIED in part;** and the Court further

**ORDERS** that Plaintiff's federal and state Equal Protection claims against the NYRA Defendants are **DISMISSED without prejudice**; and the Court further

52

**ORDERS** that Plaintiff's claims against Defendants New York and OGS are **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's claims for damages against the individual OGS Defendants in their official capacities are **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with Local Rules.[11]

**IT IS SO ORDERED.**

Dated: January 15, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[11] As a result of this Memorandum-Decision and Order, the following claims remain: (1) the state and federal First Amendment claims against the NYRA Defendants and the individual OGS Defendants; (2) the state and federal Equal Protection claims against the individual OGS Defendants; (3) the tortious interference with contract claims against the NYRA Defendants and the individual OGS Defendants; and (4) the tortious interference with prospective economic advantage claims against the NYRA Defendants and the individual OGS Defendants.