UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WANDERING DAGO INC. ) | |
| ) | ECF Case |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-cv-1053 (MAD) (RFT) |
| ) | |
| ROANN M. DESTITO, JOSEPH J. ) | |
| RABITO, WILLIAM F. BRUSO, JR., ) | **JURY TRIAL DEMANDED** |
| AARON WALTERS, NEW YORK ) | |
| RACING ASSOCIATION, INC., ) | |
| CHRISTOPHER K. KAY, STEPHEN ) | |
| TRAVERS, and JOHN DOES 1–5 ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## AMENDED COMPLAINT

Plaintiff Wandering Dago Inc. as and for its complaint herein, alleges as follows:

### INTRODUCTION

1.     This is an action for injunctive and declaratory relief and damages arising from the denial by the New York State Office of General Services ("OGS"), RoAnn M. Destito, Joseph J. Rabito, William F. Bruso, Jr., and Aaron Walters of Plaintiff's application to participate as a food vendor in the 2013 Empire State Plaza Summer Outdoor Lunch Program, and the subsequent termination of Plaintiff's status as a vendor at Saratoga Race Course by the New York Racing Association ("NYRA"), Christopher K. Kay, and Stephen Travers under pressure from, or direction of, New York State officials. Specifically, both the Empire State

Plaza application denial and the expulsion from Saratoga Race Track were based on the alleged offensive character of Plaintiff's name.

2.      These actions were in violation of the First Amendment of the United States Constitution and the Free Speech Clause of the New York State Constitution (Article I, § 8), as well as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Equal Protection Clause of the New York State Constitution (Article I, § 11).

3.      In addition, Plaintiff's expulsion from Saratoga Race Course was a tortious interference with Plaintiff's contract with Centerplate, Inc. ("Centerplate"), the hospitality company in charge of overseeing vendors at Saratoga Race Course, or in the alternative, a tortious interference with Plaintiff's business relations with Centerplate.

4.      Plaintiff is also entitled to recover costs and attorneys' fees under both 42 U.S.C. § 1988 and N.Y. CPLR 8601.

## PARTIES

5.      Plaintiff Wandering Dago Inc. is a New York Corporation with an address of 1075 Keyes Ave., Schenectady, NY 12309. Wandering Dago Inc. is operated by Andrea Loguidice and Brandon Snooks. Loguidice serves as the corporation's President. Through Wandering Dago Inc., Loguidice and Snooks operate a food truck using the "Wandering Dago" brand from which they serve a variety of gourmet foods cooked and prepared on-site in the truck's mobile kitchen. Loguidice and Snooks work as the business's co-chefs, and Snooks also drives the food truck. Loguidice and Snooks have invested a significant amount of money in the truck and equipment, and Wandering Dago is currently their only source of income.

6.      Upon information and belief, Defendant RoAnn M. Destito is the Commissioner of OGS and a citizen of New York. She is sued in her individual and official capacities.

7.      Upon information and belief, Defendant Joseph J. Rabito is the Executive Deputy Commissioner of OGS and a citizen of New York. He is sued in his individual and official capacities.

8.      Upon information and belief, Defendant William F. Bruso, Jr. is an Associate Attorney in OGS and a citizen of New York. He is sued in his individual and official capacities.

9.      Upon information and belief, Defendant Aaron Walters is a Special Events Coordinator for OGS and a citizen of New York. He is sued in his individual and official capacities.

10.      Defendant New York Racing Association, Inc. is a New York non-profit corporation with a mailing address of P.O. Box 90, Jamaica, New York 11417. NYRA holds the exclusive right to operate Saratoga Race Course.

11.      Upon information and belief, Defendant Christopher K. Kay is the CEO and President of NYRA and a citizen of New York. He is sued in his individual and official capacities.

12.      Upon information and belief, Defendant Stephen Travers is the Vice President of Hospitality, Guest Services & Group Sales for NYRA and a citizen of New York. He is sued in his individual and official capacities.

