# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

WANDERING DAGO INC.,

                              Plaintiff,

        - v -                                          Civ. No. 1:13-CV-1053
                                                              (MAD/RFT)

NEW YORK STATE OFFICE OF GENERAL
SERVICES, ROANN M. DESTITO, JOSEPH
J. RABITO, WILLIAM F. BRUSO, JR.,
AARON WALTERS, NEW YORK RACING
ASSOCIATION, INC., CHRISTOPHER K.
KAY, STEPHEN TRAVERS, JOHN DOES 1-5,
and THE STATE OF NEW YORK,

                              Defendants.

**APPEARANCES**:                          COUNSEL:

**BOIES, SCHILLER & FLEXNER, LLP**   GEORGE F. CARPINELLO, ESQ.
*Attorney for Plaintiff*                   MICHAEL Y. HAWRYLCHAK,  ESQ.
30 South Pearl Street
Albany, New York 12207


**OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL**             COLLEEN D. GALLIGAN, ESQ.
*Attorney for the State Defendants[1]*
The Capitol
Albany, New York 12224


**RANDOLPH F. TREECE**
**United States Magistrate Judge**

---

[1] Originally, the "State" Defendants were New York State, New York State Office of General Services, RoAnn M. Destito, Joseph J. Rabito, William F. Brusco, Jr., and Aaron Walters. Only the individual Defendants remain in this action. *See* Dkt. No. 54, Mem.-Dec. & Order, dated Jan. 15, 2014 (dismissing New York State and New York State Office of General Services based upon the Eleventh Amendment of the United State Constitution).  The erstwhile "NYRA" Defendants were New York Racing Association, Inc., Christopher K. Kay, and Stephen Travers.

**MEMORANDUM-DECISION and ORDER**

The issue presently before the Court is whether officials in one governmental agency and their Attorney can be sanctioned for the destruction of email(s), belonging to yet another governmental agency, *via* the New York State's Email Retention Policy. Essentially, would such an occurrence constitute spoliation of evidence, and, if so, are sanctions warranted? Here, Plaintiff moves this Court to sanction the individually named Defendants, who are employed by New York State's Office of General Services ("OGS"), and their current litigation Counsel, an Assistant Attorney General, for the systematic destruction of the Deputy Secretary of Gaming and Racing, nonparty Bennet Leibman's email(s).

In November 2014, Plaintiff initially raised the matter of Leibman's emails being deleted and requested that the Court take appropriate measures to remedy this spoliation by imposing an adverse inference against the OGS Defendants. Dkt. No. 114, Pl.'s Lt.-Mot., dated Nov. 6, 2014. As one would expect, a motion of this nature provoked an immediate and antagonistic row of Letter-Briefs between the parties. *See* Dkt. Nos. 120, Defs.' Lt.-Br., dated Nov. 10, 2014, 121, Pl.'s Lt.-Br., dated Nov. 14, 2014. During a Hearing, held on November 19, 2014, the Court addressed a myriad of discovery disputes, including the destruction of Leibman's emails. At that time, the Court declined to address the matter and directed further discovery, including

Leibman's deposition in order to better frame the issue. Dkt. No. 125, Disc. Order, dated Nov. 20, 2014, at pp. 4-5. After Leibman's deposition and further discovery were completed, Plaintiff renewed its claim of spoliation of evidence, Dkt. No. 141, Pl.'s Lt.-Br., dated Feb. 20, 2015, to which the Defendants responded, Dkt. No. 143, Defs.' Lt.-Br., dated Mar. 4, 2015. *See also* Dkt. No. 146, Pl.'s Lt.-Br., dated Mar. 9, 2015. Another Hearing was held on March 12, 2015, but to little avail. Because the record remained unclear, the Court directed further submissions. Dkt. Nos. 147, Text Order, dated Mar. 12, 2015, & 153, Hr. Tr., dated Mar. 12, 2015. Both parties filed their respective and final Letter-Briefs. Dkt. Nos. 150, Pl.'s Lt.-Br., dated Mar. 23, 2015, 152, Defs.' Lt.-Br., dated Apr. 17, 2015, & 153, Pl.'s Reply Lt.-Br., dated Apr. 24, 2015.[2] Plaintiff seeks the following relief: (a) a determination of spoliation; (b) upon such a determination, an adverse inference against the Defendants; (c) further discovery; and (d) costs and attorneys' fees. *See generally* Dkt. No. 150.

## I. LITIGATION HISTORY

The Court presumes the parties' familiarity with the facts and circumstances

---

[2] Plaintiff' Letter-Brief, dated March 23, 2015, is also comprised of Exhibits A through O, Dkt. Nos. 150-1 through 150-15. Dkt. No. 150.

Defendants' Letter-Brief, dated April 17, 2015, is also comprised of Exhibits A through K, Dkt. Nos. 152-1 through 152-15. Dkt. No. 152.

Plaintiff' Reply Letter-Brief, dated Apr. 24, 2015, is also comprised of Exhibits A through D, Dkt. Nos. 153-1 through 153-4. Dkt. No. 153.

and a full recitation of the facts can be found in *Wandering Dago, Inc. v. New York Office of Gen. Servs.*, 2014 WL 201968, at * 2-6 (N.D.N.Y. Jan. 15, 2014). However to place this Motion in its proper context, and because of the drastic remedy being sought could alter the entire complexion of this case, repetition of known facts and a detailed chronology are compelled.

## A. Complaint

Principally, this is a First Amendment case initially brought against two distinct organizations premised upon two idiosyncratic occurrences. In July 2013, the Plaintiff applied to be a food vendor at the Saratoga Race Course, which is owned by the New York Racing Association ("NYRA"). It appears that NYRA had received complaints about the "Dago" aspect of Plaintiff's name as being offensive and concluded that it would be in the best interest to remove its food truck from the premises. Included among the complainers was Bennett Leibman, Deputy Secretary of Gaming and Racing, who wrote the following email to Christopher Kay, President of NYRA, on July 19, 2013:

> I'm sure that the name of this particular food truck at the track is designed to be self-deprecating, but there is a food truck at the track from Schenectady known as the Wandering Dago. I just believe that people will find the name of the truck both offensive and insensitive, and that the fallout from authorizing this truck will inevitably land on NYRA. Is there some way to at least modify the name of this particular truck? I see this as a problem waiting to blow up.

Dkt. No. 150-1, Ex. A.

Earlier in 2013, Plaintiff filed an application to be a food vendor as a part of OGS's Empire State Plaza Outdoor Lunch Program. Plaintiff's application was initially denied, allegedly for an assortment of procedural and regulatory rationales, but also because of the offensive nature of the name.

