**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WANDERING DAGO, INC.,**

                              **Plaintiff,**

       **vs.**                                             **1:13-cv-1053**
                                                           **(MAD/DJS)**

**ROANN M. DESTITO; JOSEPH J. RABITO;**
**WILLIAM F. BRUSO, JR.; AARON**
**WALTERS; and JOHN DOES 1-5,**

                              **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **BOIES, SCHILLER & FLEXNER, LLP** | **GEORGE F. CARPINELLO, ESQ.** |
| 30 South Pearl Street | **JOHN F. DEW, ESQ.** |
| Albany, New York 12207 | |
| Attorneys for Plaintiff | |
| **ISEMAN, CUNNINGHAM, RIESTER &** | **MICHAEL Y. HAWRYLCHAK, ESQ.** |
| **HYDE, LLP** | |
| 9 Thurlow Terrace | |
| Albany, New York 12203 | |
| Attorneys for Plaintiff | |
| **OFFICE OF THE NEW YORK** | **COLLEEN D. GALLIGAN, AAG** |
| **STATE ATTORNEY GENERAL** | **LOUIS JIM, AAG** |
| The Capitol | |
| Albany, New York 12224 | |
| Attorneys for Defendants | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On August 27, 2013, Plaintiff commenced this civil rights action seeking damages, and

injunctive and declaratory relief arising from the denial by the New York State Office of

General Services ("OGS"), RoAnn M. Destito, Joseph J. Rabito, William F. Bruso, Jr., and Aaron Walters of Plaintiff's application to participate as a food vendor in the 2013 Empire State Plaza Summer Outdoor Lunch Program, and the subsequent termination of Plaintiff's status as a vendor at the Saratoga Race Course by the New York State Racing Association ("NYRA"), Christopher K. Kay, and Stephen Travers. *See* Dkt. No. 1. Plaintiff alleges that Defendants took these actions under pressure from, or at the direction of, various New York State officials. *See id.*

In a January 15, 2014 Memorandum-Decision and Order, the Court granted in part and denied in part Defendants' motions to dismiss. *See* Dkt. No. 54. Specifically, the Court dismissed without prejudice Plaintiff's federal and state Equal Protection claims against the NYRA Defendants. Further, the Court dismissed with prejudice Plaintiff's claims against OGS, as well as Plaintiff's claims for damages against the State Defendants in their official capacities. *See id.*

On May 24, 2015, Plaintiff filed a motion to amend the complaint, in which it sought to add the following: (1) four additional defendants; (2) allegations pertinent to the Equal Protection causes of action which were dismissed without prejudice; (3) facts to identify the type of forum conceivably relevant to the First Amendment causes of action; (4) "factual context" in support of the original claims; and (5) allegations concerning the denial of Plaintiff's application for the 2014 Empire State Plaza Summer Outdoor Lunch Program. *See* Dkt. No. 73-1. In a July 28, 2014 Memorandum-Decision and Order, Magistrate Judge Treece[1] granted in part and denied in part Plaintiff's motion to amend. Specifically, Magistrate

---

[1] The Court notes that, upon Magistrate Judge Treece's retirement in September of 2015,

(continued...)

Judge Treece permitted Plaintiff to add additional facts to provide some context on the "characteristics and the nature of the fora in which its speech took place," and "to more accurately reflect the manner in which the First Amendment claims have developed in the course of the litigation." *Id.* at 31. Moreover, Plaintiff was permitted to add facts to the complaint regarding the denial of their application for the 2014 Empire State Plaza Summer Outdoor Lunch Program. *See id.* at 32.

In a stipulation dated January 13, 2015, Plaintiff and the NYRA Defendants indicated that they had entered into a settlement agreement and, therefore, stipulated to the dismissal of all claims brought against the NYRA Defendants pursuant to Rule 41 of the Federal Rules of Civil Procedure. *See* Dkt. No. 140. Thereafter, in a letter dated January 15, 2015, Plaintiff informed the remaining Defendants that it "has elected to drop its claims for damages" but "continues to pursue its claims for declaratory and injunctive relief as well as attorneys' fees and costs." Dkt. No. 143-1 at 1.

On July 31, 2015, the parties cross moved for summary judgment on the remaining claims, which are currently pending before the Court. *See* Dkt. Nos. 155 & 156.

## II. BACKGROUND

### A.     The parties

Plaintiff Wandering Dago, Inc. ("Plaintiff" or "Wandering Dago") is a New York Corporation. *See* Dkt. No. 156-2 at ¶ 1. Wandering Dago is owned and operated by Andrea Loguidice and Brandon Snooks, with Ms. Loguidice serving as the corporation's president.

---

[1](...continued)
this case was reassigned to Magistrate Judge Daniel J. Stewart.

*See id.* at ¶ 2.  Through Wandering Dago, Inc., Ms. Loguidice and Mr. Snooks operate a food truck using the "Wandering Dago" brand from which they serve a variety of foods cooked and prepared on-site in the truck's mobile kitchen.  *See id.* at ¶ 3; *see also* Dkt. No. 86 at ¶ 5.  Wandering Dago serves food for a variety of types of functions, including catering events, fairs and festivals, and street-side lunch service.  *See id.* at ¶ 3.  Ms. Loguidice and Mr. Snooks work as the business' co-chefs, with Mr. Snooks also serving as the driver.  *See* Dkt. No. 86 at ¶ 5.

Defendant RoAnn M. Desito is the Commissioner of OGS.  *See* Dkt. No. 156-2 at ¶ 4.  Defendant Joseph J. Rabito is the Deputy Commissioner of OGS.  *See id.* at ¶ 5.  Defendant William F. Bruso, Jr. is an Associate Attorney working for OGS and Defendant Aaron Walters is employed as a promotions and public affairs agent for OGS.  *See id.* at ¶¶ 6-7.

## B.     The Empire State Plaza

The Empire State Plaza is a facility owned by the State of New York and operated by the Office of General Services.  *See* Dkt. No. 156-2 at ¶ 8.  The Empire State Plaza includes multiple state buildings, including the Corning Tower, four agency buildings, the Swan Street Building, the Legislative Office Building, the Robert Abrams Justice Building, the Egg Center for Performing Arts, the Cultural Education Center (which contains the State Museum and the State Library), and the New York State Capitol Building, all of which are connected by an underground Concourse.  *See* Dkt. No. 157-1 at ¶ 9.  The Plaza level of the Empire State Plaza (the "Plaza") is an outdoor space bounded on the North by State Street, on the South by

Madison Avenue, on the West by Swan Street, and on the East by a multi-story bulkhead wall. *See* Dkt. No. 156-2 at ¶ 10.

The Plaza is the site of a Farmer's Market on certain weekdays during the summer. *See id.* at ¶ 11. Moreover, several special events are held annually on the Plaza. *See id.* at ¶ 12; Dkt. No. 157-1 at ¶ 12. Some examples include the African American Family Day, Hispanic Heritage Month, the Food Festival, and the Fourth of July Festival. *See id.* Further, the Plaza is occasionally used by various private groups as a site for political rallies, marches, and protests. *See* Dkt. No. 156-2 at ¶ 13; Dkt. No. 157-1 at ¶ 13. According to Defendants, although "OGS may issue demonstration permits for individuals or organizations that apply to use the Plaza for political rallies, marches, and protests, the issuance of a demonstration permit does not equate to OGS sponsorship of the event." Dkt. No. 157-1 at ¶ 13 (citing Rabito Dep. at 86). The potential offensiveness of a political event is not a basis for the denial of an application for a political event permit, and signs and speeches are not reviewed in advance. *See* Dkt. No. 156-2 at ¶ 14.

Although OGS issues permits to individuals or organizations that apply for a permit to demonstrate on OGS-controlled property, such demonstrations sometimes occur without the individual or group first obtaining a permit. *See id.* at ¶ 15; Dkt. No. 157-1 at ¶ 15. According to Defendants, the purpose of the permit "is to provide OGS with notice of the likely size and location of the demonstration so that OGS can provide adequate services and operational management. . . ." Dkt. No. 157-1 at ¶ 15. Moreover, both permitted and unpermitted demonstrations also occur on the Concourse beneath the Plaza. *See* Dkt. No. 156-2 at ¶ 16. Unpermitted demonstrations are allowed to continue unless they create a health or safety issue,

or excess noise that disrupts the workplace.  *See id.*  When OGS issues a permit for a political demonstration to use state property, it does not mean that the State has sponsored the event. *See id.* at ¶ 18; Dkt. No. 157-1 at ¶ 18.


**C.     The Empire State Plaza Summer Outdoor Lunch Program**

In the Spring of 2013, OGS began planning a program that would allow a limited number of vendors to sell food items at designated spots on the East Roadway, located on the east side of the Plaza, between the reflecting pool and the Egg.  *See* Dkt. No. 155-1 at ¶ 1. Although an outdoor lunch program had been operated in prior years by Sodexo, a private company which had a contract to provide food services for the Empire State Plaza, Sodexo's contract was not renewed for 2013, and OGS decided to run its own summer outdoor lunch program.  *See id.* at ¶ 2; *see also* Dkt. No. 158-1 at ¶ 2.[2]  OGS operates the Summer Outdoor Lunch Program and permits only qualified food vendors to participate in providing food during lunchtime hours to the State employees and visitors who come to the Capitol and adjacent State buildings and parks during the summer and early fall months.  *See* Dkt. No. 155-1 at ¶ 3.

Vendors who seek to participate in the Summer Outdoor Lunch Program must apply with OGS for a permit, and OGS determines the applicant's eligibility for such participation. *See id.* at ¶ 4.  The Program was developed and administered by OGS' Special Events Office. *See id.* at ¶ 5.  The 2013 Summer Outdoor Lunch Program's application states, in pertinent part, as follows:

---

[2] The Court notes that Defendants contend that OGS sponsored the 2013 Empire State Plaza Summer Outdoor Lunch Program, while Plaintiff insist that no such sponsorship existed.

- Vendor participation must be confirmed by the New York State Office of General Services.

- The Office of General Services is soliciting food vendors for the 2013 Empire State Plaza (ESP) Summer Outdoor Lunch Program to be held daily on the Plaza at the Empire State Plaza in Albany, New York. The 20 week season will run from Monday, May 20th through Friday, October 4th.

- The Summer Outdoor Lunch Program Package includes: [among other things] 20 feet of vending space which includes electrical hookup and access to water . . .

- The cost for full participation, 5 days a week for 20 weeks, is $1,500.00; participation on Wednesdays and Fridays only, for 20 weeks, is $1,000.00. All fees are due with your completed application no later than May 10, 2013. Interested parties must apply for a vending permit and meet all insurance and financial requirements in order to participate in the 2013 ESP Outdoor Lunch Program.

- Vendors will not be allowed to provide vending services at the Empire State Plaza until they are in receipt of written approval of their application to participate in the Outdoor Lunch Program.

Dkt. No. 155-1 at ¶ 6. Moreover, Appendix "A" of the application form, which is entitled "Rules for the Empire State Plaza Vendor Participation," includes, among other things, the following language:

- Unless prior arrangements have been made with OGS, all vendors are expected to complete the entire season.

- Vending hours are from 9:00 a.m. – 2:00 p.m. Vendors will not be allowed to sell prior to or after these hours.

- Each vendor will be assigned a specific vending location; all space assigned will be at the discretion of OGS.

- The sale or distribution of products other than food or beverage items is prohibited.