13.      Does 1–5 are officials of the State of New York and/or NYRA who directly participated in the decision to exclude Plaintiff from both Saratoga Race Course and OGS's Summer Outdoor Lunch Program.

14. Destito, Rabito, Bruso, Walters, and some or all of the unknown Doe Defendants are hereinafter referred to collectively as the "OGS Defendants."

15. NYRA, Kay, Travers, and some or all of the unknown Doe Defendants are hereinafter referred to collectively as the "NYRA Defendants."

## JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, in particular, 42 U.S.C. § 1983 and the United States Constitution.

17. This Court has jurisdiction over Plaintiff's state law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## ALLEGATIONS OF FACT

## EMPIRE STATE PLAZA

19. The Empire State Plaza is owned by the State of New York and managed by the Office of General Services.  The Plaza is a quarter-mile stretch of open space surrounded on four sides by government buildings housing officials from all three branches of state government.

20. The Plaza itself is a park-like setting with tree-lined paths, grass areas, large reflecting pools, and open areas containing benches and picnic tables.  The Plaza is open on all sides and can be traversed by pedestrians.

21. The Empire State Plaza is used for a wide variety of events, including events sponsored or organized by the State, of New York as well as events sponsored or organized by

private parties.  These events have included political rallies, marches, and demonstrations, as well as festivals and other musical and cultural events.

### EMPIRE STATE PLAZA OUTDOOR SUMMER LUNCH PROGRAM

22.     In early 2013, Plaintiff became interested in participating in the Empire State Plaza Summer Outdoor Lunch Program, a program run by OGS which allows food vendors to operate at the Empire State Plaza ("ESP") on weekdays from late May until early October.

23.     Plaintiff was in periodic contact by phone and email with multiple individuals at OGS, including Defendant Aaron Walters, Madeline Rizzo, and Jason Rumpf, starting in February 2013. Plaintiff inquired on multiple occasions about participating as a summer vendor at ESP and requested an application for the program at least as early as April 11, 2013.

24.     On May 3, 2013, Defendant Walters sent Plaintiff the application for the ESP Summer Outdoor Lunch Program. The application deadline was May 10, 2013.  *See* Exhibit A.

25.     The ESP Summer Outdoor Lunch Program Application states that "[u]nless prior arrangements have been made with OGS, all vendors are expected to complete the entire season." On or about May 6, 2013, Plaintiff spoke with Walters by phone to inquire whether Plaintiff's seven-week commitment at Saratoga Race Course would prevent it from participating in the program. Walters told Plaintiff that he would speak with his supervisors to determine whether Plaintiff could participate.

26.     On or about May 8, 2013, Plaintiff spoke with Jason Rumpf to follow up and was informed that Walters was working on getting an answer. Rumpf told Plaintiff that OGS would be flexible on the deadline because of the delay from their management.

27.     On May 10, 2013, at approximately 3:00 p.m., Plaintiff received a voicemail from Walters indicating that he had "discussed this with [his] director" and that OGS would approve Plaintiff's application despite the expected seven-week absence.

28.     On or about May 13, 2013, Walters contacted Plaintiff by phone and advised that Plaintiff would have until Friday, May 17, 2013, to submit its application. Walters apologized for the delay caused by OGS.

29.     On May 17, 2013, at approximately 12:16 p.m., Plaintiff faxed its application to OGS. Plaintiff selected the option to participate in the program on Wednesdays and Fridays only. Plaintiff provided credit card authorization for the $1,000 fee to participate in the program.

30.     On information and belief, all applicants other than Plaintiff were deemed accepted into the Summer Outdoor Lunch Program upon the receipt of their applications by OGS.

31.     On information and belief, on or about May 20, 2013, Defendant Joseph J. Rabito declared that Plaintiff's application should be rejected.  Rabito's decision was based on the message he believed was conveyed by Plaintiff's name.