In its Complaint, Plaintiff contends that a set of NYRA Defendants and another set of state actors violated the First (Free Speech Clause) and Fourteenth (Equal Protection Clause) Amendments of the United States Constitution as well as the New York State Constitution and its common law. *See generally* Dkt. No. 1. Compl. Included in the first series of Defendants were the State of New York and the New York State agency OGS. On January 15, 2014, the Honorable Mae A. D'Agostino, United States District Judge, dismissed (1) Plaintiff's federal and state Equal Protection claims against the NYRA Defendants, (2) claims against the State of New York and OGS, and (3) damage claims against the OGS Defendants in their official capacities. *See* Dkt. No. 54, Mem.-Dec. & Order, dated Jan. 15, 2014. Subsequently, the Plaintiff was permitted to amend its Complaint to include OGS's denial of its 2014 Application to the Empire State Plaza Lunch Program, Dkt. Nos. 85, Mem.-Dec. & Order, dated July 28, 2014, & 86, Am. Compl., and a Stipulation and Order of Dismissal with Prejudice was issued upon the Plaintiff's settlement with the NYRA

Defendants, Dkt. No. 140, Stip. & Order, dated Jan. 20, 2015.[3] The remaining Defendants are the OGS Defendants in their individual capacities. *See supra* note 1.

## B. Time Line of Critical Events

To appreciate the competing narratives and the overlap of key events, a chronology will be beneficial.

After Leibman sent his email to NYRA about the Plaintiff's truck on July 19, 2013, three days later, news stories were published about NYRA removing the Plaintiff from the Saratoga Race Course as well as mentioning that it was denied a vendor's license at the Empire State Plaza; the Saratogian newspaper also added that "an unidentified state official [] complained that the name was offensive." Dkt. No. 150-7, email, dated July 22, 2013 (with news article embedded therein). On July 22, 2013, Leibman sent an email to the Governor's Executive Chamber, alerting the Governor's secretary, possibly the Governor's Special Counsel, and the Governor's Press Office about his email to NYRA and being the unidentified state official, but not to the Governor. Dkt. No. 152-13. Bennet Leibman Dep., dated Feb. 6, 2015, at pp. 23-24.

On August 13, 2013, Plaintiff's Counsel sent a letter to the Attorney General,

---

[3] Originally, the Plaintiff was seeking both monetary and injunctive relief. *See generally* Dkt. No. 1, Compl. Recently, the Plaintiff has withdrawn the quest for monetary damages but continues to pursue declaratory and injunctive relief. *See* Dkt. No. 143-1, Pl.'s Lt., dated Jan. 15, 2015.

Commissioner of OGS, and the President of NYRA about how OGS denied the Plaintiff's application on May 20, 2013, and how NYRA expelled it from the Saratoga Race Course on July 19, 2013, based upon the advice of high-ranking state officials. Dkt. No. 150-4, Pl.'s Lt. Two weeks later Plaintiff commenced this lawsuit against NYRA and the OGS Defendants, but did not include members of the Executive Chamber, the New York State Gaming Commission, nor Leibman. Dkt. No. 1, Compl., dated Aug. 27, 2013. Upon the commencement of this lawsuit, Leibman submitted a weekly report advising the Executive Chambers about the lawsuit and stating that the "[f]ood truck owners [Plaintiff] who were evicted by NYRA due to their use of a defamatory name have brought suit in federal court against NYRA for the ouster and against OGS for not letting it sell at the Empire State Plaza. I may be a witness in the suit." Dkt. No. 150-5, Weekly Rep., dated Aug. 30, 2013.

Immediately after the commencement of the lawsuit, the Plaintiff filed for a Preliminary Injunction and a Hearing was held on September 19, 2013. For the first time, Leibman was publicly acknowledged as the state official who sent the email to NYRA, which was introduced into evidence. Dkt. No. 150-6, Hr. Tr., dated Sept. 13, 2013, at pp. 45-46. In the interim, on September 3, 2013, the Attorney General's Office filed a Notice of Appearance on behalf of all of the State Defendants. Dkt. No. 16, Defs.' Notice of Appearance.

In 2007, New York State instituted an email retention policy, which essentially stated that all email messages older than 90 days would automatically be deleted each evening. Dkt. No. 150-2, Ex. B. Because of this policy, Leibman's emails, dated July 19 and 22, 2013, were deleted on October 17, 2013, and October 20, 2013, respectively.[4] Obviously, a litigation hold had not been instituted to prevent the loss of these emails. However, on May 24, 2014, after the Plaintiff had moved to amend its Complaint in order to add Leibman as a Defendant, a litigation hold relative to this litigation was instituted within the Executive Chamber.[5] Dkt. No. 152, App. 1, Timeline. Since Leibman is not a party to this action, on July 3, 2014, the Plaintiff served a subpoena upon him for the production of documents, including his emails. Upon the service of the subpoena, Leibman requested representation from the Attorney General's Office. And, on or about October 31, 2014, the Plaintiff was advised that Leibman's emails were automatically deleted pursuant to the above mentioned retention policy. Dkt. No. 114, Pl.'s Lt.-Mot., dated Nov. 6, 2014, at p. 1.

## II. THE PARTIES' CONTENTIONS ON SPOLIATION

The Plaintiff does not seek sanctions against nonparty Leibman, but rather seeks

---

[4] Hard copies of these emails were made available to all parties by the NYRA Defendants.

[5] With regard to Plaintiff's Motion to Amend, and based upon the facts that were proffered at that time, this Court found joining Leibman as a party was futile. Dkt. No. 85, Mem.-Dec. & Order, dated July 28, 2014, at pp. 24-28.

sanctions against the named OGS Defendants "because of the conduct of their counsel, the Office of the Attorney General, in failing to preserve documents that were clearly relevant to this litigation and were still available to be preserved after this action was brought and after Mr. Leibman's involvement was raised in open court." Dkt. No. 146, Pl.'s Lt.-Br., dated Mar. 9, 2015, at p. 1. The underlying premise of the Plaintiff's position is that the State of New York, as represented by the Attorney General's Office, was on notice that Leibman's emails would be relevant to this litigation, which was commenced on August 27, 2013, and clearly were on notice during the Hearing held on September 19, 2013, when Leibman's identity was publicly exposed and his email was placed into the record. Dkt. No. 114 at p. 2. The Plaintiff further contends that the Defendants and their Counsel had further notice of the litigation and the emails' relevance when Leibman submitted his weekly report to the Executive Chamber, and when it served the Attorney General's Office and OGS with its pre-litigation letter. Dkt. No. 150 at pp. 1-2. The Plaintiff posits that the Defendants, their Counsel, and the Executive Chamber had sufficient notice to preserve these documents before they were automatically deleted pursuant to the State's Email Retention Policy.