- Vendors may only sell menu items approved by the Albany County Department of Health and permitted per the Vendor's vending permit for

the ESP Outdoor Lunch Program. Vendors wishing to add additional items to their menu must request approval from the Albany County Department of Health and provide OGS' Bureau of Food Services with a copy of the revised permit. OGS reserves the right to prohibit the sale, display or distribution of certain items if, in its sole opinion, these items may reasonably cause concern such as public safety.

- All vendors are expected to conduct themselves with courtesy and in an orderly manner. Arguments, harassment, sexual harassment, name-calling, profane language, or fighting are grounds for revocation of the vendor permit.

- OGS reserves the right to change the location, dates, hours, or to terminate entirely the operation of the program at any time and without prior notice to the vendor.

- Vendors will not refer to themselves as "sponsor," "co-sponsor" or other terms conferring status other than of a participant.

Dkt. No. 155-1 at ¶ 7.

The "Plaza Vendor Permit Agreement for Empire State Plaza Vendors," which was part

of the application for the Summer Outdoor Lunch Program, provides the following language:

WHEREAS, OGS has management supervision over the general domain of the food service operations at the Empire State Plaza (hereinafter referred to as "Plaza"),

WHEREAS, the State is interested in having food vendors take part in a lunchtime food vending program for the sale and distribution of food/beverage products and services[,]

WHEREAS, OGS will be operating such a food vending program, by subcontracting some or all of the responsibilities therefore to various independent food vendors, and

WHEREAS, the Vendor wishes to sell these products in those areas and during those times OGS hereinafter designates.

Dkt. No. 155-3 at 16.

8

The Summer Outdoor Lunch Program was created by OGS for the purpose of providing lunch options to State employees and visitors to the Empire State Plaza. *See id.* at ¶ 8. According to Defendants, the Summer Outdoor Lunch Program "was created as an extension of the cafeteria services at the ESP in order to meet the practical need to provide summer outdoor lunch options, to the approximately 11,000 State employees who work at ESP, as well as visitors to the Capitol, State Museum, performing arts center (The Egg), and the various monuments and memorial[s] at ESP." *Id.* at ¶ 9. Plaintiff, however, contends that the Summer Outdoor Lunch Program is not "an extension of the cafeteria services at the ESP." Dkt. No. 158-1 at ¶ 9.

According to Heather Flynn, who is OGS' Director of Convention and Cultural Events, to promote the Summer Outdoor Lunch Program, OGS informed the public about the Program in several different ways. *See* Dkt. No. 152-4 at 3, 27-31. For example, OGS utilized "blast email advertising" which involved OGS' "sponsorship department" sending emails to a list of recipients who provided their email addresses so that they could be informed of upcoming events and programs at the Empire State Plaza. *See id.* Moreover, the Summer Outdoor Lunch Program was advertised on the Empire State Plaza's closed-circuit television system, which is located throughout the Concourse. *See id.* at 30. Also, OGS promoted the Program on its Facebook page and other social media websites. *See id.* at 31. Further, in an effort to attract vendors to the Summer Outdoor Lunch Program, OGS engaged in a "Vendor Outreach Program." *Id.* at 33. Some such outreach activities included posting on Steve Barnes' blog[3] in

---

[3] Steve Barnes is a Senior Writer and restaurant critic with the Times Union, and posts regularly in his blog entitled "Table Hopping," which is featured in the Times Union.

the primary newspaper serving the Capital District and through advertising the opportunity on social media websites. *See id.* at 33-36.

**D.      Plaintiff's application for the 2013 Summer Outdoor Lunch Program**

On February 27, 2013, Ms. Loguidice contacted OGS on behalf of Wandering Dago and inquired about participating in the 2013 Summer Outdoor Lunch Program. *See* Dkt. No. 158-1 at ¶ 31. Wandering Dago was planning to be a food vendor at the Saratoga Race Track for the 2013 race season, which ran from mid-July through Labor Day. *See id.* at ¶ 32. Ms. Loguidice inquired as to whether Wandering Dago could apply for a permit to participate in the Summer Outdoor Lunch Program even though it would not be able to participate for approximately six (6) weeks during the race season. *See id.* at ¶ 33. On Friday, May 10, 2013, Aaron Walters of OGS' Special Events Office left a voicemail message for Ms. Loguidice advising her that Wandering Dago could apply for the Program, even though it would not be present during the track season. *See id.* at ¶ 34.

On Monday, May 13, 2013, Ms. Loguidice called Mr. Walters and asked whether Wandering Dago could receive a discount on the permit fee because it would not be participating in the entire Summer Outdoor Lunch Program. *See id.* at ¶ 35. Mr. Walters advised that there would be no discount and Ms. Loguidice indicated that she would need to speak with her investor before making a determination as to whether Wandering Dago would apply for the Program. *See id.* at ¶ 36. At this point, Mr. Walters advised Ms. Loguidice that Wandering Dago had until May 17, 2013 to apply. *See id.* at ¶ 37.

On May 15, 2013, Ms. Loguidice emailed Mr. Walters and stated that Wandering Dago would submit an application to participate on Wednesdays and Fridays in the Summer Outdoor Lunch Program. *See id.* at ¶ 38. On Friday, May 17, 2013, Ms. Loguidice faxed Wandering Dago's application to OGS. *See id.* at ¶ 39. However, Appendix B of the application was not included in the fax. *See id.* Appendix B includes, among other things, the vendor's contact information and tax identification number, vending details such as whether the vendor will participate five days a week or on Wednesdays and Fridays only, the type of vending operation, the space required, and the applicant's electrical needs. *See id.* at ¶ 40. Ms. Loguidice signed the Plaza Vendor Permit Agreement for Empire State Plaza Vendors as president of Wandering Dago, Inc. *See id.* at ¶ 41. Wandering Dago's application included its proposed menu, entitled "Wandering Dago Food Truck Spring Menu." *Id.* at ¶ 42. The menu included sandwiches with the following names: "Dago," "Castro," "American Idiot," "Mick and Cheese," "Goombah," "Guido," "Polack," "El Guapo," and "KaSchloppas." *Id.*

At some point after receiving Wandering Dago's application, OGS employee Jason Rumpf provided OGS Director of Convention and Cultural Events Heather Flynn and OGS Associate Commissioner for Operations Jason Cavazos with a list of the applicants. *See* Dkt. No. 158-1 at ¶ 43. Mr. Cavazos and OGS Public Information Officer Heather Groll inquired of OGS Executive Deputy Commissioner Joseph Rabito what he thought about a vendor named "Wandering Dago" participating in the 2013 Summer Outdoor Lunch Program. *See id.* at ¶ 44. Defendants contend that Defendant Rabito recognized the term "dago" as "a highly offensive term for Italians and his initial reaction was that the application would not be approved." Dkt.

No. 155-1 at ¶ 45; Dkt. No. 158-1 at ¶ 45.[4]  Defendant Rabito decided to double-check his

understanding of the term to make sure that he was not mistaken as to its offensive meaning.

*See id.* at ¶ 46.  Defendant Rabito conducted a computer search of the term "dago," which not

only confirmed that it is an offensive derogatory term, but also revealed that it has been used to

refer to people of Spanish and Portuguese descent, as well as Italians.  *See id.* at ¶ 47.

Moreover, Defendant Rabito searched Wandering Dago's website and learned that its menu

items also had offensive names, such as "Polack" and "Mick and Cheese," which "are slurs

against people of Polish and Irish descent, respectively."  *Id.* at ¶ 48.  According to Defendants,

Mr. Rabito "denied Wandering Dago's application on the grounds that its name contains an

offensive ethnic slur and does not fit with OGS' policy of providing family-friendly

programming."  Dkt. No. 155-1 at ¶ 49.  Plaintiff, however, contends that Defendant Rabito

denied the application because he found the name to be offensive and argues that "he did not

refer to any statute[,] regulation, policy, or other source of guidance in making his decision."

Dkt. No. 158-1 at ¶ 49.  Further, Plaintiff argues that there "is no evidence in the record to

support Defendants' claim that OGS had an overall policy that events at the ESP be 'family

friendly.'"  *Id.*  When Defendant Rabito made the decision to deny Wandering Dago's

application, he did not consider any other grounds upon which it could have been denied, such

as lateness or lack of completeness.  *See id.* at ¶ 50.  Defendant Rabito believed that the

offensive nature of Plaintiff's name alone was sufficient reason to not issue a permit, even if the

application had been acceptable in all other respects.  *See id.*

---

[4] The Court notes that Plaintiff does not dispute the statements contained in paragraphs
forty five through forty eight of Defendants' statement of material facts "to the extent that the
statement reflects Rabito's opinion and his personal reasons for denying Plaintiff's application."
Dkt. No. 158-1 at ¶¶ 45-48.

Later in the day on May 17, 2013, Defendant Walters was directed to advise all applicants, other than Wandering Dago, that they had been accepted into the 2013 Summer Outdoor Lunch Program as vendors. *See id.* at ¶ 51; Dkt. No. 155-5 at ¶ 17. According to Defendant Walters, at some point after May 17, 2013, he participated in a conversation with Heather Flynn and Jason Rumpf, in which he learned that the name "Wandering Dago" was the basis for the denial of the application. *See id.* at ¶ 18. Defendants claim that Plaintiff was the only applicant to the 2013 Summer Outdoor Lunch Program that had a name which contained a derogatory ethnic or offensive term as part of its name. *See* Dkt. No. 155-1 at ¶ 53. Plaintiff, however, contends that the truck "Slidin' Dirty" was granted access to the program. *See* Dkt. No. 158-1 at ¶ 53. According to Plaintiff, "Slidin' Dirty is an obvious riff using the word 'slider,' which means a small hamburger or sandwich, and the phrase 'ridin' dirty,' defined by the Urban Dictionary as 'driving in an automobile while having at least a felony charge worth of illegal drugs and[/]or unregistered firearms with you.'" *Id.* (quoting URBANDICTIONARY.COM, Definition of "ridin dirty," available at http://www.urbandictionary.com/define.php?term=ridin+dirty (last visited February 25, 2016)). Further, Plaintiff argues that "Slidin' Dirty" evokes the song "Ridin'," which repeats the phrase "ridin' dirty" more than forty times in its chorus while describing a person driving under the influence of alcohol while using drugs and carrying a handgun." *Id.* (quoting METROLYRICS.COM, Lyrics to "Ridin'" by Chamillionaire featuring Krayzie Bone, http://www.metrolyrics.com/ridin-lyrics-chamillionaire.html (last visited February 25, 2016)).

Defendant Bruso, an attorney in OGS Counsel's Office, was asked to draft or review language advising Wandering Dago that its application had been denied. *See* Dkt. No. 158-1 at

¶ 55.  Defendant Bruso obtained a copy of Wandering Dago's application and reviewed it for additional grounds upon which it may have been denied.  *See id.* at ¶ 56.  According to Defendants, Defendant Bruso determined that, in addition to the reason provided by Defendant Rabito, the application could be denied on the grounds that it was late and incomplete.  *See id.* at ¶ 57.