32.     On information and belief, Plaintiff was the only vendor whose application was considered by Rabito.

33.     On May 20, 2013, Plaintiff asked Walters by email whether the application had been officially approved yet. Plaintiff received an email reply from Walters denying the application, stating that OGS "will be unable to accommodate your application for space in this year's program."  *See* Exhibit B.

34.     On information and belief, Walters was acting under the direction of Defendant RoAnn M. Destito, Defendant Joseph J. Rabito, Defendant William F. Bruso, Jr., and other unknown OGS officials.

35.     Plaintiff immediately called Walters to ask for an explanation of the denial. Walters informed Plaintiff that its application was the only food vendor application for the Summer 2013 program that was denied by OGS, but stated that he could not tell Plaintiff the reason for the denial and directed it to contact OGS's legal department.

36.     Plaintiff immediately contacted OGS's legal department and spoke to Defendant William F. Bruso, Jr.

37.     Bruso gave three reasons for the application's denial: (1) Bruso claimed that the application had been denied because it was late; (2) Bruso claimed that the application had been denied because it was incomplete; and (3) Bruso claimed that the application had been denied because Plaintiff's business name had been deemed offensive.

38.     The first two stated reasons were pretextual. Plaintiff was in frequent communication with OGS during the application process, was assured that OGS would be flexible with regard to the deadline, and was eventually given a new deadline of May 17, 2013. Plaintiff submitted its application on May 17, 2013.

39.     During the May 20, 2013 call with Bruso, Plaintiff asked Bruso to provide a formal letter stating the reasons for the application's denial. Bruso refused to provide a written explanation without a formal request under New York's Freedom of Information Law ("FOIL").

40.     On information and belief, Bruso was acting under the direction of Defendant RoAnn M. Destito, Defendant Joseph J. Rabito, and other unknown officials in OGS and the New York State government.

41.     On May 29, 2013, Plaintiff sent a letter to Bruso requesting a written explanation for the application's denial, including a citation to the public rule that gives OGS the authority to deny the application on the basis of Plaintiff's name.

42.     On June 25, 2013, Plaintiff submitted a FOIL request asking for all documents related to Plaintiff's Empire State Plaza Food Vendor application. The following day, Plaintiff received a confirmation from Heather R. Groll, the Director of OGS's Public Information Office, that the FOIL request had been received and that a determination on the request would be made within 20 business days.

43.     On July 1, 2013, Plaintiff received a letter from Bruso stating, "I conveyed to you by telephone on May 20, 2013, OGS' several reasons for its denial of your firm's application." The letter stated that the denial was made pursuant to the terms of the Food Vendor Application packet, as well as Parts 300 and 301 of Title 9 of the New York Codes, Rules and Regulations. The letter did not cite any specific provision of law justifying the denial. *See* Exhibit C.

44.     Heather Groll was quoted in an update to a July 22, 2013 article on the website "All Over Albany" saying, "[a]mong other reasons, it was determined that their application was not appropriate because the name of the business was found to be an offensive ethnic slur by any standard."

45.     The Empire State Plaza is the single most desirable and profitable lunchtime location for mobile food vendors in the Capital District because of the high foot traffic and large number of people working in close proximity.

46.     Since being denied access to the ESP Summer Outdoor Lunch Program, Wandering Dago has operated during lunchtime at various locations in the Capital District, but none has the volume of foot traffic and potential customers present at the Empire State Plaza.

These locations also have less visibility to the public which leads to fewer private catering jobs and other business opportunities.

47.     On Monday, May 5, 2014, Plaintiff hand-delivered an application for the 2014 Summer at the Plaza Lunchtime Food Vending Program.

48.     On May 16, 2014, Plaintiff received a letter from Defendant Bruso stating that "your application for the 2014 Lunchtime Food Vending Program at the Empire State Plaza has been denied by the NYS Office of General Services due to your firm's name as previously described."