Additionally, the Plaintiff submits that it is reasonable to infer there are more than just these two noted emails that may be relevant to this litigation and, in all

likelihood, are now missing because of the retention policy.  The Plaintiff draws the

Court's attention to a July 22, 2013 email from the Executive Chamber and the

Governor's public statement on or about September 23, 2013, to support its contention

that there was a coordination of effort between various state officials and "multiple

arms of State government" with regard to conducting business within the state and the

ensuing lawsuit.  Dkt. No. 141 at p. 2.  Apparently, reporters were asking questions

about the expulsion from NYRA and denial of the vendor license.  The Governor's

press officer sent an email blast to the press officers of the State Department, OGS,

and Gaming, as well as Leibman asking whether they had been approached by

reporters and if so what had they said.  Dkt. No. 150-7, emails, dated July 22, 2013.

OGS's press spokesperson, Heather Groll, responded in the negative.  *Id.* ("Nothing

– They haven't asked and we haven't reached out[.]").  When questioned by a reporter

about what transpired at the Saratoga Race Course, Governor Cuomo strongly

defended Leibman, and expressed, "I think if you had a state official that didn't see

the name 'Wandering Dago' and a buzzer went off or a flag was raised, then you

would say that person was asleep at the switch, right?"  Dkt. No. 150-8.  From this,

the Plaintiff extrapolates that the Governor "necessarily encourage[d] official action

against [it]," and that "[i]t is reasonable to believe that internal Executive Chamber

emails would have discussed both incidents."  Dkt. No. 153, Reply Lt.-Br., dated Apr.

24, 2015, at p. 4.

In sum, the Plaintiff argues that these Defendants and its Counsel had an obligation to preserve not only Leibman's documents but those emails that may have emerged from the Executive Chamber, that they had the requisite culpable state of mind, even if its is merely negligence, and, because, there is a coordinated campaign by high-level state officials to effectively bar it from operating on state property, sanctions are warranted and the most efficacious sanction is an adverse inference. Dkt. No. 146 at pp. 2-6.

The Defendants and its Counsel assert they cannot be held responsible for an purported spoliation of these emails because (1) they had no control over Leibman's emails or even the Executive Chamber's documents nor the ability to direct a preservation of those documents; (2) the emails relate solely to Plaintiff's claims against NYRA, who is no longer a party to this litigation by virtue of a settlement and thus are not relevant; and, (3) prior to July 3, 2014, Counsel did not represent the nonparty Leibman and therefore neither the Defendants nor Counsel had any legal authority to direct a preservation hold. Dkt. No. 152, Defs.' Lt.-Br., dated Apr. 17, 2015.

They note that at the time of the litigation, the Attorney General's Office was representing only those OGS Defendants who had been sued. Further, at that same

moment, Liebman was merely a nonparty, and legal representation for him had neither been requested nor warranted. They argue that the AG's Office was not obligated to provide any representation or legal intervention on his behalf until he was served with a subpoena for his testimony and production of documents on the July 3, 2014. Dkt. No. 143-3 (Subpoena). However, by that time, the emails had been administratively deleted nine months earlier. Dkt. No. 152 at p. 2. The Defendants insist that the loss of these emails cannot be attributable to them. *Id.* In fact, as soon as they were named as parties to this litigation, a litigation hold was instituted upon their's and OGS's records, and eventually over 1,000 pages, including emails, were produced during discovery. *Id.* at p. 3. They contend that a nonparty's alleged spoliation should not be a basis for sanctions against them, and "[s]imply put, [they] did not have the ability to or obligation to preserve or direct preservation of documents in the control of Leibman or the Executive Chambers." *Id.*

The Defendants also rely upon the fact that Leibman, who was not a party, had no obligation to maintain the emails at issue, even though he thought he may be a witness. Dkt. No. 143, Defs.' Lt.-Br., dated Mar. 4, 2015, at p. 3. They remark that Leibman did not destroy the documents nor had the requisite culpable state of mind to do so, and that the email's disappearance was due solely to an automatic retention policy. And lastly, Defendants strenuously debate the relevance and utility of these

emails to the remaining claims in this action. *Id*. In this respect, the Defendants contend that neither Leibman nor members of the Executive Chamber had any involvement in OGS's or the individual Defendants' decision to deny Plaintiff a permit to participate in the OGS Summer Lunch Program. In their considered view, there is no nexus between Leibman, OGS, and the Executive Chamber regarding the issues being litigated. *Id*. at p. 4.

## III. SPOLIATION

### A. The Law

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). The spoliation of evidence germane to an issue at trial can support an inference that is unfavorable to the party responsible of the destruction. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). The obligation to preserve evidence of this nature occurs when a party has notice or knowledge or should have known that the evidence may be relevant in future litigation. *Fujitsu Ltd. v Fed. Express Corp*., 247 F.3d 423, 436 (2d Cir. 2001). If there is a finding that a party has failed to uphold its duty to preserve evidence, "[t]he determination of an appropriate sanction, if any,

is confined to the sound discretion of the trial judge . . . and is assessed on a case-by-case basis." *Id*. at 436 (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 & *United States v. Grammatikos*, 633 F.2d 1013, 1019 (2d Cir. 1980); *see also Reilly v. Natwest Mkts. Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (noting that the case-by-case approach "seems to be working").

The authority to impose sanctions can be found statutorily and/or dwelling within a court's inherent authority. Should a party fail to obey a discovery order, a court may resort to Federal Rule of Civil Procedure 37(b) in levying a just disposition for such failure. "Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998) & *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). Sanctions can range from dismissal of a complaint to rendering an adverse inference instruction to a jury. Notwithstanding a court's wide latitude in determining an appropriate sanction for spoliation, the Second Circuit reminds us "that the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (quoted in *Beers v. Gen. Motors Corp.*, 1999 WL 325378, at *3 (N.D.N.Y. May 17, 1999); *see*

*also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 149 (2d Cir. 2008) (citing *West v. Goodyear Tire & Rubber Co.*).  That is,

> [t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150 F.3d at 126).

Where a party seeks an adverse inference instruction based upon the destruction of evidence, it must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (citations and quotation marks omitted). And, in order for an adverse inference instruction to be imposed against a party for the destruction of evidence, that party must have had control over the evidence and an obligation to preserve it at the time that it was destroyed.  *Kronisch v. United States*, 150 F.3d at 126.

Over the years, the Circuit has vacillated as to what degree a party's culpable state of mind is required before an adverse inference instruction is appropriate.  At

various times, intent, bad faith, or gross negligence were the prerequisites. *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001). Under current analysis and other certain circumstances, even negligence may prove sufficient to garner an adverse inference charge. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 108. Nonetheless, the burden to produce some evidence indicating that the destroyed document is relevant to substantiating a claim or defense resides with the party who claims to be prejudiced by the destruction. *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d at 108; *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008) (citing *Byrnie*). But a court is cautioned not to hold the prejudiced party to too strict of a standard of proof; sufficient circumstantial evidence may be enough to meet the burden. *Byrnie*, 243 F.3d at 110 (citations omitted).[6] In the final analysis, an "adverse inference instruction is an extreme sanction and should not be imposed lightly." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (*Zubulake IV*).