On Monday, May 20, 2013, Ms. Loguidice emailed Defendant Walters and inquired as to the status of Wandering Dago's application.  *See id.* at ¶ 58.  Defendant Walters responded by stating that OGS "is unable to accommodate your application for space" in the 2013 Summer Outdoor Lunch Program.  *See id.* at ¶ 59.  Upon receiving Defendant Walters' response, Ms. Loguidice contacted him for additional information regarding the denial and was advised to contact Defendant Bruso in OGS Counsel's Office for further information.  *See id.* at ¶¶ 60-61.  On May 20, 2013, during a telephone conversation, Defendant Bruso advised Ms. Loguidice that there were several reasons why the application was denied: it was late, it was incomplete, and the name Wandering Dago was determined to be offensive.  *See id.* at ¶ 62.  Thereafter, Ms. Loguidice asked Defendant Bruso to send her a letter regarding the denial of Wandering Dago's application, which he declined to do at that time.  *See id.* at ¶¶ 63-64.

On or about May 21, 2013, during a regularly scheduled morning meeting, Defendant Rabito advised OGS Commissioner Defendant Desito of his decision to deny Wandering Dago's application to the 2013 Summer Outdoor Lunch Program.  *See id.* at ¶ 66.  Although Defendants contend that Defendant Desito was not involved in the decision to deny the application, Plaintiff contends that, as the Commissioner of OGS, Defendant Desito had the

authority to overrule the decision, and declined to exercise her authority to do so.  *See* Dkt. No. 155-1 at ¶ 67; Dkt. No. 158-1 at ¶ 67.

On or about May 31, 2013, Ms. Loguidice, acting as legal counsel to Wandering Dago, sent Defendant Bruso a letter requesting a written explanation of the denial.  *See* Dkt. No. 158-1 at ¶ 68.  On July 1, 2013, Defendant Bruso responded, stating that the grounds for the denial had been explained on May 20, 2013.  *See id.* at ¶ 69.  Specifically, the letter sent by Defendant Bruso provides as follows:

> On May 20, 2013 you were advised by an email from Aaron Walters that your firm's application was denied.  A copy of that email is enclosed herewith for your easy reference.  In addition, I conveyed to you by telephone on May 20, 2013, OGS' several reasons for its denial of your firm's application.  This denial was made pursuant to the terms of the Food Vendor Application packet, as well as OGS' Facility Use and Use of State Property regulations, which are located in Parts 300 and 301, respectively, of Title 9 of the New York Codes, Rules and Regulations.

Dkt. No. 156-2 at ¶ 43.

**E.     The 2014 Summer Outdoor Lunch Program**

In the fall of 2013, the Special Events Office of OGS adopted new criteria for outside vendors for events and programs.  *See* Dkt. No. 156-2 at ¶ 60.  Under the new procedure, each event or program would have a set of explicit criteria by which applications would be scored, and explicit cutoffs to determine who is or is not accepted.  *See id.* at ¶ 61.

On May 5, 2014, Wandering Dago hand delivered an application for the 2014 Summer Outdoor Lunch Program to the OGS Special Events Office.  *See id.* at ¶ 62.  Wandering Dago's 2014 application was complete and timely.  *See id.* at ¶ 64.

Plaintiff's application was reviewed by OGS employees designated as the selection committee, and was scored and received a passing score sufficient for acceptance into the program. *See id.* at ¶ 64. Nevertheless, the decision was made to again deny the application. *See id.* at ¶ 65. Wandering Dago received a letter from Defendant Bruso, dated May 16, 2014, informing it that its application had been denied "due to your firm's name as previously described," which was consistent with the decision made by Defendant Rabito in 2013. *See id.* at ¶ 66; *see also* Dkt. No. 155-1 at ¶ 73. Aside from Wandering Dago, every other complete application was accepted into the 2014 Summer Outdoor Lunch Program. *See* Dkt. No. 156-2 at ¶ 67. By the time that Wandering Dago's application for the 2014 Summer Outdoor Lunch Program was submitted and denied, the parties were actively litigating this case. *See* Dkt. No. 155-1 at ¶ 72.

**F.      The pending motions for summary judgment**

*1. Defendants' motion for summary judgment*

In their motion for summary judgment, Defendants first argue that the denial of Plaintiff's application for a vendor permit did not violate its First Amendment right to free speech. *See* Dkt. No. 155-9 at 11-20. Defendants contend that the Court has already identified the relevant forum as the Empire State Plaza Summer Outdoor Lunch Program, and not the greater Empire State Plaza upon which the Program is physically located. *See id.* at 16 (citing Dkt. No. 54 at 2-3). In light of this finding, Defendants argue that the relevant forum is a nonpublic forum because it is not a park or a street, or similar space, which has been held in trust for the public for the purposes of assembly, communicating thoughts, or discussing public

questions. *See id.* Rather, the participation in the Program is not open to the public in general and was created by OGS in 2013 "for the sole purpose of providing lunch options to State employees and visitors to the ESP." *Id.* According to Defendants, the forum is nonpublic because the government did not open the forum for expressive activity by members of the public. *See id.* at 18. Instead, "the forum was created by the government acting not as rule maker or legislator, but as property owner and employer and, as such, the government has wide discretion and control over the management of its workplace." *Id.* at 18 (citing *Enquist*, 553 U.S. at 598). As such, Defendants argue that the restrictions on speech at issue were "'reasonable in light of the purpose of the forum and all surrounding circumstances'" and, therefore, permissible under the First Amendment. *See id.* (quoting *Cornelius*, 473 U.S. at 809).

As to Plaintiff's Fourteenth Amendment Equal Protection claim, Defendants argue that the claim fails as a matter of law. *See id.* at 21. First, Defendants contend that Plaintiff cannot establish that it was treated differently than any other similarly situated individual because no other applicant to the 2013 or 2014 Summer Outdoor Lunch Program had a name which contained a derogatory ethnic term, or any other offensive term in violation of OGS' family-friendly policy. *See id.* at 21-22. Second, even if Plaintiff could establish that it was treated differently than other similarly situated entities, Defendants argue that Plaintiff "cannot prove that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 22. Defendants assert that any argument that they acted in bad faith is undercut by the fact that both Ms. Loguidice and Mr. Snooks "testified that, on

May 20, 2013, they understood that the application had been denied because of the offensive nature of Wandering Dago's name." *Id.* at 22-23.

As to the New York State equal protection and freedom of speech claims, Defendants contend that they are subject to the same analysis as their federal counterparts and, therefore, subject to dismissal for the same reasons. *See id.* at 23. Finally, Defendants argue that the claims against Defendant Destito should be dismissed for lack of personal involvement. *See id.* at 23-24.

### 2. Plaintiff's motion for summary judgment

In its motion for summary judgment, Wandering Dago contends Defendants actions were impermissible under the First Amendment in any forum. *See* Dkt. No. 156-1 at 10-17. Specifically, Wandering Dago argues that Defendant Rabito's decision to deny its application was "an exercise of pure, unbridled discretion on the basis of his own belief that its name was offensive." *Id.* at 11. Plaintiff contends that such an exercise of "unbridled discretion" by government officials in restricting speech is prohibited under the First Amendment, regardless of the forum, because the absence of any clearly-articulated, consistently-enforced policy creates too great a danger of censorship and abridgement of First Amendment freedoms. *See id.* at 11-13. Further, Plaintiff contends that, regardless of the type of forum, Defendants' conduct was unconstitutional viewpoint discrimination. *See id.* at 17-20. Assuming there was a policy in place concerning speech for the Summer Outdoor Lunch Program, Plaintiff argues that "prohibiting language deemed to be derogatory toward an ethnicity or nationality, while allowing speech that references ethnicity in a neutral or positive way, is classic viewpoint

discrimination." *Id.* at 18. Further, Plaintiff asserts that, regardless of the forum, the denial of its application was unreasonable because the speech at issue is not in any way inconsistent with the nature of the forum. *See id.* at 20-21.

Next, Plaintiff argues that the Empire State Plaza is a quintessential public forum because it is "an open public space adjacent to public buildings, and is both a pedestrian thoroughfare and a public park." *Id.* at 22. Further, Plaintiff contends that, even if the Court finds that it is not a traditional public forum, the Empire State Plaza is a designated public forum because the government allows speech to occur there without delineating the types of speech that are allowed. *See id.* at 23-24. Finally, Plaintiff argues that, when "regulating commercial speech in a public forum, the government must meet the demanding *Central Hudson* standard, under which lawful and non-misleading speech cannot be regulated unless the regulation directly advances a substantial government interest and is not more extensive than necessary to serve that interest." *Id.* at 27. Plaintiff claims that "Defendants cannot remotely meet this standard and have not even tried." *Id.*

## III. DISCUSSION

### A. Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be

tried." *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws."  *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d

481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**C.      First Amendment jurisprudence**

From the beginning of this case, the parties and, as a consequence, the Court, have treated this case as involving the First Amendment forum jurisprudence.  From the outset, however, the Court has struggled with the idea that this case does not neatly fit within that framework; or any other First Amendment framework for that matter.  For instance, many aspects of this case more closely fit within the confines of government employee/contractor law.  In fact, Defendants have maintained that the Summer Outdoor Lunch Program is merely an extension of the cafeteria services that they provide in the Concourse of the Empire State Plaza.  Moreover, the "Plaza Vendor Permit Agreement for Empire State Plaza Vendors," which was part of the application for the 2013 Summer Outdoor Lunch Program,  provides the following language: "WHEREAS, OGS will be operating such a food vending program, by *subcontracting* some or all of the responsibilities therefore to various independent food vendors[.]"  Dkt. No. 155-3 at 16 (emphasis added).  As such, despite the fact that Wandering Dago was seeking permission to sell its food within the physical confines of what is undisputedly a traditional public forum, *i.e.*, the Empire State Plaza, its position as a potential contractor with OGS makes the application of the forum analysis less straightforward.

Plaintiff has also suggested that this case should be analyzed under the *Central Hudson* framework for cases involving commercial speech. Again, however, the cases upon which Plaintiff has relied are clearly distinguishable and the present matter does not fit cleanly within the existing framework. For example, in *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87 (2d Cir. 1998), the plaintiff made an application with the New York State Liquor Authority ("NYSLA") for brand label approval and registration, which the NYSLA denied because the label contained a frog with the second of its four unwebbed "fingers" extended in a manner evocative of a well-known human gesture of insult. *See id.* at 90. Without this approval, the plaintiff was not permitted to sell its beer at any location in the state. The Second Circuit concluded that the image of the frog was commercial speech, and the First Amendment *Central Hudson* framework applied. *See id.* at 98-101. Applying *Central Hudson*, the Second Circuit determined that the State had substantial interest in regulating the speech, but that the defendant did not show "that its denial of Bad Frog's application directly and materially advance[d] . . . its state interests" and that the prohibition was more extensive than necessary to advance the State's interests. *Id.* at 100-01.

*Bad Frog Brewery* involved the State denying the plaintiff a license for permission to sell its beer anywhere in the State, not simply on property owned by the State. Here, however, Plaintiff asserts that Defendants violated the First Amendment when they prohibited Plaintiff from conducting its business on property owned by the State, during an event sponsored by the State. As the Supreme Court has repeatedly held, "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'"

*Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 598 (2008) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961)).  Had Plaintiff been denied permission to register with the state as a domestic business corporation under Wandering Dago, Inc., application of the *Central Hudson* framework would be appropriate.  Plaintiff's one paragraph, conclusory assertion characterizing the present matter as involving a "licensing scheme" is simply unavailing.