### SARATOGA RACE COURSE

49.     Saratoga Race Course is owned by the State of New York and leased to NYRA.

50.     The racing season at Saratoga Race Course runs from July to early September each year.  In 2013, the racing season ran from July 19, 2013 until September 2, 2013.

51.     Saratoga Race Course features a Grandstand adjacent to the race track which contains, among other things, dining facilities and seating for viewing the track.

52.     The exterior grounds of the Saratoga Race Course outside of the Grandstand is a park-like setting consisting of paved, tree-lined paths surrounding grassy areas in which the visiting public lays out picnic blankets and lawn chairs.

53.     NYRA contracts with Centerplate, a hospitality company, to provide food and beverage services at Saratoga Race Course.  Centerplate in turn contracts with individual vendors to sell food and beverages out of trucks or stands on the Saratoga Race Course exterior grounds. On information and belief, NYRA usually delegates the management of vendors entirely to Centerplate and exercises no control over their selection.

54.     NYRA operates under intensive state supervision and regulation.  In 2012, the State enacted legislation reorganizing NYRA and bringing it under state control.  Under this legislation, NYRA is not scheduled to return to private control until 2015.

### SARATOGA RACE COURSE VENDOR PROGRAM

55.     On January 28, 2013, Plaintiff began talks with Drew Revella of Centerplate concerning participation as a vendor during the 2013 Saratoga Race Course racing season.

56.     Upon information and belief, Centerplate's standard commission for vendors at Saratoga Race Course is 35% of gross sales.

57.     After extensive negotiations, Plaintiff eventually reached an agreement with Centerplate to participate as a vendor at Saratoga Race Course during the seven-week track season. Plaintiff agreed to pay Centerplate 25% of gross food and beverage sales and to donate an additional 5% to the Thoroughbred Retirement Foundation, a non-profit charity.

58.     Plaintiff's menu for Saratoga Race Course was reviewed and approved by Centerplate.  This menu did not include the sandwiches named the Dago, the Polack, or the Mick & Cheese.

59.     Plaintiff was listed prominently in promotional materials produced by NYRA and Centerplate as a vendor for the 2013 race track season. On or about July 18, 2013, Centerplate issued a press release listing Plaintiff as "one of the country's top barbecue fusion trucks." NYRA listed Plaintiff as one of its vendors both on its website and in its Saratoga Insider Fan Guide.

60.     Plaintiff was offered and turned down numerous business opportunities, including both private catering events and public festivals, because they conflicted with Plaintiff's commitment at Saratoga Race Course.

61.     In preparation for the volume of business anticipated during its seven-week engagement at Saratoga Race Course, Plaintiff purchased a substantial amount of new cooking equipment, including a six-foot barbeque smoker, a stainless steel prep table, and a deep fryer. Plaintiff also hired five employees to work during the track season and obtained the necessary workers compensation insurance.

62.     On July 16, 2013, Plaintiff brought its truck, smoker, and supplies to Saratoga Race Course to begin setting up in advance of the start of the track season on Friday, July 19, 2013. Plaintiff spent three days delivering and setting up its equipment in preparation for opening day.

63.     Plaintiff was assigned a vending location in a prominent position along a walkway in the exterior grounds of Saratoga Race Course.

64.     Plaintiff arranged for Suburban Propane to deliver and install a 100-gallon propane tank for the Wandering Dago smoker so that Plaintiff could begin smoking meats on July 17, 2013. For unknown reasons, Suburban Propane was not permitted to install the propane tank.

65.     Plaintiff immediately contacted Drew Revella, and he arranged for G.A. Bove Fuels ("G.A. Bove") to deliver propane for the smoker.

66.     Plaintiff consulted with a Centerplate employee concerning the location of the propane tank, and he instructed Plaintiff where it should be positioned.  G.A. Bove employees delivered and connected the propane tank.   Neither Plaintiff nor any of its employees or operators was in any way involved with the connection or configuration of the propane tank.