## B. Analysis

The Court is now required to juxtapose the elements essential to imposing an

---

[6] "[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator with an adverse inference instruction." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999). Yet, where a party destroys evidence in bad faith, "bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002).

adverse inference instruction with the factual development in this case.

### 1. The Duty to Preserve

The fundamental principles guiding a party as to its responsibility to preserve evidence occurs when it has (1) notice or knowledge or should have known that the evidence may be relevant in future litigation, *Fujitsu Ltd. v Fed. Express Corp*., 247 F.3d at 436 and (2) control over the evidence and an obligation to preserve it at the time that it was destroyed, *Kronisch v. United States*, 150 F.3d at 126. If these two principles are at play, thereby invoking a litigation hold, it will be incumbent upon the party's counsel to monitor compliance with the litigation hold, ensuring that relevant information is retained so that it can be discovered. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431-34 (S.D.N.Y. 2004) (*Zubulake V*). To further that assurance, once a party reasonably anticipates litigation there should be a suspension of its routine document retention and destruction policy. *Id*. at p. 218.

To briefly recount, the matter of spoliation is directed at Leibman's emails that were destroyed pursuant to New York State's Email Retention Policy. Under that policy, Leibman's June 19 and July 22, 2013 emails were automatically deleted on October 17 and 22, 2013 respectively.[7] The Court starts with the obvious observation

---

[7] "Messages older than 90 days are deleted each evening." Dkt. No. 150-2 (NYS email retention policy).

that as of the deletion dates, there was no litigation hold in place as to the emails of Leibman, the Gaming Commission, or the Executive Chamber. And, the Court finds that neither the individual Defendants nor their Attorney had a duty to preserve Leibman's emails.

First, and curiously, the Plaintiff does not wish to hold Leibman accountable for the destruction of his emails but rather seeks to foist the obligation of preservation and the consequence for failing to do so upon the named Defendants and their Counsel. But even if the Plaintiff sought to hold Leibman responsible for the preservation his emails, such an attempt would fail as well simply because Leibman is and has always been nothing more than a nonparty witness to this litigation. Although Leibman advised members of the Executive Chamber's press corp and possibly others that he was the person who communicated with NYRA about the Plaintiffs' moniker and the objectionable perception that it may generate with Saratoga Race fans, and later in a weekly that he could conceivably be a witness should there be litigation, these simply are not sufficient reasons by themselves for him or anyone else to reasonably anticipate that he or members of the Executive Chamber would be litigants in a matter involving NYRA. Even when his name and emails were revealed during a Hearing, his status as a nonparty had not changed and, therefore, seeking sanctions against Leibman would prove problematical for the

Plaintiff. More importantly, the Plaintiff did not cite nor did this Court unearth any precedent that places the onus on the failure of a nonparty to preserve evidence upon the current litigants in a case, primarily because the litigants would not have control over the evidence. Merely because one suspects that he could be a witness does not generally impose an across-the-board or a state-wide duty to preserve. *See Zubulake IV*, 220 F.R.D. at 217.

Unless a litigant had control over the relevant documents or the nonparty, the contention of spoliation is dubious. Where a party against whom sanctions are sought "has not been shown to have had any responsibilities related to the maintenance, preservation or destruction of the evidence at issues, and the loss of that evidence is instead attributable to non-parties . . ., [a plaintiff] has failed to show that Defendants . . . had any role with respect to the maintenance or participated in the destruction[.]" *Grant v. Salius*, 2011 WL 5826041, *3 (D. Conn. Nov. 18, 2011); *accord Mahar v. U.S. Xpress Enters*., Inc., 688 F. Supp. 2d 95 (N.D.N.Y. 2010 (noting, generally, that the party possessing evidence is presumed to bear the expense of preservation, however, the presumption can be overcome "where a nonparty is in possession of the requested evidence"); *see also Alfieri v. Guild Times Pension Plan*, 446 F. Supp. 2d 99, 112 (E.D.N.Y. 2006) (finding that an important security log book that was not preserved was actually maintained and controlled by the New York Times, "a separate

entity from the defendant Pension Plan"); *Mikko v. Estate of Smock*, 2013 U.S. Dist. LEXIS 166759, at * 4-5 (E.D. Mich. Nov. 25, 2013).

Indeed, the duties to preserve and maintain control over relevant documents are scrutably synonymous. Prominently then, the test turns on the legal right, authority, or practical ability to obtain the materials being sought during discovery. *In re NTL, Inc. Sec. Litig. v. Blumenthal*, 244 F.R.D. 179, 195-97 (S.D.N.Y. 2007). Here, the individual Defendants correctly assert that they have no control over Leibman's emails, the Executive Chamber's emails, or over other emails pertaining to NYRA. Instead, when litigation was commenced against them, they and their agency, OGS, met their obligation by preserving those documents that were within their control and possession, and ultimately disclosed 1000 pages of documents relevant to the Empire Plaza Summer Program, including emails. The Plaintiff suffers under the erroneous notion that when a governmental agency and its officials are defendants in any litigation, they and their counsel are required to preserve and produce documents belonging to another governmental agency. To cling to such a proposition of law would lead to illogical consequences. As noted in a prior action, if the Court was to accept the Plaintiff's theory, any lawsuit brought against an agency of the State would consequently

> subject all twenty-two agencies, the legislature, the judiciary, quasi-state
> agencies, and possibly public authorities to disclosure scrutiny,

notwithstanding their relative remoteness to the issue of the case. Not only would such a discovery mandate be unduly burdensome and cumbersome but totally untenable and outside the spirit of the Federal Rules. How would one agency know what another possess without a blanket inquiry of all that constitutes New York State governance. Such an encumbrance can only precipitate absurd results.

*Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 266 (N.D.N.Y. 2006).

The Court found then, as it maintains now, that state agencies for most purposes are separate and distinct organs and should not be viewed in the aggregate. *Id*. (citations omitted). Clearly, the mission of OGS and its officials are strikingly dissimilar in every material respect from the Deputy Secretary on Racing and Wagering or the Gaming Commission. None of their respective functions and authorities cross-pollinate in any manner. *A fortiori*, the OGS Defendants would not have any control over Leibman's, the Gaming Commission's, NYRA's, or the Executive Chamber's emails and documents. Furthermore, the Court is persuaded by the rhetorical reasoning in *Zubulake IV*, when that court posed the following question:

> Must a corporation, upon recognizing the threat of litigation preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly 'no'. **Such rule would cripple large corporations, like UBS, that almost always involved in litigation**.

*Zubulake IV*, 220 F.R.D. at 217 (emphasis added).

Considering that hundreds of lawsuits are filed daily against New York State, the same observations holds true for New York State and its global infrastructure that requiring  each agency and thousands of officials to institute a litigation hold every

time a party contemplates or even commences litigation against another agency would paralyze the State.