Moreover, the argument could be made that the speech at issue should be considered "government speech" and, therefore, not protected by the First Amendment.  If the speech at issue is considered government speech – or, more specifically, an attempt to compel the government to speak – then Defendants could permissibly engage in viewpoint discrimination. In fact, Plaintiff relies upon several cases in which the plaintiffs had challenged government regulations involving specialty license plates.  *See, e.g.*, Dkt. No. 156-1 at 13 (discussing *Children First Found., Inc. v. Fiala*, 790 F.3d 328 (2d Cir. 2015)).  In these cases, generally the lower courts had found that specialty license plates were private speech subject to the First Amendment forum analysis.  In *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), however, the Supreme Court held that the designs on specialty license plates are government speech not subject to the First Amendment.  Although the application of this doctrine may seem like more of a stretch, the following hypothetical may help put into perspective the Court's rationale as to why both the employee/contractor speech and government speech doctrines are relevant.  Sodexo's contract with OGS to provide food service in the Concourse expired in 2013 and it was not renewed.  As such, the food services for the Concourse at this point were handled by a number of individual restaurants, including, among

others, Phil's Kitchen, Pho Yum, 'Merican Band Wagon, Capital Q Smokehouse, McDonald's and Subway.  *See* http://blog.timesunion.com/capitol/archives/200013/ogs-announces-new-esp-food-vendors- fate-of-capitol-deli-remains-an-enigma/ (last visited February 25, 2016).  Had Wandering Dago submitted an application/bid to become one of the new vendors in the Concourse of the Empire State Plaza, would the First Amendment require the State to accept the application of this restaurant with a racial epithet as part of its name, assuming that Wandering Dago otherwise met all of the relevant qualifications?  Whether its considered employee/contractor or government speech, should the State be forced to prominently display racially offensive language in its buildings simply because it may not have had the foresight to set forth guidelines that specifically prohibit the use of racial epithets in the names of the businesses/contractors who apply to participate in the program?

Since the Court does not believe that the facts of this case fit cleanly within any of the existing First Amendment jurisprudence, the Court will analyze Plaintiff's First Amendment claim under the forum, employee/contractor speech, and government speech jurisprudence. Whatever the appropriate analysis, the end result is the same.


### 1. General principles

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.  "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  It is "common ground" that the First Amendment "does not guarantee the right to communicate one's views at

all times and places or in any manner that may be desired." *Heffron v. Int'l Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981). A violation occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *See Frisby v. Schultz*, 487 U.S. 474, 479 (1988).

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Accordingly, governmental "[r]estrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)).

It is axiomatic that "the protections afforded by the First Amendment . . . are not absolute" and "the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The government, acting as sovereign, may regulate certain categories of expression "because of their constitutionally proscribable content (obscenity, defamation, etc.). . . ." *R.A.V.*, 505 U.S. at 383 (emphasis omitted); *see also, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem"). And, where the government acts in a non-sovereign capacity, it may be entitled or even required to consider the content of an individual's speech in its in decision-making, such as when the government acts as the owner/proprietor of real property or a conceptually analogous forum, *see Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 (2010) (citing cases), or as an employer, *see Pickering v.*

*Bd. of Educ.*, 391 U.S. 563, 568 (1968), or as an educator, *see Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). In short, the Free Speech Clause "does not leave people at liberty to publicize their views whenever and however and wherever they please." *Wood v. Moss*, ⸺ U.S. ⸺, 134 S. Ct. 2056, 2066 (2014) (quotations omitted).

### 2. Forum analysis

The Supreme Court has set forth a three-step, forum-based test for determining whether a state actor violated a plaintiff's First Amendment right to free speech. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Pursuant to this test, the court must determine "(1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard." *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005) (citing *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)).

### a. Protected speech

The First Amendment's protection of free speech, made applicable to the states through the Fourteenth Amendment, extends to a broad range of speech and expressive conduct. *See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). Speech on public issues and political matters lies at the heart of protected speech. *See*

*Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. Syracuse*, 670 F.3d 127 (2d Cir. 2012).

It is unclear whether Defendants take the position that Plaintiff has not engaged in protected speech, as they did in support of their motion to dismiss. Any such argument, however, is easily rejected. As the Court explained in its decision denying in part and granting in part Defendants' motion to dismiss, Plaintiff's corporate name, *i.e.* Wandering Dago, is a form of expressive speech protected under the First Amendment for purposes of the forum analysis. *See Kalman v. Cortes*, 723 F. Supp. 2d 766, 798-99 (E.D. Pa. 2010) (finding that a corporation's name is expressive speech protected under the First Amendment).

### b. The relevant forum

Plaintiff contends that the Empire State Plaza is the relevant forum, which is necessarily a traditional public forum. *See* Dkt. No. 156-1 at 10, 21-26. Plaintiff argues that the policies, location and physical characteristics of the Empire State Plaza dictate that it is a traditional public forum or, at the very least a designated public forum. *See id.*

In its January 15, 2014 Memorandum-Decision and Order, the Court found that, based on the allegations in the complaint, the relevant forum was not the Empire State Plaza *in toto* as the parties had assumed. *See Wandering Dago, Inc. v. N.Y.S. Office of Gen. Servs.*, 992 F. Supp. 2d 102, 120 (N.D.N.Y. 2014). Rather, the Court found that the relevant forum is the more limited Empire State Plaza Summer Outdoor Lunch Program, which happens to take place within the grounds that comprise the Empire State Plaza. *See id.* (citing *Calvary Chapel Church, Inc. v. Broward County, Fla.*, 299 F. Supp. 2d 1295, 1301 (S.D. Fla. 2003) (finding

that the "Holiday Fantasy of Lights," an annual event hosted by the county that ran from just before Thanksgiving day to the middle of January, was the relevant forum, not the Tradewind Park in which the event takes place)).  Now, with the benefit of a fully developed record, contrary to Plaintiff's arguments, the Court finds that it correctly determined that the relevant forum is the Summer Outdoor Lunch Program, which takes place on the Empire State Plaza.

The case law makes clear that even when a piece of government property may not be a public forum, channels for public communication – or alternative fora – may well exist within the greater piece of government property.  *See Air Line Pilots  Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1151-52 (7th Cir. 1995).  For example, in *Cornelius*, the Supreme Court was asked to "decide whether the Federal Government violates the First Amendment when it excludes legal defense and political advocacy organizations from participation in the Combined Federal Campaign (CFC or Campaign), a charity drive aimed at federal employees." *Cornelius*, 473 U.S. at 790.  The CFC is an annual charitable fund-raising drive conducted in the federal workplace during working hours largely through the voluntary efforts of federal employees.  *See id.*  In attempting to define the relevant forum, the petitioner argued that a "First Amendment forum necessarily consists of tangible government property" and that "[b]ecause the only 'property' involved here is the federal workplace, . . . the workplace constitutes the relevant forum." *Id.* at 800-01.  In contrast, the respondents argued that the forum should be defined in terms of the access sought by the speaker. *See id.* at 801.  "Under their view, the particular channel of communication constitutes the forum for First Amendment purposes." *Id.*

Agreeing with the respondents, the Supreme Court held that the relevant forum was the CFC, not the entirety of the federal workplace where the CFC takes place. *See id.* Specifically, the Court found that

> [a]lthough petitioner is correct that as an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. *See, e.g., Greer v. Spock,* [424 U.S. 828 (1976)]. In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property. For example, *Perry Education Assn. v. Perry Local Educators' Assn.,* . . . examined the access sought by the speaker and defined the forum as a school's internal mail system and the teachers' mailboxes, notwithstanding that an "internal mail system" lacks a physical situs. Similarly, in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 300, 94 S. Ct. 2714, 2715, 41 L. Ed. 2d 770 (1974), where petitioners sought to compel the city to permit political advertising on city-owned buses, the Court treated the advertising spaces on the buses as the forum. Here, as in *Perry Education Assn.*, respondents seek access to a particular means of communication. Consistent with the approach taken in prior cases, we find that the CFC, rather than the federal workplace, is the forum. This conclusion does not mean, however, that the Court will ignore the special nature and function of the federal workplace in evaluating the limits that may be imposed on an organization's right to participate in the CFC.

*Cornelius*, 473 U.S. at 801-02 (citation omitted).

The Supreme Court's holding in *Cornelius* makes clear that Plaintiff is attempting to define the relevant forum too broadly. As the Court previously explained, if the license at issue was to sell food at the Empire State Plaza at any time, throughout the entire year, as opposed to a sponsored program of a more limited nature, the result may be different. However, Plaintiff

submitted an application to be a vendor during the 2013 and 2014 Empire State Plaza Summer Outdoor Lunch Program. The Program ran for twenty weeks each year and vending hours were limited from 9:00 a.m. to 2:00 p.m. Businesses wishing to participate in the program were required to pay between $1,000.00 and $1,500.00. Finally, the application contained the condition that "[a]ll vendors are expected to conduct themselves with courtesy and in an orderly manner. Arguments, harassment, sexual harassment, name-calling, profane language, or fighting are grounds for revocation of the vendor permit." Considering all of the undisputed facts, the Court finds that the relevant forum is the Empire State Plaza Summer Outdoor Lunch Program, not the Empire State Plaza *in toto*. *See Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1151-52 (holding that where the speaker seeks access to diorama display cases in an airport, the public forum inquiry focuses on the display cases rather than the airport as a whole); *Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 797 F.2d 552, 555-56 (8th Cir. 1986) (holding that where the speaker seeks access to advertising space in a sports arena, the public forum inquiry focuses on the advertising space rather than the entire arena), *cert. denied*, 479 U.S. 986, 107 S. Ct. 576, 93 L. Ed. 2d 579 (1986); *Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 655-56 (2d Cir. 1995) (holding that the one billboard at issue was the relevant forum, not all of Penn Station in which the billboard was located); *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 873 F. Supp. 2d 850, 860 (E.D. Mich. 2012) (finding that the City's holiday display housed within a government complex was the relevant forum, not the entire government complex).

Having determined that the relevant forum is the Empire State Plaza Summer Outdoor Lunch Program, the Court must now determine the type of forum.

### c. Forum determination

The appropriate level of judicial scrutiny depends on the nature of the forum subject to the regulation. "'Traditional public fora'" are places such as "streets and parks which 'have immemorially been held in trust for the use of the public, and . . . have [generally] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)). "Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, *e.g.* converting a public park to an office building." *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004). "Content-based restrictions on speech in traditional public fora are subject to strict scrutiny." *Hotel Emps. & Rest. Emps. Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (citations omitted). "The government may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Id.* (quotation omitted); *see also Make the Road By Walking, Inc.*, 378 F.3d at 142 (citations omitted).

The second category, the designated public forum, "'refers to government property which, although not a traditional public forum, has been "intentionally opened up for that purpose."'" *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 507 (S.D.N.Y. 2013) (quotations and other citation omitted); *see also Perry Educ. Ass'n*, 460 U.S. at 46. "'Because the government,

as property owner, has opened up a designated public forum to the same breadth of expressive speech as found in traditional public forums, the same standards apply: Any content-based restrictions on speech must survive strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest, and content-neutral time, place, and manner restrictions are permissible only if they are narrowly tailored and leave open other avenues for expression.'" *Hershey*, 938 F. Supp. 2d at 507 (quotation and other citations omitted); *see also Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 526-27 (2d Cir. 2009) (citation omitted). Although the government may decide to close a designated public forum, "so long as a forum remains public, government regulation of speech within it 'is subject to the same limitations as that governing a traditional public forum.'" *Make the Road by Walking, Inc.*, 378 F.3d at 143 (quotation omitted).