67.     After the propane tank had been installed, Plaintiff was informed by NYRA that the smoker was obstructing an area used by NYRA employees as a walkway and needed to be

relocated. G.A. Bove employees disconnected the propane connection so that Plaintiff could move the smoker.  G.A. Bove employees then dug a new trench to bury the propane line and reconnected the propane tank. Neither Plaintiff nor any of its employees or operators was in any way involved with positioning or connecting the propane tank or burying the propane line.

68.     Plaintiff was informed that evening by the NYRA fire marshal that the propane tank was improperly located and configured. Plaintiff informed Centerplate, and its employees moved and reconfigured the propane tank in accordance with the fire marshall's instructions. Neither Plaintiff nor any of its employees or operators was in any way involved with moving or reconfiguring the propane tank.

69.     The propane tank was not finally installed and configured until late in the evening of July 18, 2013.

70.     As a result of the unexpected problem with propane delivery and installation, Plaintiff was unable to smoke its meat for the necessary 14 hours and was not open for business on opening day. After resolving the propane problem, Plaintiff began smoking meat, and was fully prepared to begin serving food the morning of July 20, 2013.

71.     Drew Revella apologized for the delay and represented via text message that he would "get [Plaintiff] another opportunity for the missed day."

72.     At or about 10:00 p.m. on the evening of July 19, 2013, Plaintiff received a call from Defendant Stephen Travers instructing Plaintiff to remove its truck and equipment from Saratoga Race Course immediately.

73.     Travers alleged that this decision had been made because a state official complained about Plaintiff's name.

74.   Plaintiff pleaded with Travers to be allowed to stay, offering to cover up its business name everywhere it appears on its truck and equipment.

75.   Travers refused and stated that his "hands are tied," because NYRA had been contacted by a high ranking state official. Travers told Plaintiff that the truck would be towed if it was not removed before 10:00 a.m. the following morning.

76.   Upon information and belief, Travers was acting under the direction of Defendant Christopher K. Kay, other unknown NYRA officials, and officials of the State of New York.

77.   After Plaintiff asked whether there were any other options that would allow it to remain at the track, Travers insisted that the truck must be removed, but suggested that Plaintiff could operate out of a tent under another business name.

78.   Plaintiff asked Travers whether that would simply involve putting up a sign with a different name, like "Montana BBQ."

79.   Travers replied that Plaintiff would have to be licensed to do business under the new name, and that all of its permits and paperwork would have to be in order under the new name.

80.   This requirement made it functionally impossible for Plaintiff to operate out of a tent, and as a result Plaintiff never agreed that it would return to the track and operate out of a tent.

81.   On the morning of July 20, 2013, Plaintiff called Travers and requested that he provide something in writing describing the reason Plaintiff was being expelled from the track. Travers never mentioned the tent proposal that morning.

82.   In order to quickly remove equipment that had been set up over a three-day period, Plaintiff was forced to rent a moving trailer, incurring additional expense.

83.     On the morning of July 20, 2013, as Plaintiff was preparing to leave Saratoga Race Course, Plaintiff was met by Defendant Travers and Drew Revella. Revella presented Plaintiff with a letter stating the purported reason for termination: "[W]e have reached out to you with concern for your business name 'Wandering Dago'. We have received numerous complaints about the Dago part being offensive and think it is in our fans [sic] best interest to remove your truck from the track."  *See* Exhibit D.

84.     The letter indicated that Plaintiff would not be charged for the food and propane ordered through Centerplate.  Plaintiff told Travers that it had incurred considerable expense in purchasing new equipment for the track and hiring labor to set up and remove our equipment. Travers said that NYRA would reimburse $900, which would cover approximately 50% of the cost of the new smoker Plaintiff had purchased to handle the volume of business anticipated at Saratoga Race Course. He refused to reimburse any other costs.  To date, Plaintiff has not received any reimbursement from NYRA.

85.     Upon information and belief, neither NYRA nor Centerplate actually received any complaints about Plaintiff's name from members of the general public.