The record before the Court buttresses the proposition that the OGS Defendants are independent and distinct from Leibman. Both OGS spokesperson Heather Groll and Leibman testified that they do not know each other nor ever communicated about the Plaintiff's respective claims against either NYRA and OGS. Dkt. Nos. 152-8, Heather Groll Dep. at pp. 12, 15, & 152-13, Bennet Leibman Dep. at p. 43. Others who were deposed confirmed that they did not communicate with anyone outside of the OGS agency, including the Executive Chamber or Leibman. Groll Dep. at p. 15; Dkt. Nos. 152-10, Joe Cavazos Dep. at pp. 86 & 152-12, Joseph Rabito Dep. at p. 44. None of the OGS documents or emails establish any inkling that there were any communications with anyone outside the purview of OGS with respect to the Plaintiff. Dkt. No. 152, Defs.' Lt.-Br. at p. 2. And, the Executive Chamber's press core's July 22, 2013 email and possibly another inquiring whether officials from the Department of State, Gaming Commission, and OGS had been contacted by news reporters does not suggest an interplay or collaboration amongst these agencies regarding the Plaintiff's or its pending lawsuit. *See* Dkt. No. 150-7 (email exchange).

Some lower courts have held that the preservation obligation "runs first to counsel" to advise his client of the potential relevant information that must be

preserved. *Chan v. Triple 8 Palace, Inc*., 2005 WL 1925579, at *6 (S.D.N.Y. Aug. 11, 2005) (citations omitted); *Zubulake IV*, 220 F.R.D. at 218. However, seeking to sanction the Defendants' Counsel, an Assistant Attorney General, for the failure to place a litigation hold on either Leibman's documents or the Executive Chamber's lends no solace to the Plaintiff's position. First, Defendants' Counsel never represented Leibman until he requested representation on or about July 3, 2014, more than eight months after his emails were destroyed pursuant to the State's Email Retention Policy. Nor did Counselor have any authority to direct Leibman, the Executive Chamber, or the Gaming Commission to preserve emails and documents that may tangentially involve the Plaintiff as it pertains to the NYRA lawsuit. NYRA is not a state agency. True, the Attorney General's Office has the authority to prosecute and defend all actions in which the State and its respective agency may be involved. However, "[n]o action or proceeding affecting the . . . state shall be . . . defended . . . by any . . . agency . . ., without a notice to the attorney-general apprising him of the said action or proceeding, [and] the nature and purpose thereof[.]" N.Y. EXEC. LAW § 63(1). The requirement notification to trigger the Attorney General's duty to defend a state official is conditioned upon the delivery to the Attorney General or an Assistant Attorney General a copy of the summons, complaint, process, notice, demand or pleading within five days after he/she is served with such document. N.Y.

PUB. OFF. LAW § 17(4). Thus, until the Attorney General has been officially notified by either a state employee or an agency that an action has been commenced against he/she/it, he has no active litigation role.

Here, when the individual OGS Defendants were served with a Summons and Complaint, exercising their rights under Public Officers Law § 17, an Assistant Attorney General was assigned to represent them. Upon receiving that assignment, the Defendants' Counsel surely advised the Defendants and its agency to place a litigation hold on any documents that they may have been relative to the Plaintiff and its application for the summer program. Pursuant to the Defendants' and Counsel's efforts thousands of pages of OGS documents were disclosed to the Plaintiff. The Plaintiff is not complaining that Defendants' Counsel failed to properly preserve and disclose OGS documents. Similarly, not until Leibman sought legal representation in July 2014 to respond to a subpoena did the Attorney General's Office, and the Defendants' Counsel, in particular, who was given this assignment, have any duty to seek a litigation hold for Leibman's documents and emails. The Attorney General had no reasonable notice that Leibman was or would be subject to litigation and hence no reason to intervene. Knowledge that a state employee may be a witness in a case that does not involve the State or a state agency does not alone activate any role by the Attorney General's Office. Neither the Plaintiff's August 13, 2013 letter advising

OGS, NYRA, and the Attorney General that a suit may be commenced nor Leibman's weekly report to the Executive Chamber about the possibility of being a witness are sufficient to have triggered the Attorney General's duty on Leibman's behalf or to place a litigation hold on his files and records.

In support of its position that the Attorney General's Office has an active role in preserving all evidence affecting officials and agencies, the Plaintiff cites to a case from the Western District of New York, *Gross v. Lunduski*, 304 F.R.D. 136 (W.D.N.Y. 2014). However, the facts in *Gross* are remarkably distinguishable from the events in our case. Gross was a prisoner who sued a correctional officer for violating his Eighth and Fourteenth Amendment rights. During the litigation, Gross requested the production of certain records, *inter alia*, pertaining to prior and subsequent excessive force complaints and the Inspector General files. The defendants, who were represented by the Attorney General's Office, filed a motion seeking a protective order against Gross's requests. Though the requested documents belonged to the Department of Corrections and Community Services ("DOCCS"), the defendant's employer, the defendant staked out the position that he did not have possession, custody, or control of such records and, therefore, had no authority to compel compliance with the discovery demand. In fact, the record established that his counsel made repeated requests to DOCCS for responsive documents, which were

received while others were withheld. The *Gross* court correctly rejected the defendant's argument because the record demonstrated that "the interest of DOCCS in promoting the safety of inmates held for correctional objectives . . . is congruent with Defendant's responsibility as a DOCCS correctional officer to carry out these public objectives on behalf of DOCCS." *Id*. at 143.[8] In essence, "DOCCS and Defendant's interests are sufficiently aligned and closely interrelated" and share a "common interest" with "a history of cooperation demonstrating DOCCS's willingness to produce documents required in the defense of a correction officer[.]" *Id*. Consequently, the closely coordinated interest and the irrefutable litigation history of cooperation between employer and employee in defending against these types of constitutional claims, in effect, gave the defendant and his counsel the practical ability to obtain access to the documents even if they were in the possession of this nonparty agency.[9]

Here, the interest of Leibman – who had a tangential relationship with the NYRA claims – and OGS Defendants – who have no relationship with the NYRA

---

[8] When rendering this decision, the Honorable Leslie G. Foschio, United States Magistrate Judge, made it clear that the facts and circumstance before him where "in contrast to the circumstances in *New York v. Nat'l R.R. Passenger Corp*., 233 F.R.D. 259, 264-65 (N.D.N.Y. 2006[.]" *Gross v. Lunduski*, 304 F.R.D. 136, 143 (W.D.N.Y. 2014).

[9] This Court and practically every other court within the Second Circuit share the same observations pronounced by Judge Foschio and that for litigation purposes, unless there is an obvious conflict of interest, DOCCS and its correctional officers are essentially inseparable when defending against constitutional claims.

claims – were not congruent, aligned, nor interrelated and thus neither the Defendants nor their Counsel had the practical ability to control Leibman's documents or to even suggest a litigation hold. Nor did Leibman have any interest or stake in the claims filed against the OGS Defendants and thus had no control over their documents.