The third category, the limited public forum, is often analyzed as a subset of the designated public forum and as a nonpublic forum opened up for specific purposes. *See Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir. 2010) ("[T]he law of [the Second Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects") (internal quotation marks and citations omitted); *see also N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 & n.2 (2d Cir. 1998) (quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)). A limited public forum is created "'where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" *Make the Road By Walking, Inc.*, 378 F.3d at 143 (quotations omitted). "Common examples of limited public fora include 'state university meeting facilities opened for

student groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations.'" *Hershey*, 938 F. Supp. 2d at 507 (quotations omitted).

"In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Hotel Emps.*, 311 F.3d at 545 (citations omitted). "'Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" *Id.* at 545-46 (quotation omitted). If the expressive activity does not fall within the limited category for which the forum has been opened, however, restrictions on speech need only be reasonable and viewpoint neutral. *See id.* at 546 (citations omitted).

The final category, the nonpublic forum, consists of property that "the government has not opened for expressive activity by members of the public." *Id.* (citation omitted). A nonpublic forum "exists '[w]here the government is acting as a proprietor, managing its internal operations.'" *Walker*, 135 S. Ct. at 2251 (quoting *Int'l Soc'y for Krishna*, 505 U.S. at 678, 112 S. Ct. 2701). Examples of nonpublic fora include airport terminals, government-owned professional sports stadiums, military bases and restricted access military stores, and jailhouse grounds. *See id.* (collecting cases). Restrictions on speech in such fora must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 800; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality").

The public forum doctrine raises particular challenges in a case such as this, where the plaintiff seeks to classify a property or program as a "traditional public forum" that does not easily meet the historic definition of such a forum. In view of such challenges, the Second Circuit does not view the "tripartite approach as a straightjacket, but instead as a useful means of analyzing the parties' competing interests, informed by such factors as the location, use, and purpose of the property in question." *Hotel Emps.*, 311 F.3d at 546 (citation omitted). "Indeed, while it has been observed that traditional public fora are not expressly designed to accommodate all forms of speech, . . . common to those types of properties deemed to be traditional public fora is that 'the open access and viewpoint neutrality commanded by the [public forum] doctrine is compatible with the intended purpose of the property.'" *Id.* (internal citation and other quotation omitted).

"In distinguishing between a public and non-public forum, we examine the forum's physical characteristics and the context of the property's use, including its location and purpose." *Hotel Emps.*, 311 F.3d at 547 (citing *United States v. Kokinda*, 497 U.S. 720, 727-29, 110 S. Ct. 3115 (1990); *United States v. Grace*, 461 U.S. 171, 179-80, 103 S. Ct. 1702 (1983)). "'The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.'" *Id.* (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 160 (3d Cir. 1982)). "Also relevant is the government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations." *Id.* (citations omitted); *see also Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (holding that the government's intent can be inferred from "policy and past practice, as well as the nature of

the property and its compatibility with expressive activity"); *N.J. Sports*, 691 F.2d at 160-61

("Public forum status is not appropriate for a locale where the full exercise of First Amendment

rights would be inconsistent with the special interests of a government in overseeing the use of

its property") (internal quotation marks omitted). "Finally, we consider whether the property in

question 'is part of a class of property which by history or tradition has been open and used for

expressive activity.'" *Hotel Emps.*, 311 F.3d at 547 (citing *Warren v. Fairfax County*, 196 F.3d

186, 190 (4th Cir. 1999); *Greer v. Spock*, 424 U.S. 828, 838, 96 S. Ct. 1211 (1976); *Venetian

Casino Resort, L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 943 (9th Cir. 2001), *cert. denied*,

535 U.S. 905, 122 S. Ct. 1204, 152 L. Ed. 2d 142 (2002)).

In *Texas v. Knights of Ku Klux Klan*, 58 F.3d 1075 (5th Cir. 1995), the plaintiff sought

to participate in Texas' Adopt-a-Highway Program by adopting a stretch of highway that was

near a housing project. In recognition of its sponsorship, the name of the adopting group is

placed on a sign posted at the end of the adopted portion of highway. *See id.* at 1078-79. First,

the court identified the relevant forum as the Adopt-a-Highway Program itself, rather that the

public highways in general, and found that it was a nonpublic forum. *See id.* at 1078. The

court noted that the Program "does not have as its purpose the provision of a forum for

expressive activity." *Id.* Rather, the stated purpose of the Program was to allow citizens an

opportunity to support the State's efforts to control and reduce litter and, therefore, "[a]ny

opportunity for speech provided by the Program is peripheral to that central purpose." *Id.* The

nonpublic nature of the forum was further supported by the fact that the state restricted the size

and content of the signs posted on the highway and all applications to participate in the

Program were reviewed by the State Department of Transportation. *See id.* at 1079.

In the present matter, the Court finds that the Summer Outdoor Lunch Program is a nonpublic forum and, therefore, restrictions on speech must only be reasonable and viewpoint neutral. As discussed, OGS took control of the Summer Outdoor Lunch Program in 2013 when Sodexo's contract with OGS expired and was not renewed. *See* Dkt. No. 155-1 at ¶ 2; *see also* Dkt. No. 158-1 at ¶ 2. Moreover, in the application itself, OGS identifies the fact that it has "management supervision over the general domain of the food service operations at the Empire State Plaza" and that its intention is to subcontract some of these responsibilities to independent food vendors through this Summer Outdoor Lunch Program. *See* Dkt. No. 155-3 at 16. The operation of the Summer Outdoor Lunch Program, similar to the food services OGS contracts to provide in the Concourse of the Empire State Plaza, is unquestionably an activity in which OGS was "'acting as a proprietor, managing its internal operations.'" *Walker*, 135 S. Ct. at 2251 (quoting *Int'l Soc'y for Krishna*, 505 U.S. at 678, 112 S. Ct. 2701).

The fact that OGS was operating as a proprietor in creating the Summer Outdoor Lunch Program is further supported by the fact that OGS promoted the program in several ways. For example, OGS provided "blast email advertising" which involved OGS' "sponsorship department" sending emails to a list of recipients who had previously asked to be informed about upcoming events and programs at the Empire State Plaza. *See* Dkt. No. 152-4 at 27-31. Moreover, the Summer Outdoor Lunch Program was advertised on the Empire State Plaza's closed-circuit television system, which is located throughout the Concourse, as well as on OGS' Facebook page. *See id.* at 31. Finally, OGS engaged in a "Vendor Outreach Program" in an attempt to attract vendors for the program. *See id.* at 33-36.

Further, the Summer Outdoor Lunch Program was created for the sole purpose of providing lunch options to the approximately 11,000 State employees who work at the Empire State Plaza, as well as for visitors to the Capitol, State Museum, performing arts center, and the various monuments and memorials at the Empire State Plaza. *See* Dkt. No. 155-3 at ¶ 9. Not only did OGS not intend to create a forum for certain types of speech, the very narrow category of speech contemplated by the Summer Outdoor Lunch Program is limited to the display of permitted vendors' business names and menu items, after approval by OGS. Considering this purpose, as well as the undisputed fact that Defendants did not intend to create a public forum in beginning this undertaking, the undisputed facts clearly demonstrate that the Summer Outdoor Lunch Program is a nonpublic forum. *See Knights of Ku Klux Klan*, 58 F.3d at 1079. Rather, any opportunity for speech that the Program may have provided was peripheral to its central purpose, *i.e.*, providing outdoor lunch options to employees and visitors at the Empire State Plaza. *See id.*

Having found that the Summer Outdoor Lunch Program is a nonpublic forum, the Court must now determine whether the restriction on speech was reasonable and content neutral.

### d. Reasonable, viewpoint neutral restrictions

Plaintiff contends that, regardless of the type of forum at issue, Defendants' actions were unconstitutional because they engaged in impermissible viewpoint discrimination. *See* Dkt. No. 156-1 at 17-20. Plaintiff asserts that Defendants' argument that Wandering Dago was excluded on the basis of a viewpoint-neutral prohibition of all speech that they have characterized as ethnic slurs is wrong for two reasons: (1) "it is simply not true" because there

was no policy in place concerning speech in the Summer Outdoor Lunch Program, nor was the decision made on the basis of any such policy; and (2) "even if that were the policy, prohibiting language deemed to be derogatory toward an ethnicity or nationality, while allowing speech that references ethnicity in a neutral or positive way, is classic viewpoint discrimination." *Id.* at 18. Specifically, Plaintiff contends that Defendants have not sought to prohibit all speech on the topic of ethnicity or nationality; rather, they seek "to prohibit only speech that expresses a particular viewpoint – speech that Defendants deem disparaging toward an ethnic or national identity." *Id.* By way of example, Plaintiff argues that Defendants approved the application of another food vendor with the name "Red Poppies: A Polish Pantry." *Id.* The Court finds Plaintiff's arguments unpersuasive.

First, the Court will address Plaintiff's argument regarding the absence of a policy and impermissible, unbridled discretion.[5] "The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation." *Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir. 1995) (citing *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770, 108 S. Ct. 2138, 2151, 100 L. Ed. 2d 771 (1988) ("[T]he limits the city claims are implicit in its law must be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice")). It is true that "'in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official

---

[5] The Court notes that Plaintiff has provided the Court with a recent decision from the Federal Circuit Court of Appeals, which it claims is relevant to the present matter. *See In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015). The Court disagrees. In that case, the Federal Circuit invalidated a portion of the Trademark Act which prohibited the registering of "disparaging" marks. In making this finding, the court declined to perform the government forum approach and instead subjected the regulation to strict scrutiny. *See id.* at 1334-37. The different standards applicable to the present matter, and the fact that the regulation at issue in *In re Tam* was inconsistently applied, make the decision largely irrelevant to this case.

or agency constitutes a prior restraint and may result in censorship,' . . . and that 'the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power.'" *Id.* (internal quotations omitted).

While the absence of any guiding principles may raise the specter of unfettered discretion, a policy does not have to be written to be real. *See Lebron*, 69 F.3d at 658. A policy limiting the use of a forum may be expressed through "well-established practice." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770 (1988). Nor does the lack of written guidelines require the inference that the forum in question is, by default, open to all users and therefore public.

The issue of standardless discretion applies only to First Amendment claims involving expressive activity. *See Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-56 (1988) ("[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to *permit or deny expressive activity* . . .") (emphasis added); *see also Miller v. City of Cincinnati*, 622 F.3d 524, 532 (6th Cir. 2010). In the present matter, as discussed above, this nonpublic forum was not opened to facilitate First Amendment activity. Rather, any speech that may occur was peripheral to the primary purpose of providing outside lunch options to the 11,000 state employees and visitors at the Empire State Plaza. Moreover, as discussed in more detail below, neither Ms. Loguidice nor Mr. Snooks could identify any message or point-of-view they were attempting to convey through the name Wandering Dago. Since Plaintiff's claim is that it was denied access to the Summer Outdoor Lunch Program, and not that it was

prohibited from conveying a message of any kind, the standardless discretion limitation is not applicable to the present matter. *See McKay*, 2014 WL 7013574, at *16.