86.     After being expelled from Saratoga Race Course, Plaintiff has attempted to book as many public and private events as possible to fill its schedule, but most events, including events that Plaintiff previously turned down because of its commitment at the race track, were no longer available. Plaintiff has also attempted to fill its lunchtime schedule, but due to the limited number of locations in the Capital District, Plaintiff typically works no more than three lunchtime shifts per week. The business Plaintiff does during weekday lunchtimes and occasional booked events does not come anywhere close to the amount of business it would have

done serving the Saratoga Race Course crowd six days a week for the duration of the seven-week track season.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>
**42 U.S.C. § 1983, Violation of the First Amendment of the U.S. Constitution**
**(All Defendants)**

87.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 61 above as if fully set forth herein.

88.     The actions of the OGS Defendants and the NYRA Defendants constitute actions under color of law and deprive Plaintiff of its civil rights and liberties and constitutional rights, privileges, and immunities.

89.     The actions taken by the OGS Defendants and the NYRA Defendants were not in good faith and constitute knowing and willful denials, deprivations, and/or violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

90.     In directly denying, and/or participating in and/or authorizing the denial of, Plaintiff's application on constitutionally impermissible bases, and acting under color of law, the OGS Defendants knowingly and willfully engaged in content-based and viewpoint-based restrictions of speech and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

91.     Upon information and belief, the OGS Defendants intentionally chose not to explain the reasons for their denial of Plaintiff's application in writing and intentionally chose to cite pretextual justifications for the denial in addition to their true reason in order to impede Plaintiff's ability to vindicate its constitutional rights.

92.     Additionally, in directly expelling, and/or participating in and/or authorizing the expulsion of, Plaintiff from Saratoga Race Course on constitutionally impermissible bases, and acting under color of law, the NYRA Defendants knowingly and willfully engaged in content-based and viewpoint-based restrictions of speech and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

93.     The actions of the NYRA Defendants constitute actions under color of law because the state has so far insinuated itself into a position of interdependence with NYRA that the state must be recognized as a joint participant in NYRA's actions, and thus NYRA is regarded as a state actor.

94.     In light of the foregoing, pursuant to 42 U.S.C. § 1983, the OGS Defendants and the NYRA Defendants are liable to Plaintiff in an action at law and suit in equity for redress of the Defendants' denials, deprivations, and violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

## COUNT II
### 42 U.S.C. § 1983, Violation of the Equal Protection Clause of the 14th Amendment
### (OGS Defendants)

95.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 69 above as if fully set forth herein.

96.     The actions of the OGS Defendants constitute actions under color of law and deprive Plaintiff of its civil rights and liberties and constitutional rights, privileges, and immunities.

97.    The actions taken by the OGS Defendants were not in good faith and constitute knowing and willful denials, deprivations, and/or violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

98.    In directly denying, and/or participating in and/or authorizing the denial of, Plaintiff's application on constitutionally impermissible bases, and acting under color of law, the OGS Defendants knowingly and willfully denied Plaintiff the equal protection of the laws and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

99.    The OGS Defendants knowingly and willfully treated Plaintiff differently from other applicants by denying its application on the basis of Plaintiff's exercise of its constitutional rights.

100.    Upon information and belief, the OGS Defendants intentionally chose not to explain the reasons for their denial of Plaintiff's application in writing and intentionally chose to cite pretextual justifications for the denial in addition to their true reason in order to impede Plaintiff's ability to vindicate its constitutional rights.

101.    In light of the foregoing, pursuant to 42 U.S.C. § 1983, the OGS Defendants are liable to Plaintiff in an action at law and suit in equity for redress of the Defendants' denials, deprivations, and violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

### COUNT III
### Violation of New York State Constitution, Article I, Section 8
### (All Defendants)

102.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 77 above as if fully set forth herein.

17

103.    The actions of the OGS Defendants and the NYRA Defendants constitute actions under color of law and deprive Plaintiff of its civil rights and liberties and constitutional rights, privileges, and immunities.