For these reasons, the Plaintiff has failed to establish that the Defendants and their Counsel had a duty to place a litigation hold on either Leibman's or the Executive Chamber's emails.[10]

## 2. Culpable State of Mind

The second element that the Plaintiff must prove is that the records were destroyed with a culpable state of mind. *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002) (citing *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 107-12 (2d Cir. 2001); *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008) ("The party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence.") (citation omitted). This factor is fulfilled when there is a showing that the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or *negligently*." *Residential Funding*, 306 F.3d at 108 (alteration and emphasis in the original). In determining

---

[10] Leibman opined that if there was a requirement to preserve his email before July 2014, it probably would have fallen upon Governor's Counsel Office. Dkt. No. 152-11, Leibman Dep. at pp. 58-61.

culpability, a case-by-case approach is preferable because failures to produce or preserve can occur "along a continuum of fault – ranging from the innocence through the degrees of negligence to intentionality." *Id*. (quoting *Reilly v. Natwest Markets Group*, 181 F.3d 253, 267 (2d. Cir. 1999)). Proof of culpability can be established by enough circumstantial evidence to permit a reasonable trier of fact to conclude that the destroyed documents would show spoliation. *Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d at 110. Intentional, grossly negligent, or bad faith can support such an inference and would constitute sufficient circumstantial evidence. *Residential Funding Corp. v. DeGeorge Fin. Corp*. 306 F.3d at 109-10. However, the Second Circuit has made clear that failure to institute a litigation hold does not constitute gross negligence *per se. Chin v. Port Auth. of New York & New Jersey*, 685 F. 135, 162 (2d Cir. 2012).

Leibman's two emails were administratively deleted and consequently unretrievable. And, there is no proof to the effect that this loss was the product of a deliberate act or in bad faith by Defendants or their Counsel, or, for that matter, anyone else. There is no proof that these Defendants or their Counsel recognized the evidence as being harmful to them and/or took steps to purposely demolish them. Even if the Plaintiff was to argue that the individual Defendants and their Counsel may have been negligent, and they were not, this Court has already found that neither

had a duty to preserve, thus there was no breach. *Grant v. Salius*, 2011 WL 5826041, at *2 (noting that an adverse inference may not be appropriate when the party had "no duty or role with respect to the maintenance or destruction of the evidence at issue"). Even when there has been a finding of either gross negligence or mere negligence, other courts have ruled that without bad faith or egregious conduct, the imposition of sanctions, particularly an adverse inference instruction, was not warranted. *Treppel v. Biovail Corp.*, 249 F.R.D. at 121 (finding at least negligence); *Chan v. Triple 8 Palace, Inc.*, 2005 WL 19225579, at *9 (finding gross negligence); *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (*Zubulake IV*) (discussing negligence); *compare Dataflow, Inc. v. Peerless Ins.*, 2014 WL 148685, *3 (N.D.N.Y. Jan. 13, 2014) (finding gross negligence and imposing sanctions). Accordingly, the Plaintiff has not met its burden in demonstrating any culpable conduct on the part of the Defendants or their Counsel.

3. Relevance

The third element that the Plaintiff must prove is relevance of the destroyed emails. "[I]n connection with an application for an adverse inference,

> relevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.

*Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, at *7 (quoting *Residential Funding*, 306 F.3d at 108-09).

Essentially, in this context, relevance means that the destroyed evidence would have been favorable to the movant against the alleged spoliator and support the claims. *Zubulake V*, 229 F.R.D. at 431 (citing *Zubulake IV*, 220 F.R.D. at 221).

Leibman's two emails pertained exclusively to his communication with NYRA's President about the Plaintiff and informing the Executive Chamber of his communication with NYRA.[11] The subject matter of those emails were selectively about NYRA. Neither destroyed email concerned OGS or OGS Defendants and, in any event, they serve no relevance as to why the OGS Defendants denied the Plaintiff the ability to participate in the Summer Program during the 2013 and 2014 summers. And the fact that the NYRA Defendants are no longer a parties to this action, vitiates any relevance or vitality that these emails may have possessed regarding this litigation. *See* Dkt. Nos. 139 & 140, Stip. & Order, dated Jan. 20, 2015 (Dismissal with Prejudice). In an attempt to bolster the relevance of these emails, the Plaintiff expounds upon the significance of Governor Cuomo's comments to reporters that he would have expected a state official to advise NYRA of the perception issue caused

---

[11] Copy of the July 19, 2013 email was disclosed by NYRA and the July 22, 2013 email was embedded in the Executive Chamber's inquiry as to any contact with reporter which was disclosed by OGS Defendants. OGS's disclosure of the July 22, 2013 email belies any notion that the OGS Defendants and Counsel failed to preserve relevant documents.

by the Plaintiff's name[12] and its argument that "[i]t is reasonable to believe that Executive Chambers' email would have discussed both incidents." Dkt. No. 153, Pl.'s Reply Lt-Br. at p. 4. The Plaintiff submits this may indicate "a coordinated campaign by certain high level state officials to effectively bar Wandering Dago from operating on any state property." Dkt. No. 146, Pl.'s Lt.-Mot., at p. 3. Though Plaintiff's extrapolation may generate an inference, it is not a reasonable one when you consider the record. Furthermore, Leibman's emails regarding NYRA to the Executive Chamber are tenuous, at best, to draw any connection between the Executive Chamber and OGS regarding OGS's denial of Plaintiff's application.

Leibman made clear that after his July 22 email, he did not receive any reply emails nor did anyone speak with him about the content of his email or his contribution to the weekly report. Leibman Dep. at pp. 46, 61 ("I never get any feedback for anything I do in these [weekly] reports."), & 63.[13] It was the weekly

---

[12] The Governor's commentary is nothing more than an endorsement of Leibman's conduct and not an exhortation or encouragement for state officials to act adversely toward the Plaintiff.

[13] Plaintiff's interrogation and Leibman's responses were as follows:
Q: Did you have any discussion with anyone in the executive chamber about the Wandering Dago, other than what you have already testified, before the Governor made these remarks?
A: No.
Q: Did you have any discussion with anyone in the executive chamber after the Governor made these remarks, other than what you have already testified to?
A: I think someone – I don't remember – said, Hey, the Governor really backed you up there. But I don't recall anything beyond that.

(continued...)

report, and not his emails, that advised the Executive Chamber that he may be a witness in the NYRA litigation.[14]  There were no responses from anyone regarding the weekly report.[15]  There is nothing else in the record indicating that Leibman spoke with high level officials about the litigation.  Leibman Dep. at p. 63.  Likewise, the July 22, 2013 email from the Executive Chamber's press office discussing the New York Times and Saratogian Articles and trying to determine if reporters have talked to other state officials does not furnish any greater credence to Plaintiff's contention.  Similarly, other OGS officials state that they had no communications with Executive Chamber about the Plaintiff's claims against them, Plaintiff's application for the Summer Program, or the NYRA matter.  The Court finds that Plaintiff's reliance upon the Governor's comment is misplaced and such comments simply does not possess the *gravitas* attributable to it by Plaintiff's claims.  First, Defendant Rabito had already denied the Plaintiff's application for the 2013 Summer Program long before the Governor spoke.  And, second, the record is devoid of any other reference, direction, or policy emanating from the Governor or the Executive Chamber relative to the

---

[13](...continued)
Dkt. No. 152-13, Bennet Leibman Dep. at p. 63.