Even if the Court found that the standardless discretion limitation were applicable to the present matter, Plaintiff's argument still fails. In *Lebron*, Amtrak had an unwritten policy prohibiting the display of political advertisements on a large billboard in Penn Station known as the Spectacular. *See Lebron*, 69 F.3d at 653-55. Upholding the unwritten policy, the Second Circuit first found that the Spectacular was the relevant forum, not Penn Station as a whole, and held that it was a nonpublic forum, or a limited public forum opened for purely commercial speech. *See id.* at 656. Thereafter, the court noted that "[i]t is especially significant that, as in *Lehman*, Amtrak acts in this case in a proprietary capacity, rather than as a governmental regulator." *Id.* at 657. Rejecting the plaintiff's arguments that the policy is unwritten, inconsistently applied, and possibly viewpoint biased, the Second Circuit noted as follows:

> Amtrak's prior written agreements, together with the testimony of the Amtrak official responsible for approving advertisements on the Spectacular and Amtrak's historic practice of reserving the Spectacular for commercial advertisements, dispel the notion that Amtrak enjoyed "unbridled discretion" or could have perpetrated an "illegitimate abuse of censorial power" in rejecting an advertisement because of its political content. Furthermore, because the policy against political advertisements was limited in scope to the Spectacular, there is no evidence that Amtrak's policy has ever been applied inconsistently.

*Id.* at 658. Further, the court rejected the plaintiff's arguments that the policy was viewpoint biased because of language contained in contracts regarding the billboard, which gave Amtrak the discretion to refuse any advertising that "'involve[s] political or other views which could result in dissension or involve [Amtrak] in dissension, complaints or controversy with its

40

patrons or the public.'" *Id.* The court noted that, if the policy were used to screen out only controversial political advertisements, it would be void for viewpoint bias. *See id.* However, the court held that "it seems more sensible to read the language as a justification, however inartfully phrased, for a categorical ban against political advertising . . . rather than as a test for discriminating against certain types of political advertisements." *Id.* at 658-59 (internal citation omitted).

Contrary to Plaintiff's contentions, its application was not rejected pursuant to an unwritten policy or through a policy in which the reviewer was granted unbridled discretion. Pursuant to the "Rules for the Empire State Plaza Vendor Participation," which was attached to the application form, OGS set forth the following: "All vendors are expected to conduct themselves with courtesy and in an orderly manner. Arguments, harassment, sexual harassment, name-calling, profane language, or fighting are grounds for revocation of the vendor permit." Dkt. No. 155-1 at ¶ 7. Profane language is defined as, among other things, language that is "vulgar, coarse, or blasphemous." *See* http://www.thefreedictionary.com/ profane (last visited Feb. 24, 2016). Ethnic slurs unquestionably fit within the definition of profanity. Although Defendants could not limit the use of profane language within a traditional public forum, absent some other compelling justification, Defendants can refuse to permit such language in a nonpublic forum.

Further, when considering whether an official is granted too much discretion, it is necessary to consider the type of forum at issue and the purpose behind the forum's creation. The Circuits that have applied the unbridled discretion doctrine outside of traditional public

forums have noted that public officials have more discretion limiting speech in nonpublic forums:

> This does not mean that the unbridled discretion analysis is precisely the same when a limited public or nonpublic forum, rather than a traditional public forum, is involved.  The unbridled discretion inquiry is "not a static inquiry, impervious to context"; rather a court will review a grant of discretion "in light of the characteristic nature and function of that forum." *Ridley v. Mass. Bay. Transp. Auth.*, 390 F.3d 65, 94-95 (1st Cir. 2004).  "That discretionary access is the defining characteristic of the nonpublic forum suggests that more official discretion is permissible in a nonpublic forum than would be acceptable in a public forum. . . ."

*McKay v. Federspiel*, No. 14-cv-10252, 2014 WL 7013574, *17 (E.D. Mich. Dec. 11, 2014) (quoting *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376, 386 (4th Cir. 2006)).

By its terms, the unbridled discretion doctrine has been articulated as a limit on licensing regimes in public fora.  *See, e.g.*, *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 153 (1969) ("[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places") (quoting *Kunz v. New York*, 340 U.S. 290, 293-94, 71 S. Ct. 312, 95 L. Ed. 280 (1951)).  In a nonpublic forum, the government is said to operate as proprietor, not licensor.  *See United States v. Kokinda*, 497 U.S. 720, 725 (1990).  As other courts have noted, selectivity and discretion are some of the defining characteristics of the nonpublic forum and, therefore, greater latitude should be accorded to government officials. *See Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1323 (Fed. Cir. 2002).  "While one might protest that such logic undercuts the fundamental premise of the unbridled discretion doctrine, *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 693 n.18, 118 S. Ct.

1633, 140 L. Ed. 2d 875 (1998) (Stevens, J., dissenting), the fact that discretionary access is a defining characteristic of the nonpublic forum should suggest that more official discretion is permissible in a nonpublic forum than would be acceptable in a public forum." *Griffin*, 288 F.3d at 1324.

Since Plaintiff sought access to a nonpublic forum, Defendants were entitled to greater discretion in deciding what speech was appropriate. This conclusion is further supported by the fact that the State was acting in a proprietary capacity in refusing to permit Plaintiff to participate in the Summer Outdoor Lunch Program. As discussed, the Summer Outdoor Lunch Program was created to provide outdoor food options to the thousands of employees and visitors at the Empire State Plaza. The program was sponsored by and promoted by OGS. The decision to create a family-friendly environment and to disassociate the State from profane language in this nonpublic forum was entirely permissible. Finally, OGS has consistently applied this policy to other events that it has sponsored on the Empire State Plaza. For example, in 2010 during "African American Family Day," Defendant Rabito directed an OGS employee to not hire one of the proposed dance troops because its dress and type of dance were deemed not family friendly. *See* Dkt. No. 155-3 at ¶¶ 14-15. Further, during African American Family Day, OGS offered an open venue to young people in the community to perform for up to three minutes. *See id.* at ¶ 16. According to Defendant Rabito, after they were advised of the "family friendly rules . . . one performer used the N-word and was removed from the stage." *Id.* Moreover, Defendant Rabito contends that, "during the course of an OGS-sponsored event on the Plaza, OGS has directed vendors that are permitted to sell products at the Plaza as part of OGS-sponsored events or programs to remove items from their

stalls that violated OGS's family-friendly [policy], including replica 'black face' figurines, panties with 'Kiss Me I'm Irish' printed on them, fertility pendants with a phallus that becomes erect when a chain is pulled, and marijuana leaf belt buckles." *Id.* at ¶ 18. Further, Defendants Bruso and Walters also acknowledged OGS' family-friendly policy and its consistent application to sponsored events. *See, e.g.*, Dkt. No. 155-4 at ¶ 35; Dkt. No. 155-5 at ¶ 28.

In *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001), the Second Circuit held that the Vermont Department of Motor Vehicles had not violated the plaintiff's First Amendment right to freedom of speech by revoking as erroneously issued her "vanity" license plate bearing the letters: "SHTHPNS."[6] Under the applicable statute, a vehicle owner was permitted to obtain a vanity plate by paying a fee, so long as the contents of the plate were not "offensive or confusing to the general public." *Perry*, 280 F.3d at 163. The Department of Motor Vehicles sought to revoke the plaintiff's plate because it was "offensive." *Id.* at 164. Discovery revealed that the Department generally did not approve any vanity plates with "offensive scatological terms," and that the plaintiff's plate had been approved in error. *See id.* at 169-71.

The court concluded that the Department's restriction on the plaintiff's speech was viewpoint-neutral, and therefore constitutional. The court explained that

> [i]t is apparent that Vermont's policy does not oppose Perry's philosophical views as reflected in the vanity plate. Vermont's policy prohibits Perry's vanity plate not because it stands for "Shit happens (so don't let life's problems drive you to drink)," but because Perry chose to express that viewpoint using a combination of letters that stands in part for the word "shit." This restriction does not discriminate on the basis of viewpoint.

---

[6] The Court is referencing the *Perry* decision only for its discussion as to what constitutes viewpoint discrimination. Although that discussion may be properly considered dicta in light of the Supreme Court's decision in *Walker*, the discussion is nevertheless relevant.

*Id.* at 170.  Further, the court noted that the policy does not prevent the plaintiff from communicating any particular message on her automobile, just on the license plate itself.  *See id.*  As such, the court held that "Vermont's scatological terms policy is thus reasonably 'directed not to suppressing, but to disassociating the [state] from, plaintiff's speech.'" *Id.* at 170-71 (quoting *General Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 281 n.10 (2d Cir. 1997)).

In the present matter, the Court finds that Defendants did not engage in impermissible viewpoint discrimination.  Plaintiff contends that the viewpoint discrimination is evidenced by the fact, "while denying Wandering Dago on the basis of its name, Defendants approved the application of another food vendor with the name 'Red Poppies: A Polish Pantry.' . . . Vendors are free to express their ethnic or national identity or the ethnic or national origins of the foods they serve, unless they wish to do so in a manner Defendants deem disparaging.  The government cannot evade the constitution's requirement of viewpoint-neutrality by simply characterizing a disapproved perspective as an off-limits topic."  Dkt. No. 156-1 at 18-19.

The Court finds Plaintiff's argument and example unpersuasive.  First, the owners of Wandering Dago have not identified any particular view they sought to convey through their name.  In fact, at their depositions, both owners of Wandering Dago testified that the name is not intended to express an opinion or communicate a point of view.  Specifically, Ms. Loguidice testified that the use of the term "dago" in the business name was "to convey our business, that we are Italian-Americans and we wander around in a food truck and we get paid as the day goes, and that we make our products on that truck and that's our business."  Dkt. No. 152-14 at 114.  Ms. Loguidice further testified that she was not intending to convey any

message about Italian-Americans beyond herself and Mr. Snooks. *See id.* When Mr. Snooks was asked if the name of the company was meant to convey a message to the public, he responded as follows: "No. Well, I mean yes. I mean obviously we have a brand, the pig on the bike, we wanted everyone to remember the logo. But not specifically with Wandering Dago. That was just a name that we felt fit what we do and who we are." Dkt. No. 152-15 at 98-99. Further, Mr. Snooks responded in the negative when asked if he was "attempting to make any type of political statement with the name Wandering Dago?" *Id.* at 100. It is difficult to see how the government can engage in viewpoint discrimination when the speaker is not intending to actually convey a point-of-view.

Second, allowing participants in the Summer Outdoor Lunch Program to identify the ethnic origin of the food they are selling using non-offensive adjectives that communicate their ethnicity or national origin while not allowing racially offensive and pejorative names is entirely reasonable, and viewpoint neutral. It strains credulity to equate the use of the word "dago," an offensive epithet used to describe people from Italy, with the word "Polish," a non-offensive adjective used to describe people from Poland. Quite simply, Plaintiff's argument is without merit. Defendants did not engage in impermissible viewpoint discrimination as Plaintiff suggests. Rather, Defendants simply prohibited Plaintiff from participating in the Program because of the offensive nature of its name, Wandering Dago, and the other offensive racial epithets contained in its menu. As Defendants noted, several menu items included ethnic slurs, specifically the items named "Dago," "Polack," "Mick and Cheese," "American Idiot," "Goombah," "Guido," "El Guapo," and "KaSchloppas." Dkt. No. 155-5 at 15-16; Dkt. No.

155-4 at ¶ 10; Dkt. No. 152-14 at 58-59.[7]  As the Supreme Court has explained, a blanket ban on the use of "odious racial epithets" by "proponents of all views" constitutes mere content-based regulation, while a ban on the use of racial slurs by one group of speakers but not "those speakers' opponents" constitutes viewpoint discrimination.  *See R.A.V.*, 505 U.S. at 391; *see also Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008).  Accordingly, prohibiting racial epithets, regardless of the message the party is seeking to convey, while permitting unoffensive terms to identify the origin of the food being sold, is not viewpoint discrimination, as Plaintiff suggests. *See id.*

As discussed, Plaintiff contends that the food truck "Slidin' Dirty" was permitted to participate in the Summer Outdoor Lunch Program despite having a name that was in violation of the alleged family-friendly policy.  The name "Slidin' Dirty," however, is not obviously offensive or easily recognizable as such.  In fact, unless Defendants were intimately familiar with the musings of the artist Chamillionaire, they would have no reason to know that the seemingly benign name may or may not have illicit connotations, which are tenuous at best.