104.    The actions of the OGS Defendants and the NYRA Defendants constitute knowing and willful denials, deprivations, and/or violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

105.    In directly denying, and/or participating in and/or authorizing the denial of, Plaintiff's application on constitutionally impermissible bases, and acting under color of law, the OGS Defendants knowingly and willfully engaged in content-based and viewpoint-based restrictions of speech and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's right to freedom of speech, guaranteed by Article I, Section 8 of the New York State Constitution.

106.    Upon information and belief, the OGS Defendants intentionally chose not to explain the reasons for their denial of Plaintiff's application in writing and intentionally chose to cite pretextual justifications for the denial in addition to their true reason in order to impede Plaintiff's ability to vindicate its constitutional rights.

107.    Additionally, in ordering, instructing, and/or encouraging the expulsion of Plaintiff from Saratoga Race Course on constitutionally impermissible grounds, the OGS Defendants knowingly and willfully engaged in content-based and viewpoint-based restrictions of speech and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's right to freedom of speech, protected by Article I, Section 8 of the New York State Constitution.

108.    Moreover, in directly expelling, and/or participating in and/or authorizing the expulsion of, Plaintiff from Saratoga Race Course on constitutionally impermissible bases, and

acting under color of law, the NYRA Defendants knowingly and willfully engaged in content-based and viewpoint-based restrictions of speech and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's right to freedom of speech, protected by Article I, Section 8 of the New York State Constitution.

109.    The actions of the NYRA Defendants constitute actions under color of law because the state has so far insinuated itself into a position of interdependence with NYRA that the state must be recognized as a joint participant in NYRA's actions, and thus NYRA is regarded as a state actor.

110.    In light of the foregoing, the OGS Defendants and the NYRA Defendants are liable to Plaintiffs in an action at law and suit in equity for redress of the Defendants' denials, deprivations, and violations of Plaintiff's right to freedom of speech, protected by Article I, Section 8 of the New York State Constitution.

**COUNT IV**
**Violation of New York State Constitution, Article I, Section 11**
**(OGS Defendants)**

111.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 86 above as if fully set forth herein.

112.    The actions of the OGS Defendants constitute actions under color of law and deprive Plaintiff of its civil rights and liberties and constitutional rights, privileges, and immunities.

113.    The actions of the OGS Defendants constitute knowing and willful denials, deprivations, and/or violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

114.    In directly denying, and/or participating in and/or authorizing the denial of, Plaintiff's application on constitutionally impermissible bases, and acting under color of law, the OGS Defendants knowingly and willfully denied Plaintiff the equal protection of the laws and, thus, knowingly and willfully denied, deprived, and/or violated Plaintiff's right to the equal protection of the laws, guaranteed by Article I, Section 11 of the New York State Constitution.

115.    The OGS Defendants knowingly and willfully treated Plaintiff differently from other applicants by denying its application on the basis of Plaintiff's exercise of its constitutional rights.

116.    Upon information and belief, the OGS Defendants intentionally chose not to explain the reasons for their denial of Plaintiff's application in writing and intentionally chose to cite pretextual justifications for the denial in addition to their true reason in order to impede Plaintiff's ability to vindicate its constitutional rights.

117.    In light of the foregoing, the OGS Defendants are liable to Plaintiffs in an action at law and suit in equity for redress of the Defendants' denials, deprivations, and violations of Plaintiff's civil rights and liberties and constitutional rights, privileges, and immunities.

### COUNT V
### Tortious Interference with Contract
### (NYRA Defendants)

118.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 95 above as if fully set forth herein.

119.    Plaintiff had a contract with Centerplate under which Plaintiff would participate as a vendor during the 2013 track season at Saratoga Race Course in exchange for payment to Centerplate of 25% of Plaintiff's gross food sales.

120.     Plaintiff began performing the contract and expended considerable time and money to erect its facilities at Saratoga Race Course.