[14] Other than Heather Groll who served as OGS's press officer and spokesperson, employees and officials within OGS did not receive the weekly reports.  Dkt. No. 152-8, Heather Groll Dep. at p. 25.  An exception is OGS Deputy Commissioner who may have received the weekly reports but did not contribute to them.  Dkt. No. 152-10, Joe Cavazos Dep. at p. 85.

[15] The August 30, 2013 weekly report was provided to the Plaintiff.

Plaintiff. The Plaintiff's contentions are tenuous at best.

The Plaintiff has failed to show that the missing evidence would have been favorable to it. The Plaintiff has also failed to demonstrate the level of prejudice that has been visited upon it by the destruction of these emails. To the extent some prejudice was foisted upon the Plaintiff, it is not severe enough to warrant sanctions. And where the destroyed evidence is of limited or marginal relevance, an adverse inference instruction is inappropriate. *Chin v. Port Auth. of New York &* New *Jersey*, 685 F.3d at 162; *Mahar v. U.S. Xpress Enters., Inc.*, 668 F. Supp. 2d 95 (N.D.N.Y. 2010) ("marginal evidence').

In weighing the three elements necessary to secure an adverse inference instruction, the Court finds that Plaintiff has failed to meets its burden.

## IV. DEMAND FOR FURTHER DISCOVERY

For virtually identical arguments proffered in seeking sanctions against the Defendants and their Counsel, the Plaintiff seeks an extension of the discovery deadline[16] in order to engage in further discovery from the Executive Chamber and OGS. The Plaintiff asserts that the need for additional discovery is necessitated by the Defendants' Counsel spoliation of evidence. Dkt. No. 150, Pl.'s Lt.-Br. at p. 4. This quest for greater discovery is further augmented by the claim that the Plaintiff was

---

[16] The discovery deadline expired on February 20, 2015.

stymied in obtaining adequate discovery regarding the denial of its application to participate in the 2014 Plaza Summer Program.

The Plaintiff contends that not only were Leibman's records not preserved but neither were Executive Chamber's emails. Relying upon its postulation that various state officials, spearheaded by Governor Cuomo's September 23, 2013 full-throated defense of Leibman, engaged in a closely coordinated effort to keep it off of state property, the Plaintiff submits that the denial of its application to participate in the 2014 Plaza Summer Program could have only come from the Executive Chamber. The Plaintiff bases its postulation upon the dearth of acceptable information garnered from deposing OGS employees: "Despite deposing numerous OGS employees, including individuals directly involved in the 2014 application process, Plaintiff has been unable to learn how or by whom the decision to deny its 2014 application was made." Dkt. No. 150 at p. 2. Citing that the OGS witnesses' curious lack of recollection as to who was the ultimate decision-maker in the denial of the 2014 application, "combined with the evidence that high State officials – including the Governor himself – were aware of Wandering Dago and had encouraged official action against it," the Plaintiff contends that "this rise[s] to a reasonable inference that high-level State officials had a hand in the 2014 application denial." *Id*. at p. 4. Therefore, Plaintiff requests additional discovery to further explore the potential

involvement of officials in the Executive Chamber. *Id*. The Court disagrees that Plaintiff's inference is reasonable or that there is anything in the record that remotely suggests that the Executive Chamber was involved in the 2014 application denial.

It is accurate, in some sense, that the depositions of OGS witnesses did not pinpoint the blame of the 2014 denial upon a specific person. Defendant Rabito, who made the decision to deny the Plaintiff's 2013 application, averred that he played no role in the 2014 application. Dkt. No. 152-12, Rabito Dep. at pp. 36 & 85. The Plaintiff submits that both Associate Commissioner Joseph Cavazos and Defendant Bruso expressly testified that the 2014 decision was not premised upon the 2013 denial. Dkt. No. 150 at p. 3.[17] The other OGS witnesses, especially those who played

---

[17] The Court does not subscribe to the Plaintiff's construction of Cavazos's deposition on this matter. The actual testimony reads as follow:
> Q: Did you understand the determination by Mr. Rabito to apply only to the 2013 summer lunch program or broadly to other programs and events run by OGS?
> A: I hadn't thought of it. I don't know.
> Q: Did you have any understanding at the time of what would happen if Wandering Dag were to submit an application to a different event or a program at the Empire State Plaza?
> A: I had no expectation. I figured I would tell Joe Rabito if they applied again.
Dkt. No. 152-10, Joseph Cavazos Dep. at pp. 62-63.

As to William Bruso testimony on this matter, his deposition reads as follows:
> Q: Is it your understanding that the reason for the denial would apply only to the 2013 summer lunch program, or would it also apply more broadly to more programs and events at the plaza?
> A: I'm not sure what you mean exactly. Each event or program would be, you know, a separate solicitation, so it would have to be judge on the merits of each one. It could be taken into considerations I suppose, but you would have to apply, and then we'd take it all into account based on the solicitation document.

(continued...)

a role within the review process and scored the application, did not accept any credit in rendering the decision. Dkt. Nos. 152-1, Aaron Walters Dep., 152-2, Jason Rumpf Dep., 152-5, Heather Flynn Dep. at p. 76, & Susan Cleary Dep. at p. 22. Defendant Bruso, the OGS attorney who sent the letter informing Plaintiff of the denial of its 2014 application, could not recall who made the decision or who directed him to forward the letter. Dkt. No. 152-11, William Bruso Dep. at pp. 54 & 55-56.

The Defendants challenge the Plaintiff's supposition that it does not or could not know the name of the decision-maker through its already extensive discovery efforts. Dkt. No. 152, Defs.' Lt.-Br. at p. 5. To support their challenge, the Defendants turn to Bruso's deposition. They note that when Bruso was advised of the Plaintiff's application for the 2014 Program, he consulted with personnel within the OGS Counsel's Office that were working on the pending litigation against the Defendants and who were involved in drafting the denial letter. Bruso Dep. at pp. 53-55. Bruso testified that he can't say exactly who told him to send the letter but "there was some group efforts in terms of the wording" of the denial letter. *Id*. at p. 56.

---

[17](...continued)
Dkt. No. 152-12, William Bruso Dep. at pp. 42-43.

Regarding the effect of the 2013 decision, Cavazos states that he does not know and Bruso mentions that it could be taken into consideration. These testimonies do not completely support the Plaintiff's contention that these witnesses "expressly testified that the 2014 decision was not a result of Rabito's 2013 denial." Dkt. No. 150 at p. 3.

When asked if he recalled who may have made the ultimate decision, Bruso responded, "I don't think I do right now." *Id*. at p. 56. In sum, the Defendants contend that the decision was a group decision made by OGS Counsel's Office and that the 2014 decision was made upon the same grounds as Rabito's decision in 2013, that is, the "offensive nature of Plaintiff's name." Dkt. No. 152 at p. 5.[18]

Despite the fact that no specific person has been proffered as the ultimate decider, it is more probable than not that the decision to draft the denial letter and direct Bruso to send it came from OGS's Counsel's Office. As the Court has noted above, there is not a shred of evidence that remotely intimates the Governor, the Executive Chamber, or anyone outside OGS playing any role regarding the 2013 and 2014 denials of Plaintiff's applications to participate in the Plaza Summer Program. Witnesses deposed by the Plaintiff denied any contact or communication with anyone from the Executive Chamber or anyone outside the agency. Rabito Dep. at p. 44 (had not discussed with Governor's office at any time); Cavazos Dep. at pp. 86-87 (did not communicate with any other agency about the Plaintiff nor had any interaction with

---

[18] The letter sent by Bruso to the Plaintiff reads as follows:
    Please be advised that your application for participation in the 2014 Lunchtime Food Vending Program at Empire State Plaza has been denied by the NYS Office of General Services due to your firm's name as previously described.
Dkt. No. 152-11, Bruso Dep. at pp. 54 & 57.

It would be reasonable to infer that the 2014 denial was premised upon the basis of the 2013 denial.

Executive Chamber). Both Leibman and Groll averred that neither knew the other nor ever communicated. Leibman further averred that he did not have any further discussions or communications with the Executive Chamber about the NYRA issues. Because his emails, which have been deleted, pertain exclusively with NYRA, there is no logical inference that they could have led to any involvement of the Executive Chamber in the OGS claims. It is reasonable to infer that once OGS Counsel's Office got involved in the 2014 application process, especially considering its engagement in the litigation, that the ultimate decision was made within the agency and specifically by OGS Counsel's Office.[19]

Critical to this discussion is the sort of relief being sought by the Plaintiff against these Defendants. The Plaintiff has withdrawn its claim for compensatory damages against the individual Defendants, and pursuing declaratory and injunctive relief against them in both their individual and official capacities. *See* Dkt. No. 54. Mem.-Dec. & Order, dated Jan. 15, 2014, at p. 44 ("To the extent that Plaintiff has also brought claims against Defendants DeStito, Rabito, Bruso and Walters in their official capacities seeking prospective injunctive relief, however, those claims are not

---

[19] The Defendants chide the Plaintiff for failing to ask Defendant Bruso for the names or identities of the persons involved in the drafting working group. Dkt. No. 152 at p. 5. They also note that when given the opportunity to serve a preservation letter to the Executive Chamber as the Plaintiff had done with OGS, it failed to do so. They point out that the Plaintiff served a subpoena upon State University of New York but did not issue a subpoena to the Executive Chamber for Leibman's emails or any documents or materials they may have had. Dkt. No. 152 at p. 2.

subject to dismissal at this time."). Plaintiff's Amended Complaint states that Defendant Bruso forwarded a letter to the Plaintiff advising that its 2014 application has been denied. Dkt. No. 86, Am. Compl., dated Aug. 4, 2014, at ¶ 48; *see also* Dkt. No. 85, Mem.-Dec. & Order, dated July 28, 2014, at pp. 31-32. A cause of action for the 2014 denial has at least been stated against Bruso. Furthermore, the record indicates that Bruso admitted to sending the letter. As long as a state official has some connection with the enforcement of the act, there may be a continuing violation of federal law. *In re Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 372-73 (2d Cir. 2005). Should it be determined that the 2014 denial violates a constitutional provision, the Plaintiff would not be denied either declaratory or injunctive relief.[20] Therefore, searching for the proverbial needle in the haystack is neither warranted nor prudent.

The Plaintiff fails to establish spoliation on the part of the Defendants and their Counsel and thus this argument carries little if any weight in seeking further discovery. In any event, the NYRA emails are not relevant to the OGS claims. The

---

[20] The Plaintiff can find sanctuary in the Defendants' Supplemental Response to its Interrogatories which states that "[t]he individuals involved in the discussions relating to the denial of Wandering Dago's application for the 2014 Summer Outdoor Lunch Program are Joseph Cavazos, Heather Groll, Jason Rumpf, Heather Flynn and William F. Bruso, Jr." Dkt. no. 153-2, Defs.' Supp. Resp. to Interrog., dated Oct. 6, 2014. Each of the Defendants executed the Supplemental Responses under the penalties of perjury and thus may serve as evidentiary admissions.

record more accurately indicates that neither the Executive Chamber or anyone outside the agency played any role in the denial of Plaintiff's 2013 and 2014 applications. Suggesting that the Governor or the Executive Chamber are the puppet masters pulling the proverbial strings of the marionette OGS agency is nothing but mere speculation and hyperbole.

And, if the ultimate objective is to determine the identity of the person or persons who specifically directed the 2014 denial, when the record reflects Bruso's connection to the act, and to satiate Plaintiff's desire for this specific answer, could conceivably entail deposing dozen more employees within OGS, dozens within the Executive Chamber, and countless nonparties who have separated from their employment from either OGS or the Executive Chamber to satisfy an enigmatic point, without end. Discovery is not designed to accomplish such infinite mining of facts. Discovery is never expected to be perfect, boundless nor pursued *ad infinitum*. The Federal Rules of Civil Procedure and the Civil Justice Reform Act of 1990 evoke the opposite.[21] Based upon the extensive record before the Court, the Court agrees with Defendants that the Plaintiff is pursuing a fishing expedition. The Plaintiff has failed to persuade the Court that further disclosure is warranted. Accordingly, the Plaintiff's

---

[21] When promulgating the Civil Justice Reform Act of 1990, Pub. L. 101-650, Title 1, Dec. 1, 1990, 104 Stat. 5089, Congress envisioned that a case would be trial ready within eighteen months of the filing of the Complaint. If further discovery was granted with a corresponding extension of the final day to file dispositive motions, this case will far exceed Congress's wishes.

request for additional discovery, as well as it request for costs and attorney fees, is denied.

The Court will lift the stay on filing dispositive motions. The Scheduling Order is amended to set the final day to file dispositive motion as July 31, 2015.

For all of the reasons stated above, it is hereby

**ORDERED** that the Plaintiff's Motions, Dkt Nos. 141, 149, and 150, are **DENIED**; and it is further

**ORDERED** that the final day to file dispositive motion is **July 31, 2015.**

**IT IS SO ORDERED**.

May 29, 2015
Albany, New York

Randolph F. Treece
U.S. Magistrate Judge