In *Perry*, the Second Circuit rejected a somewhat similar argument.  In that case, the plaintiff argued that the state inconsistently applied its scatological terms policy by issuing license plates with scatological terms it considered "cute."  *Perry*, 280 F.3d at 170.  Specifically, the plaintiff argued that the issuance of a license plate with the term "POOPER," while not permitting "SHTHPNS" constituted viewpoint discrimination.  *See id.*  Rejecting the

---

[7] When asked at her deposition to explain the meaning of the term "KaSchloppas" as used by Wandering Dago as a name for a wrap sandwich, Ms. Loguidice responded "I assume it's someplace near Greece." Dkt. No. 152-14 at 58-59.  According to Defendants, a "computer search found no such location, but revealed that the term is likely a reference to a slang term for vagina made popular by comedian Chelsea Handler." Dkt. No. 155-9 at 20 n.6.

argument, the Second Circuit held that the difference between the examples the plaintiff cited is "not that the latter are 'cute,' but that they do not use easily recognizable profanities. The relevant difference between 'shit' and 'pooper,' for instance, is not the so-called 'cuteness' of the word 'pooper,' but the fact that 'shit' is a profanity. That is why the DMV considers the latter offensive." *Id.* at 170-71.

Finally, the Court finds that the limits on speech were reasonable. Given the nature of the Summer Outdoor Lunch Program and the fact that it is sponsored and promoted by OGS, it is reasonable for the State to want to avoid the perception that it condones the use of racial epithets. *See Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 680 F. Supp. 2d 595, 601-02 (S.D.N.Y. 2010).

In sum, the Court finds that the undisputed facts establish that Defendants have not engaged in impermissible viewpoint discrimination and that the limits on speech were reasonable in light of the nature of the nonpublic forum. This result is further supported by the fact that Defendants were acting in a proprietary capacity, rather than as a governmental regulator. *See Lebron*, 69 F.3d at 656. Based on the foregoing, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross motion for summary judgment as to Plaintiff's First Amendment claim.

### 3. Employment-context cases

In *Pickering v. Board of Education*, 391 U.S. 563, 565 (1968), the Supreme Court recognized that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v.*

*Ceballos*, 547 U.S. 410, 417 (2006) (citing *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731).

*Pickering* and its progeny "identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech":

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 417 (internal citations omitted); *see also Pickering*, 391 U.S. at 568 (concluding that the scope of a public employee's First Amendment rights depends on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

In determining whether a plaintiff's speech was constitutionally protected, the court must determine "whether [he] spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418 (citation omitted). This requires two separate determinations: "(1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 291 (E.D.N.Y. 2009) (citing *Sousa*, 578 F.3d at 170). "If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law." *Id.*

Although Wandering Dago was not and is not a public employee, the Supreme Court has held that independent contractors hired by the State are protected by the First Amendment

and that the "*Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protections." *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996). "Therefore, an official may take an adverse action against an independent contractor for speech on matters of public concern if: (1) the official's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the official took the adverse action not in retaliation for the speech, but because of the potential for disruption." *Richardson v. Pratcher*, 48 F. Supp. 3d 651, 664 (S.D.N.Y. 2014) (citing *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003)) (other citation omitted).[8]

Generally, in the cases the Court has reviewed dealing with independent contractors working for the government, the contractor performed a service for which it was paid directly by the state. For example, the plaintiff in *Fahs Construction Group, Inc. v. Gray*, 725 F.3d 289 (2d Cir. 2013) was a general contractor that provided roadway construction and paving services to the New York State Department of Transportation. While a relationship of that nature is more common, the undisputed facts clearly demonstrate that, in submitting its application to participate in the Summer Outdoor Lunch Program, Wandering Dago was

---

[8] Although the Supreme Court or Second Circuit have not determined whether First Amendment protections should be extended to applicants or bidders for government contracts as opposed to those who already have a pre-existing relationship, the Court will assume for purposes of this motion that the First Amendment extends to Wandering Dago. *See African Trade & Information Center, Inc. v. Abromatis*, 294 F.3d 355, 360-61 (2d Cir. 2002); *see also A.F.C. Enterprises, Inc. v. New York City School Construction Authority*, No. 98 CV 4534, 2001 WL 1335010, *17 (E.D.N.Y. Sept. 6, 2001) (concluding "that an independent contractor potentially may state a viable First Amendment Claim for retaliation where the contractor is denied a bid in retaliation for the exercise of his right to free speech"); *Ruscoe v. Housing Auth. of City of New Britain*, 259 F. Supp. 2d 160, 170-72 (D. Conn. 2003) (applying the *Pickering-Connick* test in the context of an applicant for a government employment position who claimed that he did not receive the position in retaliation for the exercise of his First Amendment rights).

applying to be an independent contractor performing a service for the State. As discussed, although an outdoor lunch program had been operated in prior years by Sodexo, a private company which had a contract to provide food services for the Empire State Plaza, Sodexo's contract had not been renewed for 2013, and OGS decided to run its own summer outdoor lunch program. *See* Dkt. No. 155-1 at ¶ 2; *see also* Dkt. No. 158-1 at ¶ 2. The "Plaza Vendor Permit Agreement for Empire State Plaza Vendors," which was part of the application for the Summer Outdoor Lunch Program, specifically indicated that OGS would be "subcontracting" some or all of its food service operations responsibilities to interested food vendors. *See* Dkt. No. 155-3 at 16. The application also indicated that OGS would maintain supervisor control over the Program and that applications were subject to its review and approval.

In light of the relationship between accepted applicants and the State, the Court finds that such vendors are properly considered independent contractors, subject to *Pickering* and its progeny. As such, the Court must determine whether the speech addressed a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

The undisputed facts in the present matter establish that Plaintiff's speech did not address a matter of public concern. As the Court discussed in its January 15, 2014 Memorandum-Decision and Order, "the word 'dago' is highly offensive to many. For certain, the term 'dago' is not a playful or accepted word for most Italians." *Wandering Dago, Inc.*, 992 F. Supp. 2d at 108. Rather, the word constitutes a racial slur. Further, as discussed, both owners of Wandering Dago testified at their depositions that the name is not intended to

express an opinion or communicate a point of view. Rather, Ms. Loguidice and Mr. Snooks both testified that the only message that they were trying to convey through the name "Wandering Dago" is that they are Italian-Americans, selling food out of their truck. *See* Dkt. No. 152-14 at 114; Dkt. No. 152-15 at 98-100. Since Plaintiff's speech was not made in order to bring focus on an issue of importance, but was rather simply an attempt to convey they are two Italian-Americans selling food out of a truck, the speech activity in question does not touch on a matter of public concern. *See Bevill v. UAB Walker Coll.*, 62 F. Supp. 2d 1259, 1289 (N.D. Ala. 1999). Simply stated, using racially offensive terms, without an underlying agenda to bring focus to an issue, such as racial inequality, is not speech on a matter of public concern and, therefore, not protected under the First Amendment. *See Balsamo v. Univ. Sys. of N.H.*, No. 10-CV-500, 2011 WL 4566111, *8 (D.N.H. Sept. 30, 2011) (holding that "sexually explicit remarks and derogatory slurs . . . are simply not matters of public concern"); *Willson v. Yerke*, No. 3:10CV1376, 2011 WL 332487, *4 (M.D. Pa. Jan. 31, 2011) (holding that insulting personal slurs were not matters of public concern).

Even assuming that Plaintiff's use of the word "dago" was speech on a matter of public concern (which it is not), Defendants are still entitled to summary judgment on this claim. The undisputed evidence establishes that from the outset, Defendants discussed the offensive nature of the word "dago" and the potential disruption it could cause. Further, the speech at issue has limited value in the context of the present matter for the reasons discussed above, including the fact that the only message Ms. Loguidice and Mr. Snooks were attempting to convey is that they are Italian Americans selling food out of a truck. Since Plaintiff's name was admittedly

not an attempt to send a political message of any kind or start a discourse on the struggles of Italian immigrants, the speech has little value.

In his deposition, Defendant Rabito testified that, in light of the derogatory nature of Plaintiff's name, he had safety concerns if Plaintiff was permitted to participate in the Program. *See* Dkt. No. 156-19 at 13. Specifically, Defendant Rabito testified as follows:

> Q. When you made your decision, did you have any specific regulation in mind that you thought that the Wandering Dago application violated?
>
> A. I was pretty confident I was making a decision that we were talking about something that was discriminatory. And moreover, what I was concerned about was providing the workplace a safe and comfortable – not comfortable, a safe workplace.
>
> Q. What safety concern did you have?
>
> A. Well, I used my own example. That if, you know – if someone would refer to me as a Dago, I would punch them in the mouth. And I was concerned that people would take offense to it and people would be hurt by it and people would think similar to the way I thought.
>
> Q. And you viewed it as discriminatory because you thought the word was derogatory?
>
> A. I was very comfortable that the word was derogatory, yes.

*Id.* Defendant Rabito's uncontested testimony makes clear that Wandering Dago's application for the Summer Outdoor Lunch Program was denied because of the legitimate belief in the potential for disruption. As such, even if Plaintiff's speech was protected, the First Amendment claim is still subject to dismissal because the adverse action was taken because of the potential for disruption and the speech at issue had very little value. *See Richardson*, 48 F. Supp. 3d at 664.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment cause of action on this alternative ground.

### 4. Government Speech

After the Court issued its decision on Defendants' motions to dismiss, but before the parties filed the pending motions for summary judgment, the Supreme Court decided *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015). Although the parties have not addressed the implications of *Walker* on the present matter, the Court finds that a discussion of that case and the government speech doctrine discussed therein is appropriate for the resolution of the present matter.

The Free Speech Clause of the First Amendment "restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). When the government exercises "the right to 'speak for itself,'" it can freely "select the views that it wants to express." *Id.* at 467-68 (quotations omitted). This freedom includes "choosing not to speak" and "speaking through the . . . removal" of speech of which it disapproves. *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000) (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674, 118 S. Ct. 1633, 1639, 140 L. Ed. 2d 875 (1998)). Government speech is regulated primarily by "the political process," not the Constitution. *See Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). Characterizing speech as government speech should not be done lightly because the characterization "strips it of all First Amendment protection" under the Free Speech Clause. *Walker*, 135 S. Ct. at 2255 (Alito, J., dissenting).

In *Walker*, the Supreme Court determined that specialty license plates issued by the State of Texas were government speech, and that the State's denial of a Confederate Flag plate was therefore not subject to First Amendment scrutiny. *See Walker*, 135 S. Ct. at 2244-45. Applying the government speech test set forth in *Summum*, the *Walker* Court concluded that because (1) the States have historically used license plates to communicate with the public, (2) license plates are often closely identified in the public mind with the State, and (3) Texas effectively controlled the expressive content of the license plates by exercising final approval authority over submitted designs, Texas' specialty plates "are similar enough to the monuments in *Summum* to call for the same result." *Walker*, 135 S. Ct. at 2249. *Walker* acknowledged that its holding applied only in limited circumstances, however, noting the close connection between license plates and State directives. *See id.* at 2251.

The three factors that the Supreme Court applied in *Walker* came from *Summum*, a decision in which the Court concluded that privately donated monuments in public parks were government speech. *See Summum*, 555 U.S. at 470-72. There, the Court explained that "[g]overnments have long used monuments to speak to the public." *Id.* at 470. Moreover, "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* at 471. "[T]here is little chance that observers will fail to appreciate the identity of the speaker" when they view a monument in a public park, *id.*, especially because "[p]ublic parks are often closely identified in the public mind with the government unit that owns the land," *id.* at 472. Finally, the city "'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." *Id.* at 473 (quoting *Johanns*

*v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560-61, 125 S. Ct. 2055, 2062-63, 161 L. Ed. 2d 896 (2005)). "The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech." *Id.* at 472.

As to the first *Walker* factor, the government has a history of sponsoring programs of all varieties. Implicit in that sponsorship is the fact that the government endorses the message or messages conveyed.

As to the second *Walker* factor, there is little chance that the observer will fail to see the identity of the speaker. According to Heather Flynn, as part of the Summer Lunch Program, OGS informed the public about the Program in several different ways. *See* Dkt. No. 152-4 at 27-31. For example, OGS provided "blast email advertising" which involved OGS' "sponsorship department" sending emails to a list of recipients who provided their email addresses so that they could be informed of upcoming events and programs at the Empire State Plaza. *See id.* Moreover, the Summer Outdoor Lunch Program was advertised on the Empire State Plaza's closed-circuit television system, which is located throughout the Concourse. *See id.* at 30. Further, OGS promoted the program on its Facebook page and other social media websites. *See id.* at 31. Through the promotion of the Summer Outdoor Lunch Program, OGS provided the names of the participating vendors to its audience. In sponsoring the Summer Outdoor Lunch Program, the State has engaged in a form of speech (albeit of a somewhat commercial nature). If the Court was to invoke the First Amendment to protect Wandering Dago's ability to participate in this State sponsored program, Wandering Dago would be able to do to the government what the government could not do to Wandering Dago: compel it to embrace speech with which it does not agree.

As to the third *Walker* factor, the undisputed evidence clearly demonstrates that OGS maintains tight control over any messages that are sent during events it sponsors at the Empire State Plaza. OGS has long history of only sponsoring programs that are "family friendly," and suitable to persons of all ages. Although all sorts of political events take place on the Empire State Plaza, OGS does not sponsor those events and does not censor in any way their content. The events OGS does sponsor, however, are more closely scrutinized because, unlike political rallies held on the Plaza, the sponsored events are more clearly linked to the State. As such, as Defendant Rabito testified, such sponsored events are reviewed to ensure that there is a family-friendly environment. As discussed above, during OGS sponsored events, OGS employees have refused to hire performers because of the nature of their acts or attire, removed a performer from the stage when he used the "N-word," and required vendors to remove offensive and racially insensitive merchandise. *See* Dkt. No. 155-3 at ¶¶ 14-18.

Like the monuments at issue in *Summum* and the license plates at issue in *Walker*, the programs sponsored and promoted by OGS have long conveyed messages to the people of the State and reasonable observers would conclude that New York agrees with the messages these programs send. Further, as discussed above, OGS exercises direct control over the messages conveyed at these programs and prohibits those messages that do not fall within its family-friendly policy. These State sponsored programs take place in the Empire State Plaza, surrounded by the buildings that house the seat of New York government.

Who the government decides to do business with will often reflect the values of those in positions of authority. Such values are also reflected by the messages these individuals convey to the public through their positions. When the government exercises "the right to 'speak for

itself,'" it can freely "select the views that it wants to express." *Summum*, 555 U.S. at 467-68 (quotation omitted). This freedom also includes the choice to not speak. "The fact that private parties take part in the design and propagation of a message does not extinguish [its] governmental nature." *Walker*, 135 S. Ct. at 2251. The monuments in *Summum* and the license plates in *Walker* were government speech, even though private entities designed them. *See id.*; *Summum*, 555 U.S. at 470-71. OGS determines which events it wants to sponsor and then controls the messages that those events are permitted to convey. The speech at issue exhibits strong indicia of government endorsement and control. Accordingly, the Court finds that all three factors identified in *Walker* are satisfied. As such, Plaintiff's redress lies with the political process, not the courts. *See Mech v. School Bd. of Palm Beach County, Fla.*, 806 F.3d 1070, 1078-79 (11th Cir. 2015) (holding that banners hung on fences at a school to recognize private sponsors of school programs were government speech); *Sutliffe v. Epping School Dist.*, 584 F.3d 314 (1st Cir. 2009) (holding that the defendants had engaged in government speech when they advocated for approval of budgets and spending on school and Town endeavors through school and Town newsletters, mailings, and other forms of communication including the Town website, and, therefore, were not required to provide the plaintiffs access to these same communication channels to express their opposing views); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005) (holding that the government's decision to not display the plaintiff's artistic submission after the plaintiff had paid the $5,000 for permission to participate in the program was not protected by the First Amendment and that, at best, the government's "failure to abide by any of these commitments might give rise to a contract claim").

Based on the foregoing, Defendants' motion for summary judgment is granted on this alternative ground.

**D.      Equal Protection claim**

Defendants contend that Plaintiff cannot establish its Equal Protection claim as a matter of law. *See* Dkt. No. 155-9 at 21. First, Defendants argue that Plaintiff cannot establish that it was treated differently than any other similarly situated entity because no other applicant to the 2013 or 2014 Summer Outdoor Lunch Program had a name which contained a derogatory ethnic term, or another offensive term in violation of OGS' family-friendly policy. *See id.* at 21-22. Second, Defendants contend that, even if Plaintiff could establish that it was treated differently than other similarly situated entities, Plaintiff cannot prove that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure. In response, Plaintiff contends that Wandering Dago was similarly situated "to the class of vendor applicants for the Summer Lunch Program" and that it "was singled out for differential treatment – application denial – explicitly on account of its name, which is commercial speech protected by the constitution." Dkt. No. 158 at 26 (citing *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000)).

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)). A plaintiff may proceed under the Equal Protection Clause as either a

"class of one," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (citations omitted), or under the theory of "selective enforcement," *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citation omitted).  In the present matter, Plaintiff has alleged a selective enforcement claim against Defendants.

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'"  *Diesel*, 232 F.3d at 103 (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).  Nevertheless, it is well settled that a plaintiff must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment.  *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quotation omitted).  "[T]o succeed on a 'selective enforcement claim,' a plaintiff must show: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (quotation omitted); *see also Cine SK8*, 507 F.3d at 790 (quotation omitted); *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) (holding that "[a] selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated").  In particular, a "plaintiff must present evidence comparing [him]self to individuals that are 'similarly situated in all material respects.'"  *Sebold*, 2007 WL 2782527, at *26 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).[9]

---

[9] "[T]here is disagreement within the Second Circuit regarding the precise standard for

(continued...)

In the present matter, the Court finds that Defendants' are entitled to summary judgment

on Plaintiff's Equal Protection claim. First, as Defendants correctly argue, Plaintiff has failed

---

[9](...continued)

determining whether comparators are similarly situated for [selective enforcement and 'class of one'] claims." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011). In the selective enforcement context, plaintiffs must compare themselves to individuals that are "similarly situated in all material respects." *Sharpe v. City of New York*, No. 11 CIV. 5494, 2013 WL 2356063, *4 (E.D.N.Y. May 29, 2013) (citation omitted). "'The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners.'" *Mosdos*, 815 F. Supp. 2d at 696 (quotation and other citations omitted); *Abel v. Morabito*, No. 04 Civ. 07284, 2009 WL 321007, *5 (S.D.N.Y. Feb. 10, 2009); *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004).

In a "class of one" case, the "level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high," because such comparison is used "to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 104-05 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam)). Thus, the comparator's circumstances must be "*prima facie* identical." *Id.* at 105. "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (quoting *Neilson*, 409 F.3d at 105).

The Court need not decide the appropriate standard to apply because, even under the more permissive selective enforcement standard, Plaintiff's claim fails. *See, e.g., Fortunatus v. Clinton Co.*, No. 8:12-CV-458, 2013 WL 1386641, *14 (N.D.N.Y. Apr. 4, 2013) (noting disagreement within the Second Circuit, observing that "this Court does not understand the subtle distinction between 'extreme high degree' and 'all material respects,'" and ultimately concluding that the plaintiff's proof failed under the lesser standard); *Laidlaw*, 2011 WL 4954881, at *10 n.4 (acknowledging that "there is a dispute in this Circuit's district courts over whether the same standard applies to both selective enforcement and 'class of one' claims" while granting defendant's motion to dismiss "[b]ecause this Court finds that [plaintiff] is not similarly situated even under a more permissive selective enforcement standard, it need not consider whether [plaintiff] would fare better under the potentially more stringent 'class of one' standard"); *Gentile v. Nulty*, 769 F. Supp. 2d 573, 580 (S.D.N.Y. 2011).

to establish that it was treated differently than any other similarly situated entity.  Plaintiff was the only applicant to the 2013 and 2014 Summer Outdoor Lunch Program with a business name containing a racially offensive term.  Further, Wandering Dago was the only applicant with a menu containing items with offensive names.  Wandering Dago contends that the vendor "Slidin' Dirty" was permitted to participate in the program and one "may or may not find it an offensive reference to the problems of urban crime, gun violence, and drug trafficking[.]"  Dkt. No. 158 at 22.  As Plaintiff itself acknowledges, the name Slidin' Dirty requires several inferences and knowledge of the underlying meaning behind the lyrics of Chamillionaire's song "Ridin'."  Even then, an individual "may or may not" find it offensive.  Further, Plaintiff acknowledges that "someone not familiar with the phrase or the song misses the meaning entirely." *Id.*  The obvious differences between the direct use of a racial slur in a company's name, as compared to a company that may or may not be making a veiled reference to a 2005 Chamillionaire song can hardly be considered similarly situated.  Since a prudent person, looking objectively at the relevant facts, would not consider Wandering Dago and Slidin' Dirty similarly situated in all material respects, Defendants are entitled to summary judgment on this claim.

Moreover, even if Wandering Dago and Slidin' Dirty were similarly situated in all material respects, the undisputed facts establish that the differential treatment was not based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or a malicious or bad faith intent to injure.  Rather, as discussed, the undisputed facts demonstrate that Wandering Dago's application was denied because of its

offensive name and menu items that were contrary to the family-friendly atmosphere that OGS strives for at all events and programs it sponsors.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's Equal Protection claim.


E.    **Plaintiff's New York State Constitution claims**

"'The New York State Constitution's guarantees of equal protection and due process are virtually coextensive with those of the United States Constitution.'" *Guan N. v. N.Y.C. Dept. of Educ.*, No. 11-cv-4299, 2013 WL 67604, *20 (S.D.N.Y. Jan. 07, 2013) (citing *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1317 (2d Cir. 1991)) (other citation omitted).  Further, "freedom of speech claims are subject to the same analysis under the federal and New York State Constitutions." *Menes v. City Univ. of N.Y. Hunter College*, 578 F. Supp. 2d 598, 617 n.16 (S.D.N.Y. 2008) (citations omitted).

In light of the coextensive protections afforded under the New York State Constitution, Defendants' motion for summary judgment as to Plaintiff's New York State Free Speech and Equal Protection claims is granted for the reasons set forth above.


# IV. CONCLUSION

After carefully considering the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 1, 2016
       Albany, New York

Mae A. D'Agostino
U.S. District Judge