121.     The NYRA Defendants were aware of the contract between Plaintiff and Centerplate.

122.     By expelling, and/or ordering, instructing, and/or encouraging the expulsion of, Plaintiff from Saratoga Race Course, the NYRA Defendants intentionally induced Centerplate to breach the contract or otherwise render performance under the contract impossible.

123.     As a result of this breach of contract, Plaintiff incurred significant damages in the form of lost sales.

124.     In light of the foregoing, the NYRA Defendants are liable to Plaintiffs in an action at law and suit in equity for the tortious interference with Plaintiff's contract with Centerplate.

<u>**COUNT VI**</u>
**Tortious Interference with Business Relations**
**(NYRA Defendants)**

125.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 102 above as if fully set forth herein.

126.     Plaintiff had business relations with Centerplate. Plaintiff had engaged in extensive negotiations with Centerplate regarding participation as a vendor at Saratoga Race Course. Plaintiff had worked with Centerplate concerning logistical coordination before and during the first day of the 2013 track season. Plaintiff had placed orders with Centerplate for food and supplies to be used in its sales at Saratoga Race Course. Plaintiff expended considerable time and money to erect its facilities at Saratoga Race Course.

127.     By expelling, and/or ordering, instructing, and/or encouraging the expulsion of, Plaintiff from Saratoga Race Course, the NYRA Defendants intentionally interfered with Plaintiff's business relations with Centerplate. That interference was tortious.

128.     The NYRA Defendants acted for a wrongful purpose because their actions in expelling, and/or ordering, instructing, and/or encouraging the expulsion of, Plaintiff from Saratoga Race Course were taken in violation of the laws and constitutions of the United States and New York State.

129.     As a result of Defendants' interference, Plaintiff was forced to end its business relations with Centerplate.

130.     In light of the foregoing, the NYRA Defendants are liable to Plaintiffs in an action at law and suit in equity for the tortious interference with Plaintiff's business relations with Centerplate.

**COUNT VII**
**Attorneys' Fees under 42 U.S.C. § 1988**
**(All Defendants)**

131.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 108 above as if fully set forth herein.

132.     Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorneys' fees incurred in enforcing its rights and seeking recovery under 42 U.S.C. § 1983.

**COUNT VIII**
**Attorneys' Fees under CPLR 8601**
**(All Defendants)**

133.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 110 above as if fully set forth herein.

134.    The actions taken by the OGS Defendants and the NYRA Defendants were not substantially justified under the laws of the United States or New York State.

135.    Pursuant to N.Y. CPLR 8601, Plaintiff is entitled to fees and other expenses incurred in this action.

### RELIEF REQUESTED

WHEREFORE, Plaintiff Wandering Dago Inc. respectfully requests the following relief:

a)  preliminary and permanent injunctive relief ordering Defendants to allow Plaintiff to participate in the Empire State Plaza Summer Outdoor Lunch Program and to participate as a vendor for the Saratoga Race Course track season, and enjoining Defendants from denying future applications or taking other adverse actions on the basis of Plaintiff's name;

b)  a declaratory judgment declaring that Defendants' conduct violates several provisions of the United States and New York State Constitutions;

c)  monetary damages including, but not limited to, lost profits and the diminution of the value of its business, exemplary or punitive damages, costs, interest, attorney's fees, expert witness' fees, and all other damages recoverable under 28 U.S.C. § 1983, et seq., under N.Y. CPLR 8601, and under the common law; and

d)  such other relief as the Court deems just and proper.


WANDERING DAGO INC. DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

Dated:  August 4, 2014                              Respectfully submitted,

23

**BOIES, SCHILLER & FLEXNER LLP**

_/s/ Michael Y. Hawrylchak _____
George F. Carpinello (Bar No. 103750)
Michael Y. Hawrylchak (Bar No. 518393)
30 South Pearl Street
Albany, NY  12207
Ph:  (518) 434-0600

*Attorneys for Plaintiff Wandering Dago Inc